**Forrester & Worth, PLLC**
3636 North Central Avenue, Suite 700
Phoenix, Arizona 85012
602.258.2729—Main
602.271.4300—Fax
S. Cary Forrester (006342)
Byron H. Forrester (033877)
scf@forresterandworth.com
bhf@forresterandworth.com
Counsel for Debtors

## United States Bankruptcy Court
## District of Arizona

| | |
|---|---|
| In re:<br><br>**GV Hospital Management, LLC,**<br><br>Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case Nos.: 4:17-bk-03351<br>4:17-bk-03353; and<br>4:17-bk-03354 |
| In re:<br><br>**Green Valley Hospital, LLC,**<br><br>Debtor. | |
| In re:<br><br>**GV II Holdings, LLC,**<br><br>Debtor. | **DEBTORS' MOTION FOR ENTRY OF ORDER (A) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND BUYER; (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) AUTHORIZING THE ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING CERTAIN RELATED RELIEF** |
| This Filing Applies to:<br>☒ All Debtors<br>☐ Green Valley Hospital, LLC<br>☐ GV Hospital Management, LLC<br>☐ GVII Holdings, LLC | |
| | Hearing Date: January 30, 2018<br>Hearing Time: 1:00 p.m.<br>Hearing Room: 329<br><br>Video conference available in Phoenix Courtroom 301 |

Pursuant to 11 U.S.C. §§ 105(a), 363 and 365, Bankruptcy Rules 2002, 6004, 6006, and 9007, and Local Bankruptcy Rules 2002-1, 6004-1 and 6006-1, Debtors hereby move

the Court for the entry of an order authorizing and approving: (1) the Asset Purchase Agreement dated December 27, 2017 (the "**APA**") between Debtors and Lateral GV, LLC, a Delaware limited liability company ("**Buyer**"), a copy of which is attached hereto as Exhibit "A"; (2) the sale of substantially all of their assets free and clear of all liens, claims, Encumbrances,[1] and Interests (as that term is defined in proposed form of order attached hereto as Exhibit "B") for a credit bid of $28.5 million and the other consideration set forth in the APA; (3) the assumption and assignment to Buyer of the executory contracts and unexpired leases described in Schedules 2.1(i) and 2.1(j) of the APA; and (4) granting the related relief described below and in Exhibit "B". Pursuant to the *Amended Order Establishing Procedures for the Sale of Substantially All of Debtors' Assets* (the "**Amended Sale Procedures Order**") [DE 599], the APA is subject to higher and better offers, which must be received by January 22, 2018. If any such offers are received, the successful bidder will be determined at an auction to be conducted on January 25, 2018. This motion is more fully set forth and supported in the accompanying Memorandum of Points and Authorities.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

A.     <u>**Jurisdiction.**</u>

1.     On April 3, 2017, Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Debtors continue to operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[1] "Encumbrances" is defined in the APA to include any charge, lien, interest, security interest, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, transfer restriction or other similar restriction of any kind. Buyer will take subject to all "Permitted Encumbrances", defined in the APA to mean Encumbrances for utilities and Taxes not yet due and payable or being contested in good faith.

4.     The statutory predicates for the relief sought herein are sections 105(a), 363, 365, and 503 of the Bankruptcy Code.

5.     No trustee or examiner has been appointed in these cases.

6.     An official committee of unsecured creditors (the "**Committee**") was appointed on May 17, 2017 [DE 147].

B.     **Debtors and Their Assets.**

7.     The general background of these cases is set forth in the *Disclosure Statement in Support of Debtors' and GVMI's First Amended Joint Plan of Liquidation dated July 31, 2017* [DE 287] (the "**Disclosure Statement**"), which is incorporated herein by reference.

8.     Debtor GV Hospital Management, LLC ("**Management**") owns and operates the Green Valley Hospital ("**Hospital**"), a licensed and general acute care hospital, which opened in May of 2015.

9.     The Hospital is a 49-bed general acute care hospital with a 12-bed emergency department. It currently has approximately 300 employees and has credentialed over 232 physicians on its medical staff. The Hospital includes a surgical suite with four operating rooms, two procedure rooms and a 13 bed PACU, a cardiac catheterization laboratory, a full service laboratory and blood bank, diagnostic radiology services, and emergency care.

10.     Debtor Green Valley Hospital, LLC ("**GVH**") is primarily a holding company. It is the sole owner of the following subsidiaries: (a) Management; (b) Debtor GV II Holdings, LLC ("**GVII**"); (c) Non-debtor GVH MOB I, LLC ("**MOB1**"); (d)  Non-debtor GVH MOB II, LLC ("**MOB2**"); (e) Non-debtor GVH MOB III, LLC ("**MOB3**" and, collectively with MOB1 and MOB2, the "**MOBs**"); (f) Non-debtor GV Campus Management, LLC ("**Campus Management**"); and, (g) Non-debtor Green Valley Hospital Campus Owners Association, LLC ("**GVHCOA**").

11.     Management owns the real property upon which the Hospital is located, all of its accounts receivable, and is the lessee of a small portion of its equipment.  Most of the equipment is owned by GVH. Management also holds the Hospital's license.

12.     Management's land and building were appraised as of March 3, 2017, with an estimated "as is" value of approximately $59.2 million and a liquidation value of $47.4 million, as reflected in the appraisal report prepared by CBRE, Inc., which may be accessed at the following link (the "**Link**"):

https://forresterandworth.sharefile.com/d-s7cd63840d8c4fb48

13.     As of January 1, 2018, the accounts receivable totaled $15,537,872 with an estimated collectable balance of $4,308,652 (determined using the 6 month average discount rate of 72.27%, yielding a collectable amount equal to 27.73% of gross accounts receivable.

14.     As of June 28, 2017, the equipment owned by GVH had a liquidation value of not more than $2.169 million and a fair market value of $6.502 million, as reflected in the appraisal prepared by Partners Healthcare Group, which may also be accessed at the Link.

15.     The MOBs each own medical office buildings located adjacent to the Hospital. The buildings were appraised as of March 3, 2017 with a combined "as is" value of $5.9 million, as reflected in the CBRE appraisal referred to above. YAM and Western State Bank hold first position liens on the medical office buildings in the approximate amounts of $3.3 million and $1.5 million, respectively.

16.     GVHCOA owns the common areas located in and around the Hospital, which include parking lots and storm drainage areas.  Debtors have not had the common areas appraised but do not believe that they have any appreciable value.

17.     GVII owns approximately 4.26 acres of undeveloped land adjacent and to the east of the Hospital. It was appraised as of July 3, 2017 with an estimated "as is" value

of not more than $880,000, as reflected in the appraisal report prepared by CBRE, which may also be accessed at the Link.

**C.**     **Debtors' Secured Debt.**

18.     Debtors have combined secured debt totaling approximately $107.1 million, comprised of the following major components:

a.     **Buyer.**   Buyer is owed approximately $28.5 million on its senior secured DIP loan to Debtors. It holds a first-priority lien on substantially all of Debtors' assets including, without limitation: (i) the Hospital land and building; (ii) GVH's equity ownership interests in Management, GVII, and the MOBs; (iii) Management's accounts receivable; and (iv) Management's commercial tort claims. Buyer also holds second priority liens on Management and GVH's equipment and GVII's land.

b.     **GVMI**. Green Valley Medical Investments, LLLP ("**GVMI**") was owed approximately $64.8 million in principal and accrued interest, fees, and costs as of the petition date. It subordinated its debt to Buyer's as a condition of the DIP loan and, in return, received an adequate protection lien on all of the Debtors' assets.  It presently holds, among other things:  (i) a second-priority lien on the Hospital's land and building; (ii) a second-priority lien on GVH's equity ownership interests in Management and the MOBs; (iii) a second-priority lien on the land and buildings owned by the MOBs; (iv) a second-priority lien on accounts receivable; and (v) a third-priority lien on GVH's equipment.

c.     **SQN**. SQN Asset Finance (Guernsey) Limited ("**SQN**") is owed approximately $13.8 million secured by first-priority liens on most of GVH's equipment and all of GVII's land.

D.     **The Sale Process**.

19.     On October 16, 2017, the Court entered its *Order Approving the Employment of Kaufman Hall & Associates, LLC as Debtors' Sales Agent on a Fixed Fee Basis* (the "**KHA Employment Order**") [DE 491] and its *Order Establishing Procedures for the Sale of Substantially All of Debtors' Assets* (the "**Sale Procedures Order**") [DE 493].

20.     On December 19, 2017, the Court entered the Amended Sale Procedures Order, pursuant to which it modified the requirements for Potential Bidders[2] to obtain access to the data room maintained by KHA, extended the deadline for the submission of Qualified Bids, and pushed back the dates for the Auction and the Sale Hearing.

21.     As is set forth in the Declaration of Anu Singh, attached hereto as Exhibit "C", Kaufman Hall & Associates ("**KHA**") has extensively marketed the assets, including the following:

    a.     In mid to late October, KHA collected information from Debtors for inclusion in its data room. It also used the information to prepare a confidential information presentation ("**CIP**");

    b.     KHA then reached out, by email and telephone, to ninety-seven potential purchasers, including non-profit and for-profit health systems, physician groups, REITs, private equity firms, and financial sponsors;

    c.     Those who expressed an interest were asked to sign a written confidentiality agreement. Eleven did so, including several of the major players in the Arizona healthcare industry;

    d.     After signing the confidentiality agreements, these parties were provided with copies of the CIP. After reviewing it, three parties dropped out of the sale process;

---

[2] All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the Amended Sale Procedures Order.

e.  In late October, KHA opened the data room using the services of RR Donnelley. Those who signed the confidentiality agreement and expressed an interest were granted access to the data room. Ten parties, including Buyer and GVMI, currently have access to the data room.

f.  KHA then assembled a second presentation outlining the potential areas of improvement to the hospital's operations, focusing on initiatives to incrementally improve EBITDA. The supplemental presentation was circulated to all Potential Bidders who were still active in early December; and

g.  KHA remains in contact with those who are still involved in the sale process but cannot yet predict whether any will submit bids.

E.  **The Stalking Horse Bid.**

22.  Under the terms of the Amended Sale Procedures Order, Debtors had the right to select Lateral as the stalking horse bidder for a full credit bid if no one else made an acceptable offer by November 22, 2017. No one did, and Lateral and Debtors then negotiated the terms of the APA, which was finalized on December 29, 2017.

23.  **Acquired Assets**. Under the terms of the APA,[3] Lateral will purchase substantially all of Debtor's assets, free and clear of all liens, claims, Encumbrances (as defined in the APA), and Interests under § 363 of the Bankruptcy Code, including, without limitation, all of Debtors':

a.  Equipment (except those items expressly excluded);[4]

b.  Owned real property;

---

[3]  What follows is only a summary of the terms and conditions of the APA. To the extent that there is any conflict between the summary and the actual terms and conditions of the APA, the APA controls.

[4]  The APA currently excludes all equipment in which SQN holds a senior lien. However, this is likely to change if and when Buyer and SQN agree on a release price for such equipment, which is worth significantly less than SQN's secured indebtedness.

c.     Equity interests in subsidiaries;

d.     Accounts receivable;

e.     Cash and cash equivalents;

f.     Inventory;

g.     Records;

h.     Claims and causes of action, except for business tort claims against Debtors' advisors, consultants, lenders, present and former managers, officers, and directors on account of prepetition conduct;

i.     Insurance policies and binders (except those listed in Schedule 2.2(g));

j.     Avoidance actions that might interfere with Buyer's rights with respect to the acquired assets, including, but not limited to, those that might be brought or asserted against: (i) counterparties to assumed contracts and assumed leases; (ii) third parties from whom Lateral will be collecting accounts receivable; and (iii) transferred employees;

k.     Debtors' rights under the assumed contracts and leases listed in Schedules 2.1(i) and (j); and,

l.     Any other assets listed in Debtors' schedules and statements of financial affairs, or which would have been so listed had Debtors owned them on the Petition Date, and which are not expressly excluded by the APA.

24.     **Purchase Price**. The amount to be paid for the acquired assets includes the following:

m.     Credit bid in the amount of $28.5 million (subject to Lateral's right to increase its bid at the Auction);

n.     A cash payment of $100,000 for the acquired avoidance actions;

o.     Assumption of the following liabilities:

i.     All liabilities arising from the ownership of the acquired assets on and after the closing date, and any pre-closing liabilities that are

8

covered by insurance policies and binders assigned to Buyer, but only to the extent of insurance coverage;

 ii. All liabilities arising under any assumed contract or lease on or after the closing;

 iii. The cure amounts owing under any assumed contracts or leases and the payoff amounts owing to any senior lienholder on acquired equipment;

 iv. All accrued postpetition payroll obligations owing as of the closing, up to a maximum of $775,000 (subject to adjustment as set forth in Section 2.3 of the APA);

 v. All accrued liabilities owing to transferred employees for vacation time, personal time off, and sick pay, up to a maximum of $560,000;

 vi. All accrued postpetition trade payables up to a maximum of $1,180,000 (subject to adjustment as set forth in Section 2.3 of the APA);

 vii. All accrued and unpaid postpetition professional fees up to a maximum of $165,000;

 viii. All real and personal property taxes secured by tax liens on any of the acquired assets; and,

 ix. All accrued and unpaid AHCCCS assessments up to a maximum of $203,000 in the aggregate.

25. **Assumed Contracts and Leases**. The executory contracts listed on Schedule 2.1(i) (the "**Assumed Executory Contracts**") and the unexpired leases listed on Schedule 2.1(j) (the "**Assumed Unexpired Leases**") will be assumed by Debtors and assigned to Buyer. All non-executory contracts related to or used in connection with Debtors' business, all inbound license agreements, and all intellectual property licenses will also be assigned to Buyer. Buyer has the option to add additional executory contracts or

9

Case 4:17-bk-03351-SHG Doc 616 Filed 01/08/18 Entered 01/08/18 16:55:54 Desc
Main Document Page 9 of 148

unexpired leases to Schedules 2.1(i) and (j), or to delete them, up to one business day before the Bid Deadline. After that time it must obtain Debtors' consent for any deletions, which may not be unreasonably withheld. In addition, any non-Debtor party to an Assumed Executory Contract or Assumed Unexpired Lease who does not file an objection to this Motion will be deemed to have given any required consent to the assumption and assignment of such contract or lease.

26. **Cure Amounts**. Debtors' calculation of the cure amounts that Buyer will be required to pay in connection with the assignment of any Assumed Executory Contracts and Assumed Unexpired Leases (as those terms are defined in the APA) are set forth in Schedule 2.5(a) to the APA. Any party to an Assumed Executory Contract or Assumed Unexpired Lease who disagrees with the listed cure amount must timely file an objection to this Motion and, among other things, state what it believes to be the correct cure amount. Any dispute in regard to the cure amount that cannot be resolved consensually will be resolved by the Court. If the Court determines that the cure amount is higher than that set forth in Schedule 2.5(a), Buyer may, within seven business days thereafter, elect to reject such executory contract or unexpired lease pursuant to Section 2.1 of the APA.

27. **Equipment Payoff Amounts**. The amounts of any liens that are senior to Buyer's on purchased equipment are also set forth in Schedule 2.5(a) to the APA. Any senior lienholder who disagrees with the listed Equipment Senior Lien Amount (as defined in the APA) must timely file an objection to this Motion and, among other things, state what it believes to be the correct Equipment Senior Lien Amount. Any dispute that cannot be resolved consensually will be resolved by the Court.

F. **Legal Argument.**

1. **The Sale Should be Approved**.

The Bankruptcy Code provides that a debtor, "after notice and a hearing, may use sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Debtors' decision to sell substantially all of their assets is governed by

the business judgment test. *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986). Under the business judgment test, the court should approve Debtors' decision if it will benefit their estates. *Robertson v. Pierce (In re Chi-Feng Huang)*, 23 B.R. 798, 801 (9th Cir. BAP 1982). Debtors' business judgment should be accepted unless evidence is presented that it is "clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Allied Technology, Inc. v. R.B. Brunemann & Sons (In re Allied Technology, Inc.)*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982).

Here, Debtors agreed to market and sell their assets as part of a Forbearance Agreement with Buyer, their DIP lender. They entered into the Forbearance Agreement at a time when Buyer had noticed a default under the DIP Credit Agreement and, more importantly, when Debtors had determined that they did not have sufficient cash to sustain their operations beyond September of 2017. By entering into the Forbearance Agreement and agreeing to pursue the sale of substantially all their assets, Debtors obtained Buyer's agreement not only to forbear from exercising its default remedies, but also to advance an additional $3.5 million and release a contingency reserve of approximately $1.3 million. This additional funding allowed, and will allow, Debtors' to sustain their operations through March 31, 2018, which is the closing deadline under both the APA and the Sale Procedures Order. Debtors will not have sufficient funds to maintain their operations much beyond that date.[5]

While the sale of Debtors' assets will produce little or no return to the estate or its unsecured creditors, that is a simple reflection of the fact that the estates are deeply

---

[5] Significantly, Debtors' decisions to enter into the Forbearance Agreement and to pursue the sale of their assets in the manner set forth in the Sale Procedures Order have both been previously approved by the Court. See *Stipulated Order on Debtors' Emergency Motion* [DE 391] and the Sale Procedures Order [DE 493].

insolvent and the unsecured creditors have been out of the money from the outset. This would not change even if Debtors were able to obtain twice the purchase price offered by Buyer. Approving the sale will, however, allow the hospital to survive and most of its 300 employees to preserve their jobs. The only alternatives would be a shutdown of the Hospital or a foreclosure by Buyer, neither of which would result in a more favorable outcome. Accordingly, the sale should be approved.

2. **The Sale Should be Approved Free and Clear of all Liens, Claims, Encumbrances, and Interests**.

Pursuant to Bankruptcy Code § 363(f), a debtor may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

In this case, at least one of the conditions set forth in § 363(f) will be satisfied: First, Debtors anticipate that all affected interest holders will consent to the sale or, absent an objection to the Motion, will be deemed to have consented. Even if that is not the case, controlling Ninth Circuit precedent makes clear that applicable nonbankruptcy law would permit a sale of Debtors' assets free and clear of all applicable interests. In *Matter of Spanish Peaks Holdings II, LLC*, 872 F.3d 892 (2017), the Court held that § 363(f)(1) is satisfied where a foreclosure sale would terminate all junior interests, including the unexpired real estate leases at issue in that case. In so holding, it noted that the underlying bankruptcy case had proceeded like a foreclosure and that, in the absence of a § 363 sale,

an actual foreclosure would surely have followed. *Spanish Peaks* at 900. The same is true here, as evidenced by the fact that the senior secured creditor, whose loan is in default, is the stalking horse bidder.

3.     **The Successful Bidder Should be Afforded the Protections of Bankruptcy Code § 363(m) as a Good Faith Purchaser**.

Bankruptcy Code § 363(m) protects a good-faith purchaser's interest in property purchased from a bankruptcy estate even if the order approving the sale is later reversed or modified on appeal. Debtors submit, and will present evidence at the Sale Hearing, if necessary, that the selection of the Successful Bidder is the product of arm's-length, good-faith negotiations in an anticipated competitive sale process, and that no fraud, collusion, or improper relationship exists between the parties. Accordingly, Debtors request that the Court make a finding at the Sale Hearing and in the Order approving the sale that the Successful Bidder is a good faith purchaser entitled to the full protections of Bankruptcy Code § 363(m).

4.     **The Assumption and Assignment of the Executory Contracts and Unexpired Leases Should be Approved**.

As part of the sale of their assets, Debtors seek authority to assume and assign certain executory contracts and unexpired leases, as detailed in Schedules 2.1(i) and (j) of the APA. Bankruptcy Code §§ 365(a) and (b) authorize debtors in possession to assume and assign executory contracts or unexpired leases subject to the conditions set forth in § 365(b)(1), which provides, in pertinent part, as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
>     (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
>     (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss

to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

Debtors' decision to assume and assign the executory contracts and unexpired leases must satisfy the business judgment test. *See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996). Under this standard, a court should approve a debtor in possession's decision unless it is the product of bad faith or a gross abuse of discretion. *See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985). In addition, if an executory contract is to be assumed and assigned, Debtors must cure all past defaults and offer adequate assurance of future performance. *In re Pacific Express, Inc.*, 780 F.2d 1482, 1486 n.3 (9th Cir. 1986).

In the present case, the Debtors' assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder meets the business judgment standard and satisfies the requirements of Bankruptcy Code § 365. The assumption and assignment of the executory contracts and unexpired leases is necessary for any Successful Bidder to operate the Hospital and, since no purchaser would buy the Hospital without them, their assumption and assignment is essential to obtaining the highest and best offer for Debtors' assets. In addition, the Successful Bidder will be required to cure all defaults under the executory contracts and unexpired leases as a condition to their assumption and assignment.

As to adequate assurance of future performance, the meaning of that term should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *CarlisleHomes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Adequate assurance

may be provided by demonstrating, among other things, the assignee's financial health and commitment to continue to operate the business. *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986).

Pursuant to the Bid Procedures, in order to submit a Qualified Bid, all Potential Bidders must provide evidence of their ability to cure any defaults and provide adequate assurance of future performance under the executory contracts and unexpired leases to be assumed and assigned. Moreover, the assumption and assignment procedures set forth in the Amended Sale Procedures Order permit the non-debtor counterparties to such executory contracts and unexpired leases to obtain such evidence and affords them the opportunity to evaluate it prior to the Sale Hearing. Any remaining issues in that regard will be addressed at the Sale Hearing and, if necessary, Debtors will present evidence establishing adequate assurance of future performance.

**WHEREFORE**, Debtors request that the Court enter its order authorizing and approving: (1) the APA; (2) the sale of substantially all of their assets free and clear of all liens, claims, Encumbrances, and Interests, to Buyer for the consideration described above and in the APA; (3) the assumption and assignment to Buyer of the executory contracts and unexpired leases described in Schedules 2.1(i) and 2.1(j) of the APA; and (4) the related relief described in Exhibit "B". Debtors also request that the Court grant such other and further relief as is appropriate under the circumstances.

Dated January 8, 2018.

FORRESTER & WORTH, PLLC

/s/ SCF (006342)
S. Cary Forrester
Byron H. Forrester
Counsel for Debtors

Copy of the foregoing emailed or mailed
on January 8, 2018, to all those on the
Official Service List (DE 579):

/s/ Matthew Burns
Matthew Burns

EXHIBIT "A"

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 27, 2017**

**BY AND AMONG**

**LATERAL GV, LLC,**

**GV HOSPITAL MANAGEMENT, LLC,**

**GREEN VALLEY HOSPITAL, LLC,**

**AND**

**GV II HOLDINGS, LLC**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................ 6
 Section 1.1  Definitions............................................................. 6
 Section 1.2  Table of Definitions ......................................... 14

ARTICLE II PURCHASE AND SALE ......................................................... 15
 Section 2.1  Purchase and Sale of the Acquired Assets ....................... 15
 Section 2.2  Excluded Assets ................................................ 18
 Section 2.3  Assumed Liabilities ........................................... 19
 Section 2.4  Excluded Liabilities ........................................... 20
 Section 2.5  Assignments; Cure Costs ..................................... 21
 Section 2.6  Further Actions and Assurances ........................... 22
 Section 2.7  Revisions to Assumed Contracts ......................... 23
 Section 2.8  Additional Assumed Contracts ........................... 24

ARTICLE III PURCHASE PRICE .............................................................. 24
 Section 3.1  Purchase Price .................................................. 24
 Section 3.2  Closing Date Payments ....................................... 25
 Section 3.3  Discharge of Assumed Liabilities after Closing ............. 25
 Section 3.4  Tax Allocation ................................................... 25
 Section 3.5  Withholding ...................................................... 26

ARTICLE IV CLOSING .............................................................................. 26
 Section 4.1  Closing Date...................................................... 26
 Section 4.2  Buyer's Deliveries ............................................. 26
 Section 4.3  Sellers' Deliveries ............................................. 27

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS ............. 28
 Section 5.1  Organization and Good Standing........................... 28
 Section 5.2  Authority; Validity; Consents .............................. 28
 Section 5.3  No Conflict........................................................ 29
 Section 5.4  Title to Acquired Assets...................................... 29
 Section 5.5  Legal Proceedings.............................................. 29
 Section 5.6  Compliance with Laws; Permits; Healthcare Matters ............. 30
 Section 5.7  Intellectual Property .......................................... 33
 Section 5.8  Data Privacy and Security................................... 33
 Section 5.9  Environmental and Health and Safety Matters ............. 34
 Section 5.10  Assumed Contracts and Assumed Leases.................. 34
 Section 5.11  Financial Statements ......................................... 35
 Section 5.12  Employee Benefits ............................................ 35
 Section 5.13  Labor and Employment...................................... 36
 Section 5.14  Real Property ................................................... 36
 Section 5.15  Sufficiency of Assets ......................................... 37
 Section 5.16  Brokers or Finders............................................ 37

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER...............37
    Section 6.1      Organization and Good Standing..................37
    Section 6.2      Authority; Validity; Consents.......................37
    Section 6.3      No Conflict.....................................................38
    Section 6.4      Brokers or Finders.......................................38

ARTICLE VII ACTIONS PRIOR TO THE CLOSING DATE...............38
    Section 7.1      Investigation of the Business by Buyer .......38
    Section 7.2      Operations Prior to the Closing Date ..........38
    Section 7.3      Reasonable Best Efforts...............................40
    Section 7.4      Bankruptcy Court Filings and Approval.........41
    Section 7.5      Employee Matters .......................................43

ARTICLE VIII ADDITIONAL AGREEMENTS ......................44
    Section 8.1      Taxes ...........................................................44
    Section 8.2      Government Patient Receivables; Buyer Funds Received
                         Post-Closing.................................................45
    Section 8.3      Payments Received.......................................46
    Section 8.4      Sellers' Cost Reports....................................46
    Section 8.5      Adequate Assurance of Future Performance ....46
    Section 8.6      Confidentiality ............................................46
    Section 8.7      Post-Closing Access....................................47

ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER
           TO CLOSE.....................................................48
    Section 9.1      Accuracy of Representations ........................48
    Section 9.2      Sellers' Performance ....................................48
    Section 9.3      No Closing Legal Impediment......................48
    Section 9.4      Sellers' Deliveries .......................................48
    Section 9.5      Sale Order....................................................49
    Section 9.6      Credit Bid.....................................................49
    Section 9.7      Government Consents...................................49
    Section 9.8      Government and Private Insurance Programs....49
    Section 9.9      Phase I Report and Survey...........................49
    Section 9.10    No Material Adverse Effect ..........................49

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF
           SELLERS TO CLOSE....................................50
    Section 10.1    Accuracy of Representations ........................50
    Section 10.2    Buyer's Performance ...................................50
    Section 10.3    No Closing Legal Impediment......................50
    Section 10.4    Buyer's Deliveries .......................................50
    Section 10.5    Sale Order ....................................................50

ARTICLE XI TERMINATION...............................................50
    Section 11.1    Termination Events......................................50
    Section 11.2    Effect of Termination...................................52

ARTICLE XII GENERAL PROVISIONS ................................................................ 52
    Section 12.1      Public Announcements ......................................................... 52
    Section 12.2      Notices ................................................................................. 52
    Section 12.3      Waiver ................................................................................. 54
    Section 12.4      Entire Agreement; Amendment ........................................... 54
    Section 12.5      Assignment .......................................................................... 54
    Section 12.6      Severability ......................................................................... 54
    Section 12.7      Expenses .............................................................................. 54
    Section 12.8      Governing Law; Consent to Jurisdiction and Venue; Jury
                           Trial Waiver ........................................................................ 55
    Section 12.9      Counterparts ........................................................................ 55
    Section 12.10     Parties in Interest; Third Party Beneficiaries .................... 55
    Section 12.11     Interpretation ....................................................................... 56
    Section 12.12     Specific Performance .......................................................... 57
    Section 12.13     Survival ............................................................................... 57
    Section 12.14     Mutual Release .................................................................... 57

**<u>EXHIBITS</u>**

Exhibit 1          Form of Assignment and Assumption Agreement
Exhibit 2          Form of Bill of Sale
Exhibit 3          Form of Sale Order

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of December 27, 2017 (the "**Execution Date**"), by and among Lateral GV, LLC, a Delaware limited liability company ("**Buyer**"), **GV Hospital Management, LLC**, an Arizona limited liability company ("**Management**"), **Green Valley Hospital, LLC**, an Arizona limited liability company ("**GVH**"), and **GV II Holdings, LLC**, an Arizona limited liability company ("**GVII**" and, together with Management and GVH, "**Sellers**," and each individually, a "**Seller**"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

**WHEREAS**, Sellers are engaged in the business of owning and operating Green Valley Hospital, a licensed and general acute care hospital in Green Valley, Arizona and owning certain related real property (such business, as conducted as of the date hereof, the "**Business**");

**WHEREAS**, on April 3, 2017, Sellers filed voluntary petitions for relief commencing cases under chapter 11 of the Bankruptcy Code, which are being jointly administered under Case No. 4:17-bk-03351-SHG (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**");

**WHEREAS**, pursuant to the DIP Credit Agreement and the Modification & Extension Agreement (each defined below), Buyer has provided a senior secured, super-priority term loan facility to fund the working capital requirements, fees, costs and expenses of Sellers during the pendency of the Bankruptcy Cases, and the Parties expect the aggregate amount outstanding thereunder at the Closing to exceed the Credit Bid Consideration (defined below);

**WHEREAS**, Sellers believe, following consultation with their financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of substantially all of the Sellers' assets and businesses as provided herein is necessary to preserve the operations of the Green Valley Hospital and the jobs of its employees, and is in the best interest of Sellers, their creditors, and equity holders;

**WHEREAS**, Sellers desire to sell to Buyer all of the Acquired Assets and transfer to Buyer the Assumed Liabilities and Buyer desires to purchase from Sellers the Acquired Assets and assume only the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order (as defined below) under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code; and

**WHEREAS**, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**Accounts Receivable**" means all of Sellers' trade accounts receivable and other rights to payment from patients, insurers, licensees, or other Third Parties to the extent arising out of the operation of the Business, other than Government Patient Receivables.

"**Acquired Subsidiaries**" means each Subsidiary of Sellers set forth on Schedule 1.1(a).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Alternative Transaction**" means any direct or indirect financing, refinancing, acquisition, sale, divestiture (including by merger, acquisition or other business combination), public offering, recapitalization, business combination or reorganization, whether in one transaction or a series of related transactions, of or involving or implicating all or any material part of the Acquired Assets or the Assumed Liabilities (other than any such transaction or series of related transactions with Buyer or any Affiliate thereof) or any standalone plan of reorganization or liquidation for any Seller that does not contemplate the consummation of the transactions contemplated hereby.

"**Assumption Agreement**" means the Assignment and Assumption Agreement substantially in the form of Exhibit 1.

"**Auction**" shall have the meaning set forth in the Sale Procedures.

"**Avoidance Actions**" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer, or similar laws.

"**Bankruptcy Code**" means Title 11 of the United States Code, Sections 101 *et seq.*

"**Benefit Plan**" means any "employee benefit plan" (including "plans" as defined in ERISA § 3(3)); any profit sharing, deferred compensation, bonus, stock option, stock purchase, stock award, vacation pay, holiday pay, pension, savings, retirement, severance, termination pay, medical, dental, vision, life or disability insurance, or fringe benefit plan, program, policy, agreement or arrangement of any kind regardless of whether any such plan, program, policy,

6

agreement or arrangement is written or oral, in each case, that is entered into, maintained, contributed to or required to be contributed to, as the case may be, by any Seller or any Acquired Subsidiary or under which any Seller or any Acquired Subsidiary has or may have any liability.

"**Bill of Sale**" means the Bill of Sale substantially in the form of Exhibit 2.

"**Business Day**" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required by Law to close.

"**Business Employee**" means any employee of any Seller whose primary responsibility is to provide services related to the Business.

"**Buyer Cure Costs**" means (i) with respect to any Assumed Lease or Assumed Contract, the lesser of (a) the aggregate amount of Cure Costs determined in accordance with Section 2.5(a) and (b) the aggregate amount of Cure Costs determined pursuant to a written agreement between Buyer or the applicable Sellers, on the one hand, and the counterparty to the applicable Assumed Contract or the applicable Assumed Lease, on the other hand, and (ii) with respect to any Assumed Equipment, the Equipment Payoff Amount.

"**Cash and Cash Equivalents**" means all cash and cash equivalents of Sellers as of the Closing Date, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of Sellers, and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit, but excluding any consideration paid by Buyer pursuant to this Agreement.

"**Cash Collateral Order**" means that certain Final Order (1) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364; (2) Granting Liens and Superpriority Claims Pursuant to 11 U.S.C. § 364; (3) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (4) Granting Related Relief entered on May 1, 2017 in the Bankruptcy Cases [Dkt. No. 115], including the 26-week budget attached thereto as Exhibit "B", as the same has been and may be modified from time to time.

"**Claims**" means all claims, causes of action, choses in action, rights of recovery, and rights of set-off of whatever kind or description against any Person arising out of or relating to the Business, any Acquired Asset or any Assumed Liability, including: (i) all rights under any Assumed Contract, including all rights to receive payment for products sold and services rendered thereunder, to receive goods and services thereunder, to assert claims and to take other rightful actions in respect of breaches, defaults and other violations thereof; (ii) all rights under or in respect of any Seller Intellectual Property, including all rights to sue and recover damages for past, present and future infringement, dilution, misappropriation, violation, unlawful imitation or breach thereof, and all rights of priority and protection of interests therein under the laws of any jurisdiction; and (iii) all rights under all guarantees, warranties, indemnities and insurance policies, and any rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, in each case arising from or related to the Business, any Acquired Asset or any Assumed Liability. Notwithstanding anything herein to the contrary, "Claims" shall not include Avoidance Actions.

"**Code**" means the Internal Revenue Code of 1986, as amended. Any reference to a section of the Code shall include any successor provision of substantially the same effect.

"**Competing Bid**" shall mean any bid contemplating an Alternative Transaction.

"**Contract**" means any contract, agreement, insurance policy, capitalized lease, license, sublicense, sales order, purchase order, instrument, or other commitment, whether written or oral, to which any Seller is a party or that is binding on any Seller or any part of its property under applicable Law.

"**Copyrights**" means (a) all copyright registrations and applications for registration; (b) all works of authorship whether or not copyrightable; and (c) any other copyrights and works, together with all related rights, and any applications and registrations therefor.

"**Credit Bid Consideration**" means $28,500,000 (subject to increase by Buyer at the Auction in accordance with the terms of the Amended Sale Procedures Order [DE 599].

"**Cure Costs**" means, with respect to each Assumed Contract and Assumed Lease, the amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption, assignment, and/or sale of such Assumed Contract or Assumed Lease.

"**DIP Credit Agreement**" means that certain Senior Secured Super Priority Debtor In Possession Credit Agreement, dated as of April 10, 2017, by and among GVH, Management the Lenders (as defined therein) party thereto (including, without limitation, Buyer) and Lateral SMA Agent, LLC, as Administrative Agent (as defined therein).

"**Documents**" means all books, records, ledgers and files or other similar information of Sellers (in any form or medium, including, without limitation, all information in electronic form and whether stored on discs, tapes, drives, servers or other, and including e-mail communications) related to, used or held for use in connection with the Business, including all patient records, vendor lists, correspondence, mailing lists, revenue records, invoices, advertising materials, brochures, records of operation, standard forms of documents, manuals of operations or business procedures, photographs, blueprints, research files and materials, data books, Intellectual Property disclosures and information, media materials and plates, and accounting records, but specifically excluding (i) any books, records, files, data or other information solely related to (A) Excluded Assets or (B) Excluded Liabilities and (ii) the organization documents, minute and stock record books and corporate seal of Sellers.

"**Domain Names**" means any domain names and uniform resource locators.

"**Employees**" means all individuals, as of the date hereof, who are employed by any Seller.

"**Encumbrance**" means any charge, lien, interest, security interest, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, transfer restriction or other similar restriction of any kind.

8

"**Environmental Laws**" means: any Laws of any Governmental Authority relating to (A) Releases or threatened Releases of Hazardous Substances or materials containing Hazardous Substances; (B) the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Substances or materials containing Hazardous Substances; or (C) pollution or protection of the environment, health, safety or natural resources.

"**Environmental Permits**" means all Permits required under any Environmental Law.

"**Equipment**" means all personal property owned or leased by a Seller that is related to, used or held for use in connection with the Business, including all machinery, equipment, replacement and component parts, spare parts, tools, rolling stock, furniture, fixtures, office and other supplies, data processing equipment and peripheral equipment, computer hardware, vehicles, training materials, and videos and other similar personal property.

"**Equipment Payoff Amount**" means, with respect to any Assumed Equipment, the lesser of (i) the Equipment Senior Lien Amount determined in accordance with Section 2.5(a) and (ii) the Equipment Senior Lien Amount determined pursuant to a written agreement between Buyer or the applicable Sellers, on the one hand, and the applicable lien holder, on the other hand. Notwithstanding anything contained herein to the contrary, to the extent an amount qualifies for inclusion both among "Cure Costs" and "Equipment Payoff Amount," such amount shall be a Cure Cost and excluded from the calculation of Equipment Payoff Amount.

"**Equipment Senior Lien Amount**" means, with respect to any Assumed Equipment, the amount that must be paid by Buyer at Closing to fully satisfy and extinguish any enforceable and perfected liens on such Assumed Equipment that are senior to Buyer's rights and interests, if any, in such Assumed Equipment.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estate Claims**" means any business tort claims and similar causes of action of Debtors against advisors, consultants, and lenders on account of prepetition conduct, and any claims, and causes of action against Debtors' present and former members, managers, officers and directors, whether individuals or entities, on account of prepetition conduct. For the avoidance of doubt "Estate Claims" shall not include any Claims released hereunder pursuant to Section 12.14.

"**Final Order**" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Rule 9023 of the Federal Rules of Bankruptcy Procedure) or a petition for writ of certiorari has expired and no such appeal, motion, or petition is pending.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect on the date hereof.

"**Governmental Authority**" means any United States federal, provincial, state, municipal or local (or any foreign) government, governmental agency or authority, regulatory or administrative authority, court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"**Government Patient Receivables**" means all of Sellers' accounts receivable and other rights to payment from Government Programs arising from the rendering of items and services and the provision of medicine, drugs and supplies to patients, to the extent arising out of the operation of the Business on or before the Closing Date.

"**Government Programs**" means the Medicare program, the Arizona Medicaid program, and any other, similar or successor federal, state or local health care payment programs with or sponsored by Governmental Authorities in which any Seller or Acquired Subsidiary participates.

"**Hazardous Substances**" means: (A) those substances defined in or regulated under the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Air Act, and their state counterparts, as each may be amended from time to time, and all regulations thereunder; (B) petroleum and petroleum products, including crude oil and any fractions thereof; (C) natural gas, synthetic gas, and any mixtures thereof; (D) lead, polychlorinated biphenyls, asbestos and radon; (E) any other pollutant or contaminant; and (F) any substance, material or waste regulated by any Governmental Authority pursuant to any Environmental Law.

"**Intellectual Property**" means, collectively, (a) all Copyrights, (b) all Patent Rights, (c) all Trademarks, (d) all Trade Secrets, (e) all Domain Names, (f) all Inventions and (g) all other intellectual property of any kind or nature.

"**Inventions**" means all inventions used by Sellers in connection with the Business, whether or not such inventions are the subject of a patent or patent application.

"**Inventory**" means all raw materials, work-in-process, finished goods, supplies, parts, samples, components, packaging materials, and other inventories related to, used or held for use in connection with the Business.

"**IRS**" means the Internal Revenue Service.

"**Knowledge**" means, with respect to a party, the knowledge of any officer or director of such party and such knowledge as would be imputed to such persons upon due inquiry.

"**Law**" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority as in effect from time to time.

"**Lease**" means a lease, sublease, license, or other use or occupancy agreement with respect to real or personal property to which a Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"**Leased Real Property**" means all real property leased, subleased or licensed to Sellers or which Sellers otherwise have a right or option to use or occupy, and related to, used or held for use in connection with the Business, together with all structures, facilities, fixtures, systems,

improvements and items of property previously or hereafter located thereon, or attached or appurtenant thereto, and all easements, rights and appurtenances relating to the foregoing.

"**Liability**" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"**Material Adverse Effect**" means any change, event, occurrence or circumstance that, individually or in the aggregate with all other changes, events, occurrences and circumstances, results in or would reasonably be expected to result in a material adverse effect on the results of operations, financial condition, assets or liabilities of the Business, taken as a whole, except any change, event, occurrence or circumstance to the extent (and only to the extent) resulting from (a) changes in Law, GAAP or accounting requirements, except to the extent (and only to the extent) such change materially and disproportionately affects the Business when compared to other Persons engaged in the industries in which any Seller operates, (b) changes in the financial or securities markets or general economic or political conditions in the United States or any other country or region, except to the extent (and only to the extent) such changes or conditions materially and disproportionately affect the Business when compared to other Persons engaged in the industries in which any Seller operates, (c) changes (including changes of applicable Law) or conditions generally affecting the industry in which any Seller operates, except to the extent (and only to the extent) such changes or conditions materially and disproportionately affect the Business when compared to other Persons engaged in the industries in which any Seller operates, (d) acts of war, sabotage or terrorism or natural disasters involving the United States or any other country or region, except to the extent (and only to the extent) such acts or natural disasters materially and disproportionately affect the Business when compared to other Persons engaged in the industries in which any Seller operates, (e) the announcement, pendency or consummation of the transactions contemplated by this Agreement (including any impact on customers, suppliers, vendors or employees), including the filing of the Bankruptcy Cases, any actions taken pursuant to the Cash Collateral Order, the conduct of the Auction process as contemplated by the bidding procedures set forth in the Sale Procedures Order, any facts, changes, circumstances or occurrences that customarily result from the events leading up to and following the commencement of bankruptcy proceedings, (f) any action taken (or omitted to be taken) as required by this Agreement or at the request of Buyer, or (g) any failure by Sellers to meet any internal projections or forecasts (excluding the changes, events, occurrences, and circumstances underlying such failure).

"**Modification & Extension Agreement**" means that certain Modification & Extension Agreement dated as of September 6, 2017, by and among Sellers, Buyer and Lateral SMA Agent, LLC.

"**Order**" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"**Ordinary Course of Business**" shall describe any action taken by a Person if:

(i)      such action is consistent in manner and amount with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

(ii)     such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority) and is not required to be authorized by the parent company (if any) of such Person; and

(iii)    such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"**Owned Real Property**" means all real property owned by Sellers and related to, used or held for use in connection with the Business, together with all structures, facilities, fixtures, systems, improvements and items of property previously or hereafter located thereon, or attached or appurtenant thereto, and all easements, rights and appurtenances relating to the foregoing.

"**Party**" or "**Parties**" means, individually or collectively, Buyer and Sellers.

"**Patent Rights**" means (a) any United States patents and patent applications and (b) any continuation, continuation-in-part and divisional United States patent applications based on any of the foregoing and any patents issuing therefrom.

"**Permits**" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances, accreditations, provider numbers, supplier numbers and Orders that are necessary for Sellers to own, lease, and operate their properties and assets, or to carry on the Business as it is now being conducted.

"**Permitted Encumbrances**" means Encumbrances for utilities and Taxes not yet due and payable or being contested in good faith.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity, or Governmental Authority.

"**Postpetition**" means arising after commencement of the Bankruptcy Cases on April 3, 2017.

"**Potential Assigned Agreement**" means all Contracts and Leases which Buyer may designate for assignment and assumption to Buyer pursuant to the terms of this Agreement.

"**Pre-Paid Expenses**" means all deposits and prepaid charges and expenses of Sellers as of the Closing Date to the extent related to any Acquired Asset.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, other than an Avoidance Action.

"**Release**" has the meaning set forth in Section 101(22) of CERCLA (42 U.S.C. § 9601(22)), but not subject to the exceptions in Subsections (A) and (D) of 42 U.S.C. § 9601(22).

"**Representative**" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Retained Subsidiary**" means any Subsidiary of any Seller that is not an Acquired Subsidiary.

"**Sale Order**" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall be in substantially in the form attached as Exhibit 3 hereto.

"**Sale Procedures**" means the procedures set forth in the Sale Procedures Order.

"**Sale Procedures Order**" means that certain Order Establishing Procedures for the Sale of Substantially All of Debtors' Assets entered on October 17, 2017 in the Bankruptcy Cases [Dkt. No. 493], as the same may be amended by the Bankruptcy Court.

"**Seller Intellectual Property**" means all Intellectual Property owned (in whole or in part) by or exclusively licensed to Sellers or the Acquired Subsidiaries and related to, used or held for use in connection with the Business.

"**Software**" means any and all computer programs, software (in object and source code), firmware, middleware, applications, API's, web widgets, code and related algorithms, models and methodologies, files, documentation and all other tangible embodiments thereof.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the board of directors or similar managing body.

"**Successful Bidder**" shall have the meaning set forth in the Sale Procedures.

"**Systems**" means servers, hardware systems, databases, circuits, networks and other computer and telecommunications assets and equipment.

"**Tax**" or "**Taxes**" means any and all taxes of any kind (including all interest and penalties thereon and additions thereto) imposed by any Governmental Authority.

"**Tax Return**" means any return, declaration, report, claim for refund, information return, or other document (including any elections, schedules, statements, or supporting documents attached thereto) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Third Party**" means a Person who or which is neither a Party hereto nor an Affiliate of a Party hereto.

"**Trademarks**" means all trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor, and all goodwill appurtenant to any or all of the foregoing.

"**Trade Secrets**" means trade secrets, know-how, inventions, methods, processes and processing instructions, technical data, specifications, research and development information, technology, product roadmaps, patient lists and any other information, in each case to the extent any of the foregoing derives economic value (actual or potential) from not being generally known to other Persons who can obtain economic value from its disclosure or use, excluding any Copyrights or Patent Rights that may cover or protect any of the foregoing.

"**Transaction Documents**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Transferred Employee Plans**" means the Benefit Plans expressly assumed (in whole or in part) pursuant to this Agreement, set forth on Schedule 1.1(b).

"**Treasury Regulations**" means the final or temporary regulations promulgated by the U.S. Treasury Department pursuant to the Code, as such regulations may be amended from time to time.

"**Websites**" means all Internet websites, including content, text, graphics, images, audio, video, data, databases, Software and related items included on or used in the operation of and maintenance thereof, and all documentation, ASP, HTML, DHTML, SHTML, and XML files, cgi and other scripts, subscriber data, archives, and server and traffic logs and all other tangible embodiments related to any of the foregoing.

Section 1.2    Table of Definitions.  The following terms have the meanings set forth in the Sections referenced below:

| Definition | Location |
| --- | --- |
| Acquired Assets | Section 2.1 |
| Additional Consideration | Section 3.1(b) |
| Agreement | Preamble |
| Allocation | Section 3.4(a) |
| Allocation Dispute | Section 3.4(a) |
| Allocation Dispute Notice | Section 3.4(a) |
| Assumed Contracts | Section 2.1(i) |
| Assumed Equipment | Section 2.1(g) |
| Assumed Leases | Section 2.1(j) |
| Assumed Liabilities | Section 2.3 |
| Bankruptcy Cases | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Buyer | Preamble |
| Buyer Termination Notice | Section 11.1(c)(i) |

14

Closing ................................................................................................ Section 4.1
Closing Date ...................................................................................... Section 4.1
Closing Legal Impediment.................................................................. Section 9.3
Confidential Information ..................................................................Section 8.6(b)
Diligence Contract .........................................................................Section 2.7(a)
Disclosure Schedules ............................................................................ Article V
Dispute .........................................................................................Section 3.4(b)
Excluded Assets.................................................................................. Section 2.2
Excluded Liabilities ........................................................................... Section 2.4
Execution Date.................................................................................... Preamble
GVH .................................................................................................... Preamble
GVII ...................................................................................................... Recitals
HIPAA ...........................................................................................Section 5.9(a)
Management........................................................................................ Preamble
Neutral Firm...................................................................................Section 3.4(b)
Outside Date..............................................................................Section 11.1(b)(ii)
Personal Information.......................................................................Section 5.9(a)
Post-Closing Tax Period ................................................................Section 8.1(d)
Pre-Closing Tax Period...................................................................Section 8.1(d)
Privacy Laws...................................................................................Section 5.9(a)
Purchase Price .................................................................................... Section 3.1
Seller .................................................................................................. Preamble
Seller Cost Reports ............................................................................ Section 8.4
Sellers ................................................................................................ Preamble
Sellers Termination Notice ...........................................................Section 11.1(d)
Tax Lien Payments ........................................................................Section 2.3(e)
Transfer Consent ................................................................................ Section 5.4
Transfer Taxes ...............................................................................Section 8.1(a)
Undisclosed Assumed Contract .....................................................Section 2.7(b)
WARN Act.......................................................................................... Section 7.5(f)

## ARTICLE II
## PURCHASE AND SALE

Section 2.1 <u>Purchase and Sale of the Acquired Assets</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Buyer, and Buyer, in reliance on the representations, warranties and covenants of Sellers contained herein, shall purchase, assume and accept conveyance, transfer and delivery of, all of Sellers' right, title and interest in and to all assets, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, accrued or contingent (including goodwill), wherever located and whether now existing or hereafter acquired prior to the Closing Date, related to, used or held for use in connection with the Business, as the same shall exist on the Closing Date, whether or not carried or reflected on or specifically referred to in the Sellers' books or financial statements or in the Schedules hereto, other than the Excluded Assets (collectively, the "**Acquired Assets**"), in each case

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 31 of 148

free and clear of any Encumbrances other than Permitted Encumbrances, including all of Sellers' right, title and interest in and to the following:

(a) all assets listed or reflected in Sellers' Schedules and Statements of Financial Affairs filed in the Bankruptcy Cases and any amendments thereto (including assets such as Assumed Contracts to which no value was attributed);

(b) all assets acquired by Sellers since April 3, 2017 which, had they been held by Sellers on such date, would have been recorded or reflected in their Schedules and Statements of Financial Affairs (including assets such as Assumed Contracts to which no value would have been attributed);

(c) all assets that would be recorded or reflected on a balance sheet of the Business as of the Closing Date prepared in accordance with GAAP;

(d) all equity interests held by Sellers in the Acquired Subsidiaries;

(e) all Cash and Cash Equivalents;

(f) all Accounts Receivable;

(g) all Inventory;

(h) all Equipment (other than Equipment set forth on Schedule 2.2(b)) ("**Assumed Equipment**");

(i) all Contracts related to or used in connection with the Business (the "**Assumed Contracts**"), including (i) all Contracts listed or described on Schedule 2.1(i), (ii) all Inbound License Agreements, and (iii) all Contracts pursuant to which Intellectual Property is transferred to the Business, but excluding any Executory Contract (as that term is defined in the Bankruptcy Code) that is not listed on Schedule 2.1(i);

(j) all Leases listed or described on Schedule 2.1(j) (the "**Assumed Leases**") and all rights in respect of the applicable Leased Real Property;

(k) all Owned Real Property;

(l) all rights under any Transferred Employee Plan listed on Schedule 1.1(b), and the assets thereof;

(m) all Permits and pending applications therefor, in each case to the extent assignable;

(n) all Seller Intellectual Property and all tangible embodiments thereof;

(o) all Pre-Paid Expenses, except to the extent that such Pre-Paid Expenses primarily relate to Excluded Assets or Excluded Liabilities;

Case 4:17-bk-03351-SHG   Doc 616   Filed 01/08/18   Entered 01/08/18 16:55:54   Desc
Main Document      Page 32 of 148

(p)     the goodwill and going concern value and other intangible assets, if any, arising from or related to the Business;

(q)     all Documents;

(r)     all telephone, telex and telephonic facsimile numbers and other directory listings related to, used or held for use in connection with the Business, to the extent assignable;

(s)     all Claims except for the Estate Claims;

(t)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements relating to the Business, any Acquired Asset or any Assumed Liability (or any portion thereof);

(u)     Tax refunds, Tax rebates or Tax credits of Sellers to the extent relating to the Acquired Assets or the Assumed Liabilities;

(v)     all insurance policies and binders, to the extent assignable, together with all Claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof (other than those policies set forth on Schedule 2.2(g));

(w)     Avoidance Actions that might interfere with Buyer's rights and entitlements with respect to the Acquired Assets, including but not limited to Avoidance Actions that might be brought or asserted against (i) non-Seller parties to Assumed Contracts and Assumed Leases; (ii) Third Parties from whom Buyer will be collecting Accounts Receivable; and (iii) Transferred Employees; and

(x)     the right to receive, consistent with Section 8.2, an amount equal to the Government Patient Receivables actually collected and received by Sellers after the Closing Date.

At any time at least one Business Day prior to the Bid Deadline, as defined in the Sale Procedures, Buyer, in its discretion by written notice to Sellers, may (i) exclude from being assigned pursuant hereto any Contracts or Leases, and such Contracts or Leases shall not constitute Assumed Contracts or Assumed Leases, and Buyer shall not acquire any rights or assume any Liabilities with respect thereto, (ii) add any Contracts or Leases as assigned Contracts or Leases pursuant hereto, and such Contracts or Leases shall constitute Assumed Contracts or Assumed Leases, (iii) exclude from being assigned pursuant hereto any Transferred Employee Plan listed on Schedule 1.1(b) and Buyer shall not acquire any rights or assume any Liabilities with respect thereto, (iv) add any Transferred Employee Plan to Schedule 1.1(b) as an assigned Transferred Employee Plan, and (v) add or remove any Equipment from Schedule 2.2(b).  Upon Buyer's reasonable request, Sellers shall provide additional detailed information as to Equipment or the Liabilities under the Contracts or Leases sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Equipment, Contract or Lease hereunder.  At any time prior to one Business Day prior to the Closing Date, Buyer may (A) designate any of the Excluded Assets described in Section 2.2(b), (c), and (f) as

additional Acquired Assets (so long as Buyer pays all Buyer Cure Costs associated with any such assumption and assignment, if applicable), and (B) with the written consent of Sellers, which consent may not be unreasonably withheld, conditioned or delayed, designate any of the Acquired Assets as additional Excluded Assets; provided, however, that in the event the Bankruptcy Court determines that the Cure Cost in regard to any Assumed Contract or Assumed Lease exceeds the amount set forth on Schedule 2.5(a), Buyer may in its sole discretion, and within seven (7) Business Days after the Bankruptcy Court makes such determination, elect in writing to reject such Contract or Lease such that it would not be an Assumed Contract or Assumed Lease. Notwithstanding any other provision hereof, any Acquired Asset excluded under this paragraph shall on such exclusion become an Excluded Asset and the Liabilities of Sellers related thereto shall constitute Excluded Liabilities.

Section 2.2    Excluded Assets. Notwithstanding anything herein to the contrary, the Acquired Assets shall not include any of the following (collectively, the "**Excluded Assets**"):

(a)    each Seller's rights under this Agreement;

(b)    the Equipment set forth on Schedule 2.2(b);

(c)    any Contract or Lease that is not an Assumed Contract or Assumed Lease, respectively;

(d)    any interest in or right to any refunds, rebates or credits of Taxes not described in Section 2.1(t), and any interest in any Tax loss or other Tax attribute of Sellers;

(e)    shares of capital stock or other equity interests of any Seller or Retained Subsidiary or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or Retained Subsidiary;

(f)    all rights under any Benefit Plan that is not a Transferred Employee Plan listed on Schedule 1.1(b), and the assets thereof;

(g)    all insurance policies and binders set forth on Schedule 2.2(g), all claims, refunds and credits from such policies or binders due or to become due with respect to such policies or binders, and all rights to proceeds thereof;

(h)    all other assets, properties, rights, interests, and Claims of every kind and description of any Seller that are (A) neither related to, used nor held for use in connection with the Business, any Acquired Asset or any Assumed Liability or (B) set forth on Schedule 2.2(h);

(i)    all Avoidance Actions other than those described in Section 2.1(w); and

(j)    all Estate Claims.

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 34 of 148

Section 2.3　　　Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof) only the following Liabilities of Sellers and no others (collectively, the "**Assumed Liabilities**"):

(a)　　　Liabilities arising from the ownership of the Acquired Assets by Buyer, except for those Excluded Liabilities set forth in Section 2.4, in each case on and after the Closing Date, it being understood that Liabilities arising from the ownership of the Acquired Assets or the operation of the Business prior to the Closing Date shall not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities arises, other than as expressly set forth in this Sections 2.3 or Section 7.5; provided, however, that any liabilities that are covered by insurance policies and binders assigned to Buyer pursuant to this Agreement will be Assumed Liabilities, but only to the extent of any such insurance coverage;

(b)　　　Liabilities under the Assumed Contracts and Assumed Leases arising on and after the Closing;

(c)　　　the Buyer Cure Costs;

(d)　　　payment obligations of the Sellers with respect to Postpetition, accrued and unpaid payroll Liabilities of the Sellers to any Transferred Employees up to an amount of $775,000 in the aggregate, provided, however that such amount is subject to an upwards adjustment of not more than fifteen percent (15%) based on the difference between (i) the trailing five week average census at the time of payment, and (ii) the census of 19 as of the date hereof.  Notwithstanding the foregoing, in no event shall Buyer assume, under this subsection (d), any amount in excess of actual payroll liabilities as of the Closing;

(e)　　　payment obligations of the Sellers with respect to accrued and unpaid Liabilities of the Sellers owed to any Transferred Employee on account of vacation, holiday, personal time off and sick pay up to an amount of $560,000 in the aggregate;

(f)　　　payment obligations of the Sellers with respect to Postpetition, accrued and unpaid trade Liabilities owed by the Sellers up to an amount of $1,180,000 in the aggregate, provided, however that such amount is subject to an upwards adjustment of not more than fifteen percent (15%) based on the difference between (i) the trailing five week average census at the time of payment, and (ii) the census of 19 as of the date hereof.  Notwithstanding the foregoing, in no event shall Buyer assume, under this subsection (f), any amount in excess of actual unpaid trade liabilities as of the Closing;

(g)　　　payment obligations of the Sellers with respect to Postpetition accrued and unpaid professional fees of the Debtors' estates up to an amount of $165,000 in the aggregate but only upon and to the extent of approval of same by the Bankruptcy Court;

(h)　　　the amount of all real and personal property taxes secured by tax liens on any of the Acquired Assets (the "**Tax Lien Payments**"); and

19

(i)     Payment obligations of the Sellers with respect to Postpetition, accrued and unpaid AHCCCS assessment up to an amount of $203,000 in the aggregate.

Section 2.4     Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform, or otherwise discharge any Liability that is not an Assumed Liability, and Sellers shall be solely and exclusively liable with respect to any Liability of Sellers or any Retained Subsidiary that is not an Assumed Liability (such Liabilities, collectively, the "**Excluded Liabilities**").  For the avoidance of doubt, the Excluded Liabilities include, without limitation, the following:

(a)     all Liabilities relating to any of the Excluded Assets or the Contracts and Leases that are not Assumed Contracts or Assumed Leases;

(b)     any Liability arising from or related to any Proceeding against Sellers, their Subsidiaries, the Business or the Acquired Assets pending as of the Closing Date or based upon any action, event, circumstance or condition arising as of or prior to the Closing Date (other than the Buyer Cure Costs and any other Assumed Liabilities expressly assumed pursuant to Section 2.3); provided, however, that any liabilities that are covered by insurance policies and binders assigned to Buyer pursuant to this Agreement will be Assumed Liabilities, but only to the extent of any such insurance coverage;

(c)     all Liabilities (whether known or unknown) arising in respect of or relating to current or former employees of Sellers or any Retained Subsidiary, including payroll, paid or unpaid vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including any Liability pursuant to the WARN Act for any action or inaction, except to the extent specifically set forth in Sections 2.3(d), 2.3(e) and 7.5;

(d)     any Liability under any employment, collective bargaining, severance, retention or termination agreement with any employee, independent contractor or contractor (or their representatives) of Sellers or any Retained Subsidiary, except to the extent such Liabilities arise under an Assumed Contract, and except to the extent specifically set forth in Sections 2.3(d), 2.3(e) and 7.5;

(e)     any Liability to indemnify, reimburse or advance amounts to any shareholder, officer, director, employee, or agent of Sellers or any Retained Subsidiary;

(f)     any Liability of Sellers or any Retained Subsidiary to any shareholder or Affiliate of Sellers or the Retained Subsidiaries, including any Liability to distribute to Sellers' shareholders or otherwise apply all or any part of the consideration received hereunder;

(g)    any liability arising from or related to any compliance or noncompliance on or prior to the Closing Date with any Law applicable to Sellers, their Subsidiaries, the Business or the Acquired Assets;

(h)    any Liability of Sellers under this Agreement or any other document executed in connection herewith;

(i)    except as otherwise provided in Sections 2.3(g), any Liability of Sellers or any Retained Subsidiary not arising in the Ordinary Course of Business resulting from the Bankruptcy Cases;

(j)    except as otherwise provided in Sections 2.3(h) and 8.1, any Tax Liabilities of Seller or any Retained Subsidiary, and any Tax Liabilities arising from or with respect to the Business or the Acquired Assets that are incurred in or attributable to the period prior to the Closing;

(k)    except as otherwise provided in Section 2.3(c), any Liability of Sellers or any Retained Subsidiary to any lien holder in respect of any Equipment; and

(l)    any Liability arising out of or resulting from actions taken by a Seller or any Retained Subsidiary prior to Closing related to the shutdown of any of its operations or facilities or the termination of any of its employees or independent contractors including any severance obligations.

Buyer and Sellers hereby acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability in accordance with the provisions of Section 2.3.

Section 2.5    Assignments; Cure Costs.

(a)    On or prior to the Execution Date, Sellers have delivered Schedule 2.5(a) to Buyer, which Schedule contains:  (i) with respect to each Potential Assigned Agreement, Sellers' good-faith estimate of the amount of the monetary value of any defaults existing under each such Potential Assigned Agreement, which amounts may be contested by the landlord under any Lease or the counterparty pursuant to such other Contract, and (ii) with respect to any Assumed Equipment, Sellers' good-faith estimate of the applicable Equipment Senior Lien Amount, which amount may be contested by the applicable lien holders.  Absent any objection by any non-debtor party to an Assumed Contract or Assumed Lease or an applicable lien holder in respect of any Assumed Equipment, the Cure Costs and Equipment Senior Lien Amounts, if any, set forth on Schedule 2.5(a) shall be dispositive, binding and controlling on the non-debtor party to an Assumed Contract or Assumed Lease and lien holders in respect of any Assumed Equipment.  In the event any non-debtor party to an Assumed Contract or Assumed Lease, or any lien holder in respect of any Assumed Equipment, objects to the proposed Cure Costs or Equipment Senior Lien Amounts set forth on Schedule 2.5(a), the Bankruptcy Court shall determine such Cure Costs or Equipment Senior Lien Amounts, as applicable, and Sellers shall commence appropriate proceedings before the Bankruptcy

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 37 of 148

Court and otherwise take all reasonably necessary actions in order to determine such Cure Costs or Equipment Senior Lien Amounts, including, subject to prior consultation in good faith with Buyer, negotiating in good faith and litigating, at Buyer's sole cost and expense, if necessary, with any counterparty to any Potential Assigned Agreement or any lien holder in respect of Assumed Equipment, such Cure Costs and Equipment Senior Lien Amounts.

(b)     At the Closing, pursuant to section 365 of the Bankruptcy Code and the Sale Order:

(i)     Sellers shall assign and/or sell all Assumed Contracts and Assumed Leases to Buyer, subject to provision of adequate assurance by Buyer as may be required under section 365 of the Bankruptcy Code and payment by Buyer of the Buyer Cure Costs in respect of such Assumed Contracts and Assumed Leases;

(ii)     Buyer shall assume and accept the assignment of all Assumed Contracts and Assumed Leases from Sellers, and shall pay the Buyer Cure Costs in respect of such Assumed Contracts and Assumed Leases to the appropriate counterparty.

(c)     In the case of licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Acquired Assets (i) that cannot be sold or assigned effectively without the consent of Third Parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, cooperate with Buyer in all reasonable respects to provide to Buyer the benefits thereof in some other manner, or (ii) that are otherwise not capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Sellers thereunder).

(d)     If, following the Closing, any Seller receives or becomes aware that it holds any asset, property or right which constitutes an Acquired Asset, then Sellers shall transfer such asset, property or right to Buyer (including the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

(e)     If, following the Closing, Buyer receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Buyer shall transfer such asset, property or right to Sellers (including the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

Section 2.6     <u>Further Actions and Assurances</u>.  At the Closing, Sellers shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably

Case 4:17-bk-03351-SHG     Doc 616     Filed 01/08/18     Entered 01/08/18 16:55:54     Desc
Main Document      Page 38 of 148

necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of all Encumbrances, except Permitted Encumbrances, and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment and/or sale by Sellers and assumption by Buyer of the Assumed Contracts and Assumed Leases. Sellers, on the one hand, and Buyer, on the other hand, shall use their respective reasonable best efforts to take, or cause to be taken, all appropriate actions, do or cause to be done, all things necessary, proper, or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing, including, subject to Section 2.5, assistance by Sellers with the transfer of the Inventory, Permits, Documents and Intellectual Property (including with respect to making all appropriate filings and submissions with the United States Patent and Trademark Office promptly after Closing, and in any event within 30 days of Closing), all at the sole expense of Buyer. In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Sellers shall use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing, and pending such conveyance shall, to the extent practicable, provide the applicable benefits thereof to Buyer in a manner consistent in all material respects with past practice. Prior to the Closing, the Parties shall cooperate in good faith to identify any Acquired Assets that may not be able to be conveyed at Closing.

Section 2.7    Revisions to Assumed Contracts.

(a)    Diligence Contracts. With respect to any executory Contract that was included in Schedule 2.1(i) or Schedule 2.1(j), as applicable but not made available to Buyer prior to the date hereof (any such Contract, a "**Diligence Contract**"), Buyer shall have the right to include or exclude such Diligence Contract as an Assumed Contract or Assumed Lease, and Buyer shall provide Sellers with written notice of such election as promptly as practicable following receipt of any such Diligence Contract and in any event prior to the later of (i) the Bid Deadline or (ii) five Business Days following receipt of such Diligence Contract, but in no event later than the Closing Date, and, if Buyer decides to include such Diligence Contract as an Assumed Contract or Assumed Lease, such Diligence Contract shall continue to be deemed to be an Assumed Contract or Assumed Lease for purposes of this Agreement and the Sale Order.  If Buyer decides to exclude any such Diligence Contract from the Assumed Contracts or Assumed Leases, such Diligence Contract shall be deemed to be an Excluded Asset for purposes of this Agreement and the Sale Order and shall be removed from Schedule 2.1(i) or Schedule 2.1(j). Buyer shall provide Sellers with a list of Diligence Contracts no later than December 27, 2017.

(b)    Undisclosed Assumed Contracts. If prior to the Closing, any party becomes aware of any executory Contract or unexpired Lease that has not been disclosed in writing or that was not made available, in each case, to Buyer prior to the date hereof, the discovering party shall promptly (but in any event no later than three Business Days) notify the other party in writing of such executory Contract or unexpired Lease. Buyer may elect, no later than the later of (i) 10 Business Days after such notice and receipt of such Contract or Lease and (ii) the Closing Date, to receive an assignment of the applicable Seller's rights in such executory Contract or unexpired Lease (upon such election by Buyer, an "**Undisclosed Assumed Contract**"); provided that the Bankruptcy Court enters an order (in a form and substance

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 39 of 148

reasonably acceptable to Buyer and Sellers) authorizing the assumption by Sellers (for Contracts entered prior to the commencement of the Bankruptcy Cases, whether or not amended after the commencement of the Bankruptcy Cases) and the assignment to Buyer of such Undisclosed Assumed Contract(s) and Buyer pays any applicable Cure Costs.

Section 2.8    Additional Assumed Contracts.  Notwithstanding anything in this Agreement to the contrary, following the Closing, Buyer may, in its sole and absolute discretion, by written notice delivered to Sellers, add any Contract to the Assumed Contracts up to 45 calendar days after the Closing Date, provided that such Contract has not then been rejected by Sellers.  Upon the addition of any such Contract to the Assumed Contracts pursuant to this Section 2.8, Sellers will use their reasonable best efforts to assign to Buyer such Contract so long as Buyer pays all Buyer Cure Costs associated with such assumption and assignment and all costs and fees associated with obtaining Bankruptcy Court approval of the assumption and assignment; provided, however, that nothing herein shall be deemed or construed to obligate Sellers to retain, or refrain from rejecting or terminating any Contract after the Closing that does not constitute an Assumed Contract at the time of Closing.  Notwithstanding anything to the contrary herein, Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 2.8 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance.

## ARTICLE III
## PURCHASE PRICE

Section 3.1    Purchase Price.  The purchase price (the "**Purchase Price**") for the purchase, sale, assignment, and conveyance of Sellers' right, title, and interest in, to, and under the Acquired Assets shall consist of:

(a)    a credit against an amount of debt under the DIP Credit Agreement held by Buyer equal to the Credit Bid Consideration; plus

(b)    the amount of $100,000 (the "**Additional Consideration**"), in compensation for the assignment to Buyer of the Avoidance Actions described in Section 2.1(w) above; plus

(c)    the assumption of the Assumed Liabilities.

To the extent that Buyer is not the Successful Bidder and Sellers consummate a sale to another party, Buyer consents to the surcharge of its collateral for the payment of the Milestone Fees (as defined in the KHA Employment Order), but only to the extent that the amount owing under the DIP Credit Agreement, the Modification and Extension Agreement, any related loan, security and transactional documents delivered pursuant thereto and any portion of any related orders of the Bankruptcy Court pertaining to such Claims exceeds the Credit Bid Consideration. Buyer agrees that upon the Closing, whether it is the Successful Bidder or not, and after any surcharge of its collateral for the payment of the Milestone Fees, it will waive any remaining Claims against Sellers under the DIP Credit Agreement, the Modification and Extension Agreement, any related loan, security and transactional documents delivered pursuant thereto and any portion of

any related orders of the Bankruptcy Court pertaining to such Claims, **provided that** (i) it is the Successful Bidder or (ii) it receives a cash payment of no less than the Credit Bid Consideration.

Section 3.2    Closing Date Payments.

(a)    At the Closing, Buyer shall pay in cash by wire transfer of immediately available funds, to an account or accounts designated by the applicable counterparties at least three Business Days in advance, (i) the Buyer Cure Costs and (ii) the Tax Lien Payments.  If any applicable counterparty or lien holder has not provided Buyer with wire transfer instructions at least three Business Days prior to Closing, Buyer will make a wire transfer of the applicable Buyer Cure Cost or Tax Lien Payment within three Business Days after obtaining such wire transfer instructions.

(b)    At the Closing, Buyer shall pay in cash by wire transfer of immediately available funds, to an account or accounts designated by Sellers at least three Business Days in advance, the Additional Consideration.

Section 3.3    Discharge of Assumed Liabilities after Closing.  From and after the Closing, Buyer shall pay, perform, or satisfy the Assumed Liabilities in accordance with their respective terms.

Section 3.4    Tax Allocation.

(a)    The Purchase Price (and, without duplication, any liabilities of Sellers to the extent treated as purchase price for United States federal income Tax purposes), shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Allocation**").  The Allocation shall be prepared by Buyer and delivered to Sellers no later than 60 days following the Closing Date.  The Allocation shall be considered final and binding on the Parties absent manifest error unless Sellers convey written objections (an "**Allocation Dispute Notice**") to Buyer within 10 Business Days of receipt of the Allocation.  Buyer and Sellers shall endeavor in good faith to resolve any such disagreement within 10 Business Days following the delivery of the Allocation Dispute Notice, and if resolution of such disagreement is reached, the Allocation shall immediately become binding.  If Buyer and Sellers are unable to completely resolve any such disagreement within 10 Business Days, the unresolved issues (the "**Allocation Dispute**") shall be resolved by the Neutral Firm in accordance with Section 3.4(b).  Upon the Allocation becoming binding, Buyer and Sellers agree to (i) be bound by the Allocation, (ii) act in accordance with the Allocation for all U.S. federal income Tax purposes (including timely filing IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the Closing Date and in the course of any audit, review or litigation and to make any timely comparable filings required by applicable state or local Law), and (iii) take no position and cause their Affiliates, to the extent that such Affiliates are under the control of Sellers, to take no position inconsistent with the Allocation for U.S. federal income Tax purposes, unless required by a final determination resulting from a Proceeding initiated by a Governmental Authority challenging the Allocation or any allocation resulting therefrom.  If any Governmental Authority challenges the Allocation or any allocation resulting therefrom,

the party receiving notice of such challenge shall give the other party prompt written notice thereof and the parties shall use reasonable efforts to preserve the effectiveness of the Allocation or such allocation.

(b)     If Buyer and Sellers are unable to completely resolve any Allocation Dispute within the 10 Business Day period referred to in Section 3.4(a), the unresolved issues (and only such unresolved issues) (such unresolved issues collectively, the "**Dispute**") shall be promptly submitted for resolution to a recognizable, reputable, and impartial certified public accounting firm that is mutually acceptable to Buyer and Sellers, or, if they are unable to agree, selected by the Bankruptcy Court (the "**Neutral Firm**"). The Neutral Firm shall be instructed to resolve any outstanding Dispute; provided, however, that the Neutral Firm's determination of any amount subject to the Dispute shall be no (x) less than the lesser of the amounts claimed by Buyer and Sellers, respectively, or (y) greater than the greater of the amounts claimed by Buyer and Sellers, respectively. The Parties shall instruct the Neutral Firm to render its determination with respect to the entire Dispute within 30 days of the referral of the Dispute thereto, and the determination of the Neutral Firm shall be final and binding upon the Parties hereto for all purposes of this Agreement. The fees and expenses of the Neutral Firm shall be borne by Buyer.

Section 3.5     Withholding. Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under applicable U.S. federal, state or local or foreign laws. To the extent that amounts are so deducted and withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to Sellers or any other Person in respect of which such deduction and withholding was made.

# ARTICLE IV
# CLOSING

Section 4.1     Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") shall take place no later than the third Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Sellers may mutually agree. The date and time at which the Closing actually occurs is referred to as the "**Closing Date**."

Section 4.2     Buyer's Deliveries. At the Closing, Buyer shall deliver or cause to be delivered, to Sellers (and to the applicable counterparties in the case of clause (a) below):

(a)     the Buyer Cure Costs and Tax Lien Payments, if any, to the applicable counterparties in accordance with Section 3.2(a);

(b)     the Additional Consideration in accordance with Section 3.2(b);

(c)     the Assumption Agreement, and each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(d)     the certificates of Buyer to be received by Sellers pursuant to Sections 10.1 and 10.2; and

(e)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3     <u>Sellers' Deliveries</u>.  At the Closing, Sellers shall deliver to Buyer:

(a)     the Assumption Agreement, the Bill of Sale and each other Transaction Document to which any Seller is a party, duly executed by each applicable Seller;

(b)     physical possession of all of the Acquired Assets;

(c)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts and Assumed Leases (together with all amendments, supplements or modifications thereto);

(d)     the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(e)     any and all Tax Returns relating to Transfer Taxes and other documents required by Law in connection with the transactions contemplated hereby and relating to the Leased Real Property or Owned Real Property, any part thereof or ownership interest, all duly and properly executed and acknowledged by the applicable Seller, and any affidavits in connection with such filings as shall have been required by Law or reasonably requested by Buyer;

(f)     a certificate of non-foreign status executed by each Seller (or, if applicable, a direct or indirect owner of a Seller), dated no more than thirty (30) days prior to the Closing Date, signed under penalties of perjury and prepared in accordance with Treasury Regulation Section 1.1445-2(b); and

(g)     such other bills of sale, special warranty deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title, and interest in, to or under any or all the Acquired Assets.

Case 4:17-bk-03351-SHG   Doc 616   Filed 01/08/18   Entered 01/08/18 16:55:54   Desc
Main Document     Page 43 of 148

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections or subsections of the Schedules attached hereto (collectively, the "**Disclosure Schedules**") (each of which shall qualify only the specifically identified sections or subsections hereof to which such Disclosure Schedule relates and shall not qualify any other provision of this Agreement or any Transaction Document), Sellers hereby represent and warrant, jointly and severally, to Buyer that the statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date:

Section 5.1    <u>Organization and Good Standing</u>.  Each Seller is an entity duly organized, validly existing and in good standing under the Law of the jurisdiction of its organization, except where any such failure to be in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Sellers have the requisite limited liability company power and authority to own or lease and to operate and use their respective properties and to carry on the Business as now conducted.  Each Seller is duly qualified or licensed to do business and in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.  Each Seller has made available to Buyer true and complete copies of its charter and bylaws (or comparable organizational documents).

Section 5.2    <u>Authority; Validity; Consents</u>.  Each Seller has, subject to requisite Bankruptcy Court approval, the requisite limited liability company power and authority necessary to enter into and perform its respective obligations under this Agreement and the other Transaction Documents to which each Seller is or will become a party, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Sellers, and the consummation by Sellers of the transactions contemplated herein, have been duly and validly authorized by all requisite limited liability company action in respect thereof.  This Agreement has been duly and validly executed and delivered by each Seller, and each other Transaction Document required to be executed and delivered by each Seller at the Closing will be duly and validly executed and delivered by each such Seller at the Closing.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to each Seller, the legal, valid and binding obligations of such Sellers, enforceable against such Sellers in accordance with their respective terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity that restrict the availability of equitable remedies.  Subject to requisite Bankruptcy Court approval, except (a) for entry of the Sale Order and (b) for notices, filings and consents required in connection with the Bankruptcy Cases or Cash Collateral Order, neither Sellers nor the Acquired Subsidiaries are required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except for (i) such notices, filings and consents, the failure of which to provide,

make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect, and (ii) the consent of Third Parties, if any, required for the assignment and/or sale of any Assumed Contract or Assumed Lease, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.3    No Conflict.  When the consents and other actions described in Section 5.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or require consent or the giving of notice under, or cause any acceleration of any obligation of Sellers under (a) any Order or (b) any Law, other than any breach, default, consent, notice, or acceleration that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The execution, delivery, and performance by each Seller of this Agreement and the other Transaction Documents, the consummation of the transactions contemplated hereby and thereby, and the compliance by Seller with the provisions hereof and thereof (i) do not and will not violate any provision of the charter or bylaws (or comparable organizational documents) of any Seller and (ii) except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, do not (A) except as set forth on Schedule 5.3(ii)(A), result in a violation or breach of, conflict with, constitute a default (with or without notice or lapse of time, or both) under, accelerate any obligation under, result in the loss of any benefit or right under, or give rise to a right of termination or cancellation of, any Assumed Contract , (B) except as set forth on Schedule 5.3(ii)(B), result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any of the Acquired Assets or (C) except as set forth on Schedule 5.3(ii)(C), require any consent by any Person, or giving notice to any Person.

Section 5.4    Title to Acquired Assets.  At Closing, and after payment of any Tax Lien Payments or Buyer Cure Costs, as contemplated by this Agreement, Sellers will have good and valid title to or a valid leasehold interest in all of the Acquired Assets, and will convey them to Buyer free and clear of any Encumbrance, other than Permitted Encumbrances.  Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and after Buyer's payment of any Tax Lien Payments or Buyer Cure Costs, as contemplated by this Agreement, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, all of Sellers' right, title and interest in and to the Acquired Assets free and clear of all Encumbrances, except (a) for the Assumed Liabilities, (b) for Permitted Encumbrances, and (c) subject to the limitation that certain transfers, assignments, licenses, sublicenses, leases and subleases, as the case may be, of Acquired Assets, Assumed Contracts, Assumed Leases, and Permits, and any claim or right or benefit arising thereunder or resulting therefrom, may require consent of a Third Party or Governmental Authority (each, a "**Transfer Consent**"), which has not been obtained.

Section 5.5    Legal Proceedings.  As of the date hereof, except for the Bankruptcy Case, Cash Collateral Order, any other Order entered in the Bankruptcy Case, or any appeal from such Order, and any Proceeding or Order set forth on Schedule 5.5, there is no Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened against any Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation,

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 45 of 148

legality or validity of the transactions contemplated hereby or (b) would have, individually or in the aggregate, a Material Adverse Effect, or a Material Adverse Effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

Section 5.6    Compliance with Laws; Permits; Healthcare Matters.  The following representations and warranties are subject in all respects to the matters set forth in Schedule 5.6.

(a)    Sellers and the Acquired Subsidiaries are not in violation in any material respect of any Law applicable to the operation of the Business or any rules or regulations promulgated pursuant to all such applicable Law.

(b)    Sellers and the Acquired Subsidiaries hold all material Permits required for Sellers and the Acquired Subsidiaries to own, lease and operate the Acquired Assets and conduct the Business as it is currently conducted.  There are no Proceedings pending, or to Sellers' Knowledge threatened, regarding any of the Permits.  Sellers are in compliance with the terms of all material Permits in all material respects.

(c)    Sellers meet, without material exception, the conditions for participation in the Medicare and Medicaid programs, and there is not pending or, to the Knowledge of Sellers, threatened any proceeding or investigation under such programs involving the Business of Sellers.  Sellers comply in all material respects with all Medicare, Medicaid, federal and state anti-fraud and abuse laws and regulations.  Sellers are not party to any financial relationship (as defined in 42 U.S.C. §1395nn) with a physician or an immediate family member of a physician which is prohibited by or does not otherwise meet an exception under the Stark prohibition (or similar state laws) on self-referrals applicable to entities that provide certain designated health services.

(d)    Sellers: (i) have not experienced a material data privacy or security breach; (ii) are in compliance with all Contracts that involve the use, disclosure, or access to individually identifiable health information, including HIPAA business associate agreements; (iii) have not received, in the past twelve (12) months, any inquiries from any Governmental Authority regarding their compliance with all applicable state privacy and security Laws, nor are there any lawsuits, claims, proceedings, notices of violation, or investigation from any party against Sellers or, to the Knowledge of Sellers, any officers, directors, employees or agents of Sellers with respect to any violation or alleged violation of such applicable state privacy and security Laws.

(e)    Sellers and the Acquired Subsidiaries each (i) are in compliance in all material respects with the requirements for participation in the Medicare and Medicaid programs with respect to the Business to the extent of any current participation in such programs, and (ii) has a current provider agreement or contract under Title XVIII and/or XIX of the Social Security Act, which is in full force and effect for the Business.  Sellers have the requisite valid participation agreement or provider number or other Permit to bill all private payors that currently account for any portion of Sellers' revenues.

(f)     No event has occurred within the past twelve (12) months and no circumstance exists that (i) may constitute or result in a material violation of any Seller or Acquired Subsidiary of, or failure on the part of any Seller or Acquired Subsidiary to comply with, any Law in any material respect, or (ii) may give rise to any obligation on the party of any Seller or Acquired Subsidiary to undertake, or to bear all or any portion of the cost of, any remedial action under any Law other than refunds, overpayments or adjustments in the ordinary course of business.

(g)     No Seller or Acquired Subsidiary has received within the past twelve (12) months any written notice or other written communication from any Governmental Authority or any other person, including any call or other communication through the compliance hotline reporting system of any Seller or Acquired Subsidiary, of (i) any actual, alleged and reasonably credible material violation of, or failure to materially comply with, any Law, or (ii) any actual, alleged and reasonably credible obligation on the part of any Seller or Acquired Subsidiary to undertake, or to bear all or any portion of the cost of, any remedial action under any Law other than refunds, overpayments or adjustments in the ordinary course of business.

(h)     No Seller or any of their respective employees is subject to the terms of a corporate integrity agreement with a Governmental Authority.

(i)     Within the past twelve (12) months, each Seller has filed all cost reports required to be filed in accordance with the Government Programs in which it participates, the private insurance programs with which it is contracted, all fiscal intermediaries and contractors, and other insurance carriers. All such cost reports submitted by any Seller to Government Programs and private insurance programs were complete and accurate in all material respects when filed and have been prepared in compliance with all applicable Laws.  Within the past twelve (12) months, each Seller has paid or caused to be paid in the Ordinary Course of Business all known and undisputed refunds, overpayments or adjustments that have become due to any Government Program or private insurance program.  No Seller (i) has any pending appeals, adjustments, disputes, contested positions, challenges, litigation, or audits pending by or before a Governmental Authority or a private insurance program with respect to submitted claims or cost reports, except for such appeals or individual claim denials that occur in the ordinary course of business; and (ii) is being audited, surveyed or otherwise examined in connection with any Government Program or any private insurance program other than audits, surveys or reviews that occur in the ordinary course of business.  No Seller has, within the past twelve months, received any written notice of denial of payment, recoupment, or overpayment from any Government Program or private insurance program other than notices received in the ordinary course of business, and there are no facts or circumstances that may reasonably be expected to (x) give rise to any material denial, overpayment, refund, or dispute from any Government Program or private insurance program; or (y) indicate a pattern of denial of payments, recoupment, or overpayment from any Government Program or private insurance program with respect to a type of claim or a series of related claims.  There is no investigation, audit, claim review, or other action pending or, to the Knowledge of Sellers, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Government Program or private insurance

participation agreement or provider number or other Permit or result in exclusion of either Seller or any Acquired Subsidiary from any Government Program or private insurance program, nor has any Government Program or private insurance program made any decision not to renew any participation agreement or provider agreement or other Permit.

(j) Each Seller has in all material respects charged and billed in accordance with the terms of its respective contracts with any Government Programs or private insurance programs and otherwise in accordance with Law, including, where applicable, billing and collection of all deductibles and co-payments. All claims that have been filed by any Seller are for services actually rendered, and were properly coded, and were filed in compliance with all Government Program and private insurance program requirements, including those regarding physician certification and recertification for services. No funds relating to Sellers are now, or, to the Knowledge of Sellers, will be, withheld by any Government Program or private insurance program.

(k) No Seller nor any member of the governing body of any Seller, or any officer or current employee of any Seller or Acquired Subsidiary, or to the Knowledge of Sellers any third party vendor or independent contractor who furnishes services or supplies that may be reimbursed in whole or in part under any Government Program, is excluded, suspended or debarred from participation, or has been convicted of or charged with any violation of any Law related to the Medicare or Medicaid programs or any other Government Program that is reasonably likely to serve as the basis for any such exclusion, suspension, debarment or other ineligibility.

(l) No Seller, nor any member of the governing body of any Seller, or any officer, agent, or employee of any Seller, or any Person acting for or on behalf of any Seller has directly or indirectly within the past twelve (12) months (i) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services in violation of any Law (x) to obtain favorable treatment in securing business, (y) to pay for favorable treatment for business secured, or (z) to obtain special concessions or for special concessions already obtained, for or in respect to any Seller, or (ii) established or maintained any fund or asset that has not been recorded in the books and records of any Seller or Acquired Subsidiary.

(m) Each of Sellers has not, nor to the Knowledge of Sellers has been alleged to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest (as that phrase is defined in 42 C.F.R. § 420.201) in any Seller or Acquired Subsidiary has, within the past twelve (12) months, engaged in any of the following: (i) knowingly and willfully making or causing to be made a false statement or representation of material fact in any application for benefit or payment under any Government Program or private insurance program; (ii) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Government Program or private insurance program; (iii) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any

Government Program or private insurance program on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (iv) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (x) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Government Program or private insurance program, or (y) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in party by any Government Program or private insurance program; (v) presenting or causing to be presented a claim for reimbursement for an item or services that is or for an item or services that was known or should have been known to be (x) not provided as claimed, or (y) false or fraudulent; or (vi) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein no misleading) of a material fact with respect to (x) qualification for participation in any Government Program, private insurance program or to obtain any Permit, or (y) information required to be provided under 42 U.S.C. § 1320a-3.  No portion of the Business is currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by any Governmental Authority.

(n)     No Seller is subject to any Proceeding or investigation by any Governmental Authority:  (i) which may result in the imposition of a fine, alternative, interim or final sanction, or a lower reimbursement rate for services rendered; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or any Permit; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims, or any disallowance in connection with any audit of such cost reports.

Section 5.7     Intellectual Property.  To the Knowledge of Sellers, Schedule 5.7 sets forth a true and complete list of all Patent Rights, registered Copyrights, registered and material unregistered Trademarks, Domain Names, and material Inventions, if any, included in the Seller Intellectual Property.

Section 5.8     Data Privacy and Security. The following representations and warranties are subject in all respects to the matters set forth in Schedule 5.8. Each Seller and each of the Acquired Subsidiaries complies with all applicable U.S. and state Laws relating to privacy or data security (including the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et. seq.) ("**HIPAA**"),  (all of the foregoing collectively, "**Privacy Laws**") with respect to personally identifiable information (including name, address, telephone number, electronic mail address, social security number, bank account number or credit card number), sensitive personal information and any special categories of personal information regulated thereunder or covered thereby ("**Personal Information**"). No written claims have been asserted and, to the Knowledge of Sellers, no claims are

threatened against Sellers or any Acquired Subsidiaries by any Person alleging a violation of any Privacy Laws.

(b) No Seller and none of the Acquired Subsidiaries and, to the Knowledge of Sellers, no subcontractor or agent of Sellers or any Acquired Subsidiary has in the past twelve (12) months been required pursuant to any Privacy Law to notify customers, consumers or employees of any information security breach of Personal Information of such customers, consumers or employees (in the case of such subcontractors or agents, of Personal Information obtained from or on behalf of any Seller or Acquired Subsidiary). To the Knowledge of Sellers, no Seller and none of the Acquired Subsidiaries have been the subject of any inquiry, investigation or enforcement action of any Governmental Authority with respect to compliance with any Privacy Law in the past twelve (12) months.

Section 5.9    Environmental and Health and Safety Matters.

(a) Each Seller and each Acquired Subsidiary is and has within the past twelve (12) months been in compliance with all applicable Environmental Laws in connection with the conduct or operation of the Business and the ownership or use of the Acquired Assets. None of Seller, the Acquired Subsidiaries nor any of their respective executive officers has received within the past twelve (12) months, nor to the Knowledge of the Sellers is there any basis for, any notice, communication or complaint from a Governmental Authority or other Person alleging that such Seller or Acquired Subsidiary has any liability under any such Environmental Law or is not in compliance with any such Environmental Law.

(b) There is and has been within the past twelve (12) months no Release or threatened Release of Hazardous Substances or any investigation, clean-up, remediation or corrective action of any kind relating to the Owned Real Property and the Leased Real Property. No underground improvement, including any treatment or storage tank or water, gas or oil well, is or has been located on the Owned Real Property or the Leased Real Property. There is no pending or, to the Knowledge of any Seller, threatened investigation by any Governmental Authority, nor any pending or, to the Knowledge of any Seller, threatened Claim, Proceeding or Order with respect to the Owned Real Property, the Leased Real Property, the Business, any Seller or any Acquired Subsidiary relating to Hazardous Substances or otherwise under any Environmental Law.

(c) Sellers and the Acquired Subsidiaries hold all Environmental Permits, and are and have been within the past twelve (12) months in compliance therewith. Sellers have made available to Buyer all permits, audits and other reports pertaining to compliance with Environmental Law and all "Phase I," "Phase II" or other environmental investigation reports in its possession, or to which they have reasonable access.

Section 5.10    Assumed Contracts and Assumed Leases. Except as may otherwise appear by an examination on the face thereof, each Assumed Contract is in full force and effect and is a valid and binding obligation of the applicable Sellers party thereto and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and

conditions, in each case except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, or as would not reasonably be expected to have a Material Adverse Effect. Correct and complete copies of all Assumed Contracts and Assumed Leases have been, or will be upon request, made available to Buyer. Upon entry of the Sale Order, payment of the Buyer Cure Costs, as applicable, and receipt of Transfer Consents (if any), (i) no Seller will be in material breach or default of its obligations under any such Assumed Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a material default by any Seller under any such Assumed Contract, and (iii) to Sellers' Knowledge, no other party to any such Assumed Contract is in material breach or default thereunder, and (iv) to Sellers' Knowledge, each such Assumed Contract may be enforced by Buyer against the other party thereto in accordance with its terms.

Section 5.11    Financial Statements.

(a)    Schedule 5.11 sets forth, (i) to the Sellers' Knowledge, true and complete copies of the unaudited consolidated financial statements of the Business for the year ended December 31, 2016, accompanied by the reports thereon of the Sellers' independent auditors (collectively, the "**Historical Financial Statements**"), and (ii) true and complete copies of the unaudited consolidated financial statements of the Business for the period ended November 30, 2017 (the "**Interim Financial Statements**"), including in each of clauses (i) and (ii) a balance sheet, statement of income, , and for clause (i) a statement of retained earnings (the Historical Financial Statements and the Interim Financial Statements collectively, the "**Financial Statements**"). The Financial Statements (i) are correct and complete in all material respects and have been prepared in accordance with the books and records of Sellers pertaining to the Business, (ii) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated and (iii) present fairly, in all material respects, the financial condition of Sellers at their respective dates, subject to normal year-end adjustments and the absence of notes.

(b)    The Accounts Receivable and Government Patient Receivables outstanding on the Closing Date will represent bona fide and valid obligations arising from sales actually made or services actually performed or to be performed in the Ordinary Course of Business in bona fide, arms-length transactions completed in accordance with the terms and provisions contained in any documents relating thereto and in compliance with applicable Law.

Section 5.12    Employee Benefits.

(a)    Schedule 5.12 sets forth each Benefit Plan, copies of which, along with all amendments thereto and any related trust agreements and IRS determination letters, have been made available to Buyer or its Affiliates.

(b)     Each Benefit Plan has been maintained and administered at all times within the past twelve (12) months in compliance in all material respects with its terms and all applicable Laws, including ERISA and the Code, applicable to such Benefit Plan.

Section 5.13     Labor and Employment.

(a)     No Seller or Acquired Subsidiary is party to any collective bargaining agreement.  There is no labor strike, slowdown, work stoppage or other labor dispute pending or, to Sellers' Knowledge, threatened against any Seller or Acquired Subsidiary.

(b)     There are no pending grievances or unfair labor practices or other employment-related proceedings against any Seller or Acquired Subsidiary.

(c)     No Seller or Acquired Subsidiary has within the past twelve (12) months received written notice of any representation proceeding or unfair labor practice charge or complaint against it before, or that could come before, the National Labor Relations Board or any similar Governmental Authority and, to Sellers' Knowledge, there is no threatened unfair labor practice charge or complaint or representation proceeding before, or that could come before, the National Labor Relations Board or other Governmental Authority or union organizing or decertification activity.

(d)     No Seller or Acquired Subsidiary is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to or affecting Business Employees or employment practices in connection with the Business.

Section 5.14     Real Property.

(a)     Sellers have (i) good and marketable title in fee simple to all Owned Real Property and (ii) good and marketable leasehold title to all Leased Real Property and will convey it free and clear of all Encumbrances except Permitted Encumbrances.  No parcel of Owned Real Property or Leased Real Property is subject to any governmental decree or order to be sold or is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefore, nor, to the Knowledge of Sellers, has any such condemnation, expropriation or taking been proposed.  All leases of Leased Real Property and all amendments and modifications thereto are in full force and effect, and there exists no default under any such lease by any Seller or any other party thereto, nor any event which, with notice or lapse of time or both, would constitute a default thereunder by such Seller or any other party thereto.

(b)     There are no contractual or legal restrictions that preclude or restrict the ability to use any Owned Real Property or Leased Real Property by Sellers, the Acquired Subsidiaries or the Business for the current use of such real property.  To the Sellers' Knowledge, there are no material latent defects or material adverse physical conditions affecting the Owned Real Property or Leased Real Property.  To the Sellers' Knowledge, all plants, structures and other improvements and fixtures on the Owned Real Property or Leased Real Property are adequately maintained and are in good operating condition and repair for the requirements of the Business as currently conducted.

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 52 of 148

Section 5.15    Sufficiency of Assets.  To Sellers' Knowledge, the Acquired Assets (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, reasonably necessary to operate the Business in the manner currently operated by Sellers and the Acquired Subsidiaries and (b) include all of the operating assets of Sellers reasonably related to the Business.

Section 5.16    Brokers or Finders.  Neither Sellers nor the Acquired Subsidiaries have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby for which Buyer is or will become liable, except for the obligation to compensate Kaufman Hall & Associates, LLC ("**KHA**"), on the terms, and subject to the conditions, set forth in the *Order Approving the Employment of Kaufman, Hall & Associates, LLC as Debtors' Sales Agent on a Fixed Fee Basis* entered by the Bankruptcy Court on October 16, 2017 (the "**KHA Employment Order**") [DE 491].

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that the statements contained in this Article VI are true and correct as of the date hereof and as of the Closing Date:

Section 6.1    Organization and Good Standing.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the Law of the State of Delaware.

Section 6.2    Authority; Validity; Consents.  Buyer has the requisite limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer, and the consummation by Buyer of the transactions contemplated herein, have been duly and validly authorized by all requisite limited liability company action in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. Subject to requisite Bankruptcy Court approval, this Agreement, and the other Transaction Documents to which Buyer is a party constitute the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity that restrict the availability of equitable remedies.  Except as required by the Sale Order, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a material adverse effect.

Section 6.3    No Conflict.  The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) the organizational documents of Buyer, (b) any Order, or (c) any Law.

Section 6.4    Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Sellers are or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

# ARTICLE VII
# ACTIONS PRIOR TO THE CLOSING DATE

Section 7.1    Investigation of the Business by Buyer.

(a)    From the date hereof through the Closing Date, Sellers shall afford, and shall cause their respective Subsidiaries to afford, Buyer and its Representatives complete access (including for inspection and copying) at all reasonable times to the Acquired Assets, the Representatives of Sellers and their Subsidiaries, and the properties, offices, plants and other facilities, and books and records relating to the Business and the Acquired Assets, and shall furnish Buyer with such financial, operating and other data and information in connection with the Business and the Acquired Assets as Buyer may reasonably request.

(b)    From the date hereof through the Closing Date, Sellers shall, and shall cause their Subsidiaries to, promptly following Buyer's request, seek and use their respective reasonable best efforts to arrange such meetings and telephone conferences with material suppliers and vendors of Sellers and their Subsidiaries as may be reasonably requested by Buyer and necessary and appropriate for Buyer to coordinate transition of such suppliers and vendors to the Business following the Closing.

Section 7.2    Operations Prior to the Closing Date.  Sellers covenant and agree that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (which consent, other than with respect to Section 7.2(b)(iv), shall not be unreasonably withheld or delayed), (iii) as required by the Bankruptcy Court, and (iv) as otherwise required by Law, after the Execution Date and prior to the Closing Date:

(a)    Sellers shall use commercially reasonable efforts, taking into account Sellers' status in the Bankruptcy Cases and under the Cash Collateral Order, to carry on in the Ordinary Course of Business, to maintain in full force and effect the Permits, to maintain and preserve the Business and the Acquired Assets in their present condition (including by using reasonable best efforts to renew any Assumed Contracts or Assumed Leases that come up for renewal in the Ordinary Course of Business),  and, with respect to Leased Real Property, in the condition required under the respective Leases (if the

38

condition of such Leased Real Property on the date hereof does not satisfy such standard) reasonable wear and tear excepted, and to keep intact the business relationships relating to the Acquired Assets; and, without limiting the generality of the foregoing,

(b)     Sellers shall not, and shall cause the Acquired Subsidiaries not to:

(i)     except in the Ordinary Course of Business, or pursuant to any Order, sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or cause to be imposed, any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) on any Acquired Asset;

(ii)     issue, deliver or sell or authorize the issuance, delivery or sale of, any shares of capital stock or membership or other equity interests of Sellers;

(iii)     fail to pay any maintenance or similar fees in connection with the prosecution and maintenance of Intellectual Property, or otherwise fail to protect and maintain Intellectual Property consistent with past practice in any material respect;

(iv)     amend, modify, terminate, waive any rights under or create any Encumbrance with respect to, any of the Assumed Contracts or Assumed Leases or otherwise take any actions not required by the terms of any Assumed Contract or Assumed Lease that would result in any increase in any payments to be made under such Assumed Contract or Assumed Lease;

(v)     other than in the Ordinary Course of Business, enter into any new, or amend any existing, license or other similar agreement concerning any Intellectual Property;

(vi)     except in the Ordinary Course of Business, cancel or compromise any Claim or waive or release any right, in each case, that is a Claim or right related to an Acquired Asset; or

(vii)     enter into any agreement or commitment to take any action prohibited by this Section 7.2.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers, or the Business, prior to the Closing, and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and their operations.  From the date of this Agreement until the Closing, Sellers shall, and shall instruct their employees, counsel, accountants, financial advisors, and other Representatives to, reasonably consult with Buyer (and its Affiliates, counsel, financial advisors, auditors, employees, agents, and other Representatives) in connection with planning by Buyer with respect to patients, services, products, pricing, distribution, suppliers, and any other matters related to the post-Closing operation of the Business.

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 55 of 148

Section 7.3     Reasonable Best Efforts.

(a)     Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following:  (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in Article IX and Article X to be satisfied, (ii) the obtaining of all necessary consents and approvals of any Governmental Authority, the obtaining of all necessary Permits and the making of all necessary registrations, notices, declarations and filings (including registrations, notices, declarations and filings with Governmental Authorities, if any) and the taking of all steps as may be necessary to avoid any Proceeding by any Governmental Authority and to allow Buyer to, after Closing, operate the Business as it is currently conducted, (iii) the defending of any Proceedings challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining Order entered by any court or other Governmental Authority vacated or reversed, and (iv) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the intents and purposes of this Agreement.  In furtherance and not in limitation of the foregoing, Sellers shall permit Buyer reasonably to participate in the defense and settlement of any claim, suit or cause of action relating to this Agreement or the transactions contemplated hereby, and Sellers shall not settle or compromise any such claim, suit or cause of action without Buyer's written consent (not to be unreasonably withheld).

(b)     Sellers, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto and shall discuss and attempt to reasonably account for any comments or suggestions of the other Party.  In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent not prohibited by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to any restrictions under applicable Laws, rules or regulations, Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval.  In carrying out their obligations under this Section 7.3, subject to applicable Law, none of

the Parties shall submit or otherwise provide any information to such Governmental Authority without first having provided a reasonable opportunity to the other Party and its counsel to comment upon such information. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Any Party may, as it deems advisable and necessary, reasonably designate any sensitive material provided to the other Party under this Section 7.3, or otherwise pursuant to this Agreement, as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to the directors, officers or employees of the recipient, unless express written permission is obtained in advance from the source of the materials.

(c)     Sellers shall, and shall cause the Acquired Subsidiaries to, give promptly such notice to and make filings with third parties and obtain the Transfer Consents and such other Third Party consents and estoppel certificates as Buyer may in its reasonable discretion deem necessary or desirable in connection with the transactions contemplated by this Agreement and the Transaction Documents, all at the sole expense of Buyer. Buyer shall cooperate with and assist Sellers in giving such notices and obtaining such consents and estoppel certificates; provided, however, that except for the Buyer Cure Costs contemplated to be paid by Buyer in accordance with Section 3.2, Buyer shall have no obligation to give any guarantee or other consideration of any nature in connection with any such notice, consent or estoppel certificate or consent to any change in the terms of any agreement or arrangement that Buyer in its sole discretion may deem adverse to the interests of Buyer or the Acquired Subsidiaries.

(d)     Sellers and Buyer agree that, in the event that any consent, approval or authorization necessary or desirable to preserve for Buyer or the Acquired Subsidiaries any right or benefit under any Assumed Contract or Assumed Lease is not obtained prior to the Closing, Sellers will, subsequent to the Closing, and at the sole expense of Buyer, reasonably cooperate with Buyer or any such Subsidiary in attempting to obtain such consent, approval or authorization as promptly thereafter as practicable.

(e)     Neither Buyer, on the one hand, nor Sellers, on the other hand, shall, after the entry of the Sale Order, enter into any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other Party.

Section 7.4     Bankruptcy Court Filings and Approval.

(a)     Sellers shall use their reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement as promptly as practicable after the Execution Date.

(b)     Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and, consistent with Section 8.5(a) below, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(c)     Prior to the filing by Sellers of the motion contemplated by Section 7.4(a), Sellers will (i) provide a copy of such motion (including, in each case, the related forms of order and notice and supporting materials) to Buyer and its counsel, (ii) provide Buyer and its counsel a reasonable opportunity to review and comment on such document, and any amendment or supplement thereto, and (iii) incorporate any reasonable comments of Buyer and its counsel into such document and any amendment or supplement thereto.

(d)     Sellers and Buyer acknowledge that this Agreement and the sale of the Acquired Assets and the assumption, assignment, and/or sale of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval.  Sellers and Buyer acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest, best, or otherwise financially superior offer possible for the Acquired Assets and (ii) Buyer must provide adequate assurance of future performance under the Assumed Contracts and Assumed Leases to be assigned by Sellers.

(e)     In each case other than in accordance with the terms of the Sale Procedures Order as now in effect or as otherwise approved by the Bankruptcy Court, from the date hereof until the Closing, Sellers shall not, and shall cause their Representatives and Affiliates not to, directly or indirectly, (a) initiate contact with, pursue, knowingly facilitate, solicit or encourage submission of, or discuss, negotiate or assist with, any inquiries, proposals or offers by any Person (other than Buyer and its Affiliates, agents and Representatives) with respect to a Competing Bid or (b) provide any Person (other than Buyer and its Affiliates, agents and Representatives) with access to the books, records, operating data, contracts, documents or other information in connection with any Competing Bid.  For the avoidance of doubt, nothing in this Section 7.4(e) shall preclude Sellers or their Representatives from acting in accordance with the Sale Procedures Order, including marketing and sales efforts in compliance therewith.

(f)     Buyer agrees and acknowledges that (i) Sellers and their Affiliates shall be permitted, and shall be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates, agents and Representatives) in accordance with the terms of the Sale Procedures Order; and (ii) the bidding procedures contained in the Sale Procedures Order may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth therein and the terms of this Agreement.

(g)     Sellers shall give all notices required to be given by applicable Law, to all Persons entitled thereto, of all motions, orders, hearings and other proceedings relating to

this Agreement and the transactions contemplated hereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

(h)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of such order.  Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal, all at Buyer's sole expense.

(i)     After entry of the Sale Order, to the extent Buyer is the Successful Bidder at the Auction, Sellers shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order, subject to Sellers having sufficient funds to take such action.

Section 7.5     Employee Matters.

(a)     With respect to each Business Employee, not later than January 15, 2018, Sellers shall provide Buyer with a list setting forth, to the extent such information is permitted to be disclosed under applicable Law:  (i) title or job/position, (ii) job designation (i.e., salaried or hourly), (iii) location of employment and Seller employer, (iv) employment status (active, on leave or on unpaid leave), and (v) annual base rate of compensation for all salaried employees and any bonus amount that he or she has received for the fiscal year ended December 31, 2016.

(b)     Not later than February 9, 2018, Buyer shall provide a list to Sellers of those Business Employees who will be offered employment by Buyer or a Subsidiary of Buyer effective as of the Closing Date.  No Seller shall preclude Buyer from offering employment to any Business Employee or solicit any such Business Employee to refuse such offer of employment.

(c)     Each Business Employee who accepts an offer of employment from Buyer and who becomes an employee of Buyer or of one of its Subsidiaries shall be a "**Transferred Employee**."  Sellers shall cooperate with Buyer in effecting the Transferred Employees' transfer of employment from Sellers to Buyer or an Affiliate of Buyer as contemplated hereby.

(d)     From and after the Closing Date, Sellers shall retain all (i) employment obligations with regard to those Employees and former employees of Sellers (or who are otherwise related to the Business) who are not Transferred Employees, and (ii) any liabilities related to any Transferred Employees to the extent not expressly assumed by Buyer in this Section 7.5 or under Section 2.3.

(e)     Without limitation of Section 12.10, nothing in this Section 7.5 shall (a) be treated as an amendment of, or undertaking to amend, any Benefit Plan, (b) obligate Buyer, Sellers, or any of their respective Affiliates to retain the employment of any

particular employee, or (c) confer any rights or benefits on any Person, including any Transferred Employee, other than the Parties to this Agreement.  Nothing contained in this Section 7.5 shall confer upon any Transferred Employee any right with respect to continued employment by Buyer, nor shall anything herein interfere with the right of Buyer to terminate the employment of any Transferred Employee at any time, with or without cause, following the effective date of his or her employment with Buyer, or restrict Buyer in the exercise of its independent business judgment in modifying any of the terms and conditions of the employment of the Transferred Employees.

(f)    Buyer agrees to provide any required notice under the Worker Adjustment Retraining and Notification Act of 1988 (the "**WARN Act**") and any similar state or non-U.S. statute, and otherwise to comply with any such statute with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting Business Employees and occurring after the Closing Date.  Sellers agree to provide any required notice under the WARN Act, and any similar state or non-U.S. statute, and otherwise to comply with any such statute with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting Business Employees and occurring on or prior to the Closing Date.

Section 7.6    Update of Disclosure Schedules; Knowledge of Breach. Sellers shall have the right (but not the obligation) from time to time prior to the Closing to supplement or amend the Disclosure Schedules with respect to any matter hereafter arising or discovered which if existing or known at the date of this Agreement would have been required to be set forth or described in such Disclosure Schedules and also with respect to events or conditions arising after the date hereof and prior to Closing.  Any such supplemental or amended disclosure shall be deemed to have cured any breach of any representation or warranty made in this Agreement for purposes of determining whether or not the conditions set forth in Article IX have been satisfied.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

Section 8.1    Taxes.

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services Tax, harmonized sales Tax and land transfer Tax) payable solely as a result of the sale or transfer of the Acquired Assets pursuant to this Agreement ("**Transfer Taxes**") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne and paid by Buyer.  Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes.  In the event any such Tax Return requires execution by Sellers, Buyer shall prepare and deliver to Sellers for their review, comment and approval, which approval shall not be unreasonably withheld, a copy of such Tax Return at least 10 Business Days before the due date thereof, and upon Sellers' approval thereof,

Sellers shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.

(b) Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

(c) Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

(d) All Taxes and similar ad valorem obligations levied with respect to the Acquired Assets and Assumed Liabilities (other than income Taxes of Sellers) for a taxable period that includes (but does not end on) the Closing Date shall be paid by Buyer as and when due. Buyer shall be responsible for the timely preparation and filing of Tax Returns solely with respect to the Acquired Assets or the Assumed Liabilities relating to a Post-Closing Tax Period.

Section 8.2    Government Patient Receivables; Buyer Funds Received Post-Closing.

(a) Pursuant to Section 2.1(x) hereof Sellers are obligated to convey to Buyer an amount equal to the Government Patient Receivables actually collected and received by Sellers after the Closing Date. In connection with such obligation, Sellers shall cause all such Government Patient Receivables to be paid into that certain current account of Sellers which is subject to an existing account agreement between Sellers, the depositary and Buyer or into a replacement account subject to a substantially equivalent account agreement satisfactory Buyer as needed to comply with applicable Law. Sellers shall not commingle with such Government Patient Receivables paid to such account by depositing into such account any other funds of Sellers. As necessary, Sellers hereby and hereafter shall take any and all other actions and execute any and all documents (including sweep instructions to transfer such collected funds to Buyer on a daily basis) reasonably requested by Buyer as may be necessary to effect in compliance with applicable Law the transfer of such amount paid into such account to Buyer in satisfaction of these Sellers' obligation.

(b) In addition to the terms of Section 8.2(a), Sellers agree that any amounts that are received by any Seller or that are deposited or paid into any bank or other account of any Seller (whether from a Government Program or any other source) that relate to the operation of the Business on and after Closing shall be the property of Buyer, shall be held by Sellers in constructive trust for Buyer without further commingling with

any other funds of Sellers and Sellers shall promptly turnover and deliver such amounts to Buyer.  Sellers shall take all actions to establish arrangements to effectuate the terms of this subparagraph in compliance with applicable Law (as reasonably determined by Buyer) including continuing to allow or cause, as the case may be, such funds to be paid into the deposit account referenced in Section 8.2(a).

(c)     In the event the "account" collection arrangement reflected in Section 8.2(a) or any other arrangement in this Section 8.2 is determined by a change in Law or regulation or interpretation by a Governmental Authority to be illegal or noncompliant with regulatory requirements, Sellers agree to make such modifications to this Section as reasonably requested by Buyer as may be necessary to comply with applicable Law while fulfilling the intent of this transaction and minimizing the fiscal effect on the parties of the change.

Section 8.3     Payments Received.  Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 8.4     Sellers' Cost Reports.  Sellers, at their expense, will timely prepare and file all cost reports relating to Sellers for periods ending on or prior to the Closing Date or required as a result of the consummation of the transactions set forth herein (the "**Seller Cost Reports**").  Buyer shall forward to Seller any and all correspondence relating to Seller Cost Reports within five (5) business days after receipt by Buyer.

Section 8.5     Adequate Assurance of Future Performance.  Buyer and Sellers agree that they will promptly take all actions reasonably required to provide the evidence required to establish that Buyer can provide adequate assurance of future performance under the Assumed Contracts and Assumed Leases, including such affidavits, non-confidential financial information and other documents or information as may be necessary or desirable for filing with the Bankruptcy Court and making Buyer's and Sellers' Representatives available to testify before the Bankruptcy Court.

Section 8.6     Confidentiality.

(a)     The terms of any confidentiality agreement to which Buyer (or an Affiliate of Buyer) is party in respect of any Seller (or any Affiliate thereof) shall continue in full force and effect until the Closing as to the Acquired Assets, at which time Buyer's obligations under any such confidentiality agreement shall terminate as to the Acquired Assets, but shall remain in full force and effect as to the Excluded Assets.

(b)     Except for the preparation and filing of Tax Returns and any filings or reports required by the Bankruptcy Code or other Law, the Bankruptcy Court, or any applicable rule or regulation relating to the Bankruptcy Cases, for a period of five years following the Closing Date, Sellers shall not, and Sellers shall cause their Affiliates and

46

the respective Representatives of Sellers and their Affiliates not to, use for their own benefit or divulge or convey to any Third Party, any Confidential Information; provided, however, that Sellers and their Affiliates may furnish such portion (and only such portion) of the Confidential Information as such Seller or Affiliate reasonably determines it is legally obligated to disclose if: (i) it receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority; (ii) to the extent not inconsistent with such request, it notifies Buyer of the existence, terms and circumstances surrounding such request and consults with Buyer on the advisability of taking steps available under applicable Law to resist or narrow such request; (iii) it exercises its commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Confidential Information; and (iv) disclosure of such Confidential Information is required to prevent such Seller or Affiliate from being held in contempt or becoming subject to any other penalty under applicable Law. For purposes of this Agreement, "**Confidential Information**" consists of all information and data relating to the Business (including Intellectual Property, patient and supplier lists, pricing information, marketing plans, market studies, client development plans, business acquisition plans and all other similar information or data), the Acquired Assets or the transactions contemplated hereby, except for data or information that is or becomes available to the public other than as a result of a breach of this Section.

(c)     Effective as of the Closing, Sellers hereby assign to Buyer all of the Sellers' right, title and interest in and to any confidentiality agreements entered into by Sellers (or their Affiliates or Representatives) and each Person (other than Buyer and its Affiliates and Representatives) who entered into any such agreement or to whom Confidential Information was provided in connection with any transaction involving the acquisition or purchase of all or any portion of the Business or the Acquired Assets. From and after the Closing, Sellers will take all actions reasonably requested by Buyer in order to assist in enforcing the rights so assigned, at Buyer's sole expense. Sellers shall use their commercially reasonable efforts to cause any such Person to return to Sellers any documents, files, data or other materials constituting Confidential Information provided to such Person in connection with the consideration of any such transaction.

Section 8.7    Post-Closing Access. For the longer of (x) five years, (y) the pendency of any Claim relating to the Business, and (z) the pendency of any Tax audit or investigation by any Governmental Authority commenced during the first five years after the Closing, (a) neither Buyer nor any Seller shall dispose of or destroy any of the business records and files of the Business and (b) Buyer and Sellers (including, for clarity, any trust established under a Chapter 11 plan of Sellers or any other successors of Sellers) shall allow each other and their respective Representatives reasonable access during normal business hours, and upon reasonable advance notice, to all employees, files and any books and records and other materials included in the Acquired Assets for purposes relating to the Bankruptcy Cases, the wind down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, including Tax matters, litigation, or potential litigation, each as it relates to the Business, the Acquired Assets or the Assumed Liabilities prior to the Closing Date (with respect to Sellers) or from and after the Closing Date (with respect to Buyer), and Buyer and Sellers (including any such trust or successors)

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 63 of 148

and such Representatives shall have the right to make copies of any such files, books, records and other materials; provided, that Sellers agree to cooperate with Buyer and its Affiliates in giving consideration to business demands of such Persons and Buyer and its Affiliates shall not be obligated to comply with this Section 8.5 to the extent compliance unreasonably interferes with the operation of their business. In addition, from and after the Closing, for a period of 60 days, Sellers will permit Buyer and its Representatives access to such personnel of Sellers during normal business hours as Buyer may reasonably request to assist with the transfer of the Inventory, Documents, Equipment and Permits that are included in the Acquired Assets.

Section 8.10 <u>Seller Names</u>. Sellers agree to take all reasonable actions necessary to cease all use of the names "Green Valley Hospital" and "GVH" and any mark containing or comprising such names within five (5) Business Days after the Closing, and shall, upon the written request of Buyer, and at Buyer's sole expense, promptly change the name of any entity including such names.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1 <u>Accuracy of Representations</u>. Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct (disregarding any materiality and "Material Adverse Effect" qualifiers therein) at the signing of this Agreement and at and as of the Closing as though made at and as of such time, other than representations and warranties that speak as of another specified date or time (which need only be true and correct as of such date and time), in each case, with only such exceptions that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Sellers shall have delivered to Buyer a certificate, dated as of the Closing Date, executed on behalf of each Seller by an authorized executive officer thereof, certifying that the conditions specified above have been fulfilled.

Section 9.2 <u>Sellers' Performance</u>. Sellers shall have performed and complied in all material respects with the covenants and agreements that Sellers are required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

Section 9.3 <u>No Closing Legal Impediment</u>. No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "**Closing Legal Impediment**").

Section 9.4 <u>Sellers' Deliveries</u>. Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.5    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Procedures Order and Sale Order shall not be subject to a stay pending appeal.

Section 9.6    Credit Bid.  Buyer shall be a secured creditor of Sellers holding valid, binding, enforceable and perfected first priority liens under the DIP Credit Agreement and the Modification & Extension Agreement against the property of Sellers' bankruptcy estates, and no portion of the amount of Buyer's secured claims under the DIP Credit Agreement and the Modification & Extension Agreement available to be applied against the Purchase Price in accordance with Section 3.1 shall have been subject to any challenge, avoidance, reduction (except on account of satisfaction), disallowance, re-characterization, impairment or subordination.

Section 9.7    Government Consents.  All filings, notices, licenses, permits and other consents of, to or with, any Governmental Authority or any Person that are required: (i) to permit Sellers to perform the transactions contemplated by this Agreement; (ii) to permit Buyer to, after Closing, operate the Business as it is currently conducted; or (iii) in order to prevent a material breach of or material default under or a right of termination or material modification of any Assumed Contract, in each case as set forth on Schedule 9.7, shall have been duly made or obtained and, in the case of Governmental Authorities, shall no longer be subject to administrative or judicial appeal, review or reconsideration, if any. No consent to the assumption, assignment, and/or sale of any Assumed Contract shall be required if the Sale Order expressly provides that Sellers have the power to assume, assign, and/or sell such Assumed Contract under Section 365 of the Bankruptcy Code without such consent.

Section 9.8    Government and Private Insurance Programs.  Buyer shall have determined that Buyer shall have the right to continue to receive payment in amounts satisfactory to Buyer under Government Programs and private insurance payor agreements and programs in connection with the operation of the Business after Closing.

Section 9.9    Phase I Report and Survey. Buyer shall have obtained (i) an environmental Phase I report and (ii) a survey, satisfactory in its sole discretion, regarding the Leased Real Property and Owned Real Property.

Section 9.10    No Material Adverse Effect.  There shall not have occurred any change, event or development or prospective change, event or development that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect.

**ARTICLE X**
**CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE**

Sellers' obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.  Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct (disregarding any materiality qualifiers therein) at the signing of this Agreement and at and as of the Closing as though made at and as of such time, other than representations and warranties that speak as of another specified date or time (which need only be true and correct as of such date and time), in each case, with only such exceptions that have not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.  Buyer shall have delivered to Sellers a certificate, dated as of the Closing Date, executed by an authorized executive officer of Buyer, certifying that the conditions specified above have been fulfilled.

Section 10.2    Buyer's Performance.  Buyer shall have performed and complied with in all material respects the material covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    No Closing Legal Impediment.  No Closing Legal Impediment shall be in effect.

Section 10.4    Buyer's Deliveries.  Each of the deliveries required to be made to Sellers pursuant to Section 4.2 shall have been so delivered.

Section 10.5    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Procedures Order and Sale Order shall not be subject to a stay pending appeal.

**ARTICLE XI**
**TERMINATION**

Section 11.1    Termination Events.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, provided, however, that the right to terminate this Agreement pursuant to this

50

Section 11.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Order;

(ii)    if the Closing shall not have occurred by the close of business on March 31, 2018 (the "**Outside Date**"); provided, however, that (A) Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(b)(ii) only if Buyer is not in material breach of any of its representations, warranties, covenants, or agreements contained herein, and (B) Sellers shall be permitted to terminate this Agreement pursuant to this Section 11.1(b)(ii) only if Sellers are not themselves in material breach of any of their representations, warranties, covenants or agreements contained herein;

(iii)    upon approval by the Bankruptcy Court of an Alternative Transaction, provided however, that confirmation of the pending *Debtors' and GVMI's Joint Plan of Liquidation dated July 31, 2017* [Dkt. No. 286] shall not constitute a Termination Event unless and until the Effective Date, as defined therein, shall have occurred;

(c)    by Buyer:

(i)    in the event of any breach by any Seller of any of its agreements, covenants, representations, or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied), and the failure of Sellers to cure such breach by the earlier of (A) the first Business Day before the Outside Date and (B) the date that is 15 Business Days after receipt of the Buyer Termination Notice; provided, that (1) Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein, (2) Buyer notifies Sellers in writing (the "**Buyer Termination Notice**") of its intention to exercise its rights under this Section 11.1(c)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representations, warranties, covenants, and agreements contained herein of which Sellers are allegedly in breach;

(ii)    if any of the Bankruptcy Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(iii)    if any conditions to the obligations of Buyer set forth in Article IX shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d)    by Sellers:

(i)    in the event of any breach by Buyer of any of its agreements, covenants, representations or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 10.1 or Section 10.2

to be satisfied), and the failure of Buyer to cure such breach by the earlier of (i) the first Business Day before the Outside Date and (ii) the date that is 15 Business Days after receipt of the Sellers Termination Notice; provided, that Sellers (1) are not themselves in material breach of any of their representations, warranties, covenants or agreements contained herein or in the Sale Procedures Order or the Sale Order, (2) notify Buyer in writing (the "**Sellers Termination Notice**") of their intention to exercise their rights under this Section 11.1(d) as a result of the breach, and (3) specify in the Sellers Termination Notice the representations, warranties, covenants, or agreements contained herein of which Buyer is allegedly in breach. Notwithstanding the foregoing, Seller shall not be considered to be in material breach of the Sale Procedures Order for purposes of this Section 11.1(d)(i) by virtue of (I) any missed milestones to date and/or (II) the failure to date, if any, to timely obtain financial information from potential bidders.

Section 11.2    Effect of Termination. In the event of termination of this Agreement as provided in Section 11.1, this Agreement shall forthwith become void and there shall be no liability on the part of either Party except for the provisions of Sections 5.23 and 6.4 relating to broker's fees and finder's fees, Section 8.6(a) relating to confidentiality, Section 12.1 relating to public announcements, Section 12.2 relating to notices, Section 12.7 relating to fees and expenses, Section 12.10 relating to third-party beneficiaries, Section 12.8 relating to governing law and submission to jurisdiction, and this Section 11.2.

## ARTICLE XII
## GENERAL PROVISIONS

Section 12.1    Public Announcements. The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by Buyer, on the one hand, and Sellers, on the other hand. Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

Section 12.2    Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt) or e-mail, (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested), or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, Representatives (if applicable), facsimile numbers and e-mail addresses set forth below (or to such other addresses, Representatives, facsimile numbers and e-mail addresses as a Party may designate by notice to the other Parties):

(a)    If to Sellers, then to:

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 68 of 148

Green Valley Hospital, LLC
4455 S I-19 Frontage Road
Green Valley, AZ 85622
Attn: John Matuska, CEO
E-mail: JMatuska@GreenValleyHospital.com

and

GV Hospital Management, LLC
4455 S I-19 Frontage Road
Green Valley, AZ 85622
Attn: John Matuska, CEO
E-mail: JMatuska@GreenValleyHospital.com

and

GVH II Holdings, LLC
4455 S I-19 Frontage Road
Green Valley, AZ 85622
Attn: John Matuska, CEO
E-mail: JMatuska@GreenValleyHospital.com

with a copy (which shall not constitute notice) to:

Forrester & Worth, PLLC
3636 North Central Avenue, Suite 700
Phoenix, AZ 85012
Attn: S. Cary Forrester
Facsimile: (602) 271-4300
E-mail: SCF@forresterandworth.com

(b)     If to Buyer:

c/o Lateral Investment Management, LLC
1825 S. Grant Street, Suite 210
San Mateo, CA 94402
Attention: Patrick Feeney
E-mail: patrick@lateralim.com

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher, LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067
Attn: Cromwell Montgomery
Facsimile: (310) 552-7063
E-mail: CMontgomery@gibsondunn.com

Section 12.3    Waiver.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

Section 12.4    Entire Agreement; Amendment.  This Agreement (including the Schedules and the Exhibits), the other Transaction Documents, the DIP Credit Agreement and the Modification & Extension Agreement (and any agreements delivered in connection with each of the foregoing) supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter.  This Agreement may not be amended except by a written agreement executed by all of the Parties.

Section 12.5    Assignment.  This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that (a) Buyer shall have the right to assign, without such consent of Sellers but with prior notice to Sellers, all or any portion of any Transaction Documents (including rights hereunder and thereunder) to any Affiliate, or to any of its lenders as collateral security, in each case whether prior to or subsequent to the Closing, but no such assignment shall (i) relieve Buyer of its obligations under this Agreement or any other Transaction Document, (ii) enlarge, alter, or change any obligation of any other party hereto or thereto due to Buyer or its assignees, or (iii) be permitted if such assignment would reasonably be expected to prevent, impair, or delay the consummation of the transactions contemplated hereby, and (b) Sellers shall be permitted to assign all or part of their rights or obligations hereunder pursuant to a plan of reorganization or liquidation approved by the Bankruptcy Court.

Section 12.6    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7    Expenses.  Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document        Page 70 of 148

independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby (except as otherwise specified herein).

Section 12.8    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Arizona applicable to Contracts and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the Laws of any other jurisdiction other than the State of Arizona applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, other than disputes referenced in the dispute resolution procedure set forth in Section 3.4 (Tax Allocation), any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Cases is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in an Arizona state court or a federal court sitting in the State of Arizona, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by Law.

(c)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.9    Counterparts. This Agreement and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 12.10    Parties in Interest; Third Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement is for the sole benefit of the Parties and their permitted

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 71 of 148

assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

Section 12.11     Interpretation.

(a)     Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Any reference in this Agreement to "$" means U.S. dollars.

(iii)     Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules.  No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any agreement, Law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Any information, item, or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)     Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)     References herein to any contract or agreement (including this Agreement) mean such contract or agreement as amended, supplemented, or modified from time to time in accordance with the terms thereof, to the extent a copy of such amendment, supplement or modification was made available to Buyer.

(vi)     The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 72 of 148

(vii)    Words such as "**herein**," "**hereof**," and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)    The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    An item shall be considered "**made available**" if such item was posted by Sellers or their representatives and made available to Buyer with unrestricted access for a continuous period of at least two Business Days prior to the date of this Agreement by means of the electronic documentation site established by RR Donnelley on behalf of Sellers entitled "Virtual Data Room (VDR) for Project GV", or otherwise actually provided to and received by Buyer.

(b)    No Strict Construction.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

Section 12.12    Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement.  If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law. Buyer's sole remedy, in the event of any breach of this Agreement by Sellers, will be to either (a) terminate this Agreement in accordance with the provisions of Section 11, above, or seek specific performance under the provisions of this Section 12.13.

Section 12.13    Survival.  All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate.

Section 12.14    Mutual Release.

(a)    Notwithstanding anything to the contrary contained herein, effective upon the Closing, (i) Buyer (individually and on behalf of its Affiliates) hereby releases and

forever discharges each Seller and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees, agents of each of them from any and all actual or potential claims, causes of action, proceedings, liabilities, damages, expenses and/or losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Party had, have, or may have in the future relating in any way to the Acquired Assets or the Assumed Liabilities and (ii) each Seller, individually and on behalf of its Affiliates, and such Seller's and Affiliates' respective successors and assigns, including any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code, hereby releases and forever discharges Buyer and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees, agents of each of them from any and all actual or potential claims, causes of action, proceedings, liabilities, damages, expenses and/or losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Party had, have, or may have in the future relating in any way to the Acquired Assets, Assumed Liabilities, Excluded Assets or the Excluded Liabilities; provided that (x) nothing in this Section 12.15 shall constitute a release of any Person arising from conduct of such Person that is determined by a Final Order of a court of competent jurisdiction to have constituted an actual fraud, willful breach, knowing and intentional misrepresentation, or criminal act by such Person and (y) except as expressly set forth in Section 3.1, nothing in this Agreement shall be construed to release any Person from any of its contractual obligations under this Agreement, the other Transaction Documents, or any agreements delivered in connection with any of the foregoing, including such Person's obligations in respect of the Acquired Assets, Assumed Liabilities, Excluded Assets, and Excluded Liabilities, as the case may be, each of which shall remain fully effective and enforceable from and after the Closing Date. The foregoing release extends to all claims whether or not claimed or suspected, and constitutes a waiver of each and all of the provisions of California Civil Code Section 1542 (to the extent it would be applicable), which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

*Signature pages follow.*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

**LATERAL GV, LLC**

By: _____
Name:
Title:

**GV HOSPITAL MANAGEMENT, LLC**

By: _____
Name:
Title:

**GREEN VALLEY HOSPITAL, LLC**

By: _____
Name:
Title:

**GV II HOLDINGS, LLC**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

**LATERAL GV, LLC**

By: _____
Name: RICHARD DE SILVA
Title: Managing Member

**GV HOSPITAL MANAGEMENT, LLC**

By: _____
Name:
Title:

**GREEN VALLEY HOSPITAL, LLC**

By: _____
Name:
Title:

**GV II HOLDINGS, LLC**

By: _____
Name:
Title:

# EXHIBIT 1

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [___], 2017, is made by and among [Lateral GV, LLC], a Delaware limited liability company (the "Assignee"), GV Hospital Management, LLC, an Arizona limited liability company ("Management"), Green Valley Hospital, LLC, an Arizona limited liability company ("GVH") and GVH II Holdings, LLC, an Arizona limited liability company ("GVII" and, together with Management and GVH, the "Assignors" and each individually, an "Assignor").

## RECITALS

A.    The Assignors and the Assignee have entered into that certain Asset Purchase Agreement, dated as of [___], 2017 (the "Purchase Agreement"), pursuant to which, among other things, the Assignors have agreed to sell and the Assignee has agreed to purchase the Acquired Assets.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

B.    Pursuant to the Purchase Agreement, the Assignors have agreed to assign and the Assignee has agreed to assume the Assumed Liabilities.

## AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    The Assignors hereby contribute, convey, transfer and assign to the Assignee all of the Assignors' rights, duties and obligations under the Assumed Liabilities, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.  The Assignee hereby agrees to pay, discharge, perform or otherwise satisfy, and assumes and agrees to be bound by, the Assumed Liabilities, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

2.    Nothing in this Agreement shall change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement or any liability or obligation of the Assignors or the Assignee arising under the Purchase Agreement.  In the event of any conflict between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

3.    This Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

4.    This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Arizona, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Arizona.

5.      This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  A facsimile, PDF or other electronic signature of this Agreement shall be valid and have the same force and effect as a manually signed original.

*The remainder of this page has been intentionally left blank.*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**[LATERAL GV, LLC]**

By: _____
Name:
Title:

**GV HOSPITAL MANAGEMENT, LLC**

By: _____
Name:
Title:

**GREEN VALLEY HOSPITAL, LLC**

By: _____
Name:
Title:

**GV II HOLDINGS, LLC**

By: _____
Name:
Title:

# EXHIBIT 2

## BILL OF SALE

This BILL OF SALE (this "Bill of Sale"), dated as of [___], 2017, is made by and among [Lateral GV, LLC], a Delaware limited liability company (the "Buyer"), GV Hospital Management, LLC, an Arizona limited liability company ("Management"), Green Valley Hospital, LLC, an Arizona limited liability company ("GVH"), and GVH II Holdings, LLC, an Arizona limited liability company ("GVII" and, together with Management and GVH, the "Sellers" and each individually, a "Seller").

## RECITALS

A.    The Sellers and the Buyer have entered into that certain Asset Purchase Agreement, dated as of [___], 2017 (the "Purchase Agreement"), pursuant to which, among other things, the Sellers have agreed to sell and the Buyer has agreed to purchase the Acquired Assets. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

B.    The Sellers have agreed to execute and deliver this Bill of Sale to the Buyer for the purpose of transferring to and vesting in the Buyer title to the Acquired Assets as set forth herein.

## AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    The Sellers do hereby sell, convey, transfer, assign, deliver, and vest in the Buyer, its successors and assigns, forever, all of the Sellers' rights, titles, and interests in and to the Acquired Assets free and clear of any and all Encumbrances other than Permitted Encumbrances of any and every kind, nature and description, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and the Sale Order.  The Buyer hereby purchases, acquires, and accepts the Acquired Assets free and clear of all Encumbrances other than Permitted Encumbrances pursuant to and in accordance with the terms and conditions of the Purchase Agreement and the Sale Order.

2.    The Sellers hereby constitute and appoint the Buyer, its successors and assigns, as the Sellers' true and lawful attorney, with full power of substitution, in the Sellers' name and stead, on behalf of and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in the Sellers' name, at the sole expense and for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, reasonably may require for the collection or reduction to possession of any of the Acquired Assets.

3.     The Sellers hereby covenant that, from time to time after the delivery of this instrument, at the Buyer's request, the Sellers will do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged, and delivered such further acts, conveyances, transfers, assignments, powers of attorney, and assurances as the Buyer may reasonably require to convey, transfer to, and vest in the Buyer, and to put the Buyer in possession of, any of the Acquired Assets.

4.     Nothing in this Bill of Sale shall change, amend, extend, or alter (nor shall it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Purchase Agreement or any liability or obligation of the Sellers or the Buyer arising under the Purchase Agreement, which shall govern the representations, warranties, and obligations of the parties with respect to the Acquired Assets.  In the event of any conflict between the Purchase Agreement, the Sale Order and this Bill of Sale, the provisions of the Purchase Agreement and the Sale Order shall control.

5.     This Bill of Sale will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

6.     This Bill of Sale and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Arizona, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Arizona.

7.     This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.  A facsimile, PDF or other electronic signature of this Bill of Sale shall be valid and have the same force and effect as a manually signed original.

*The remainder of this page has been intentionally left blank.*

IN WITNESS WHEREOF, the parties have executed this Bill of Sale as of the date first written above.

**[LATERAL GV, LLC]**

By: _____
Name:
Title:

**GV HOSPITAL MANAGEMENT, LLC**

By: _____
Name:
Title:

**GREEN VALLEY HOSPITAL, LLC**

By: _____
Name:
Title:

**GV II HOLDINGS, LLC**

By: _____
Name:
Title:

**<u>EXHIBIT 3</u>**

**FORM OF SALE ORDER**

**(TO COME)**

**Schedule 1.1(a)**[1]
**Acquired Subsidiaries**

1. GVH MOB 1, LLC, an Arizona limited liability company

2. GVH MOB 2, LLC, an Arizona limited liability company

3. GVH MOB 3, LLC, an Arizona limited liability company

4. GV Campus Management, LLC, an Arizona limited liability company

5. Green Valley Hospital Campus Owner's Association

---

[1] NTD: These Schedules remain subject in all respects to continued review and diligence.

**Schedule 1.1(b)**
**Transferred Employee Plans**

1. Paid Time Off Policy (Reference #HR010)

2. Paid Time Off Policy for Director Level and Above (Reference #HR011)

3. Aetna PPO 1000 Plan Design and Benefits 2017

4. Aetna PPO 2500 Plan Design and Benefits 2500

5. Aetna PPO HSA 2600 Plan Design and Benefits 2017

6. Green Valley 401k

7. Green Valley Hospital 2016_Aflac

8. Guardian Dental and Vision Enrollment Form

9. GV Hospital Management LLC - amend 1 1 2016 - Plan Document

10. Metlife Supplemental Term Life Rates

11. GVH Disability Pricing

12. HSA Document – 2017

13. Metlife Basic Life Policy

14. Power Point- Benefits 2017

15. Humana Health Plans

2

**Schedule 2.1(i)**
**Assumed Executory Contracts**

| Document Name | Entity | Description of Contract | Nature of Debtor's Interest | Date Contract Expires |
|---|---|---|---|---|
| Anil Prasad Rama Rao, MD Agreement | Green Valley Hospital Management | Anil Prasad Rama Rao: Foothills Pathology PC 6200 N. La Cholla Blvd. Tucson, AZ 85741 | Medical Director Services Agreement, $175 per hour for 20-40 hours | 5/14/2018 |
| Emergency Surgical Services of AZ On-Call Agreement | Green Valley Hospital Management | Emergency Surgical Services of Arizona: 4539 E. Fort Lowell Tucson AZ, 85712 | General Surgery On-Call Agreement $1,200 per 24 hour period on call | 5/19/2018 |
| Foothills Pathology MD Services Agreement | Green Valley Hospital Management | Foothills Pathology PC 6200 N. La Cholla Blvd. Tucson, AZ 85740 | Medical Director Services Agreement | 5/14/18 |
| Foothills Pathology Services Agreement | Green Valley Hospital Management | Foothills Pathology PC 6200 N. La Cholla Blvd. Tucson, AZ 85741 | Pathology Services Agreement | 5/14/2018 |
| Ironwood Gastroenterology Services Agreement | Green Valley Hospital Management | Ironwood Gastroenterology : 1953 W Grant Rd, Tucson, AZ 85745 | Medical Director Services Agreement | 4/30/16 (renewed) |
| Pima Heart MD Services Agreement | Green Valley Hospital | PIMA Heart: 2404 E. River Rd. Bldg 2, Ste 100, Tucson AZ 85718 | Medical Director Services Agreement, $150 per hour max 10 hours per month | 4/30/16 (renewed) |

3

| Document Name | Entity | Description of Contract | Nature of Debtor's Interest | Date Contract Expires |
|---|---|---|---|---|
| Pima Heart Services Agreement | Green Valley Hospital | Pima Heart Physicians, PC: 3375 N. Campbell Ave, Tucson, AZ 85719 | Cardiology Services Agreement | 12/31/17 |
| SAA Anesthesia On-Call Agreement | Green Valley Hospital Management | Souther Arizona Anesthesia Services, P.C. 3390 N Campbell Tucson, AZ 85713 | Anesthesia On- Call Agreement | 5/17/16 (auto renewal to 5/17/18) |
| SAA Anesthesia Services Agreement | Green Valley Hospital Management | Souther Arizona Anesthesia Services, P.C. 3390 N Campbell Tucson, AZ 85714 | Anesthesia Services Agreement | 5/17/16 (auto renewal to 5/17/18) |
| SAA Medical Director Services Agreement | Green Valley Hospital Management | Souther Arizona Anesthesia Services, P.C. 3390 N Campbell Tucson, AZ 85715 | Medical Director Services Agreement, $150 per hour max 40 hours per month | 5/10/2016 |
| Southern Arizona Gastroenterology Services Agreement | Green Valley Hospital Management | Southern Arizona Gastroenterology Associates, PLLC 1701 W. St. Marys Rd Tucson, AZ 8571 | Gastroenterology Service Agreement | 12/31/17 |
| Tristan T. Berry, MD Urology On-Call Agreement | Green Valley Hospital Management | Tristan T. Berry: El Dorado Urology and Prostate Center 1100 N. El Dorado Place Tucson, AZ 85715 | Urology On- Call Agreement | 4/5/17 (auto renew until 4/5/19) |
| Dr. Taggarse Agreement | Green Valley Hospital | Akash Taggarse: 1521 E Tangerine Rd, Suite #3A Oro Valley, AZ 85755 | Independent Contractor Hospitalist Service Agreement | 12/7/2017 |
| TOI OnCall Agreement | Green Valley Hospital Management | Tucson Orthopedic Institute, P.C.: 333 E. Wetmore, Suite 305 Tucson, Arizona 85705 | Orthopedic Surgery On-Call Agreement, $1,500-$1,600 for each 24 hour period a physician is on call | 1/16/18 (auto renew until 1/16/20) |

| Document Name | Entity | Description of Contract | Nature of Debtor's Interest | Date Contract Expires |
|---|---|---|---|---|
| AZ Community Surgeons | Green Valley Hospital Management | Arizona Community Surgeons, PC: 4539 East Fort Lowell Rd, Tucson, AZ 85712 | Orthopedic Surgery On-Call Agreement, $1,200 for each 24 hour day that one physician is on call | 11/1/17 and auto renew until 11/1/19 |
| Ameritrade Plan Sponsor Agreement and Plan Account Form | Pension and Retirement | | | Re: 401k |
| Mission Linen Supply | Green Valley Hospital | Mission Linen Supply: 301 South Park Avenue, Tucson, Arizona 85719 | Linen and Uniform | 4/2/2018 |
| Waste Management | Green Valley Hospital | Waste Management: 3152 N 34th Drive Phoenix, AZ 85018 | Waste removal | 5/1/2018 |
| Contract C-Suite | Green Valley Hospital | JM Healthcare Solutions, LLC: 1301 A Grand Central Ave., Laballette, NJ 08735 | Contract CEO | 9/30/2017 |
| Contract Labor | Green Valley Hospital | Joe Vincent Fote, 119 Crabelle Mill Dr., Bluffton, SC 29909 | Contract PFS Director | No Term |
| Collections Agreement | Green Valley Hospital | Medical Account Systems, LLC: 16115 SW 117th Ave #3, Miami, FL 33177 | Collections agreement | No Term |
| Extended Repayment Schedule | Green Valley Hospital | Noridian Healthcare Solutions | Overpayment payback agreement | 5/31/2021 |
| Alex Verhoogen, MD Chief of Staff Services Agreement | Green Valley Hospital Management | Alex Verhoogen: 657 W GREENVIEW PLACE 85614 GREEN VALLEY AZ | Chief of Staff Service Agreement for $150 per hour for ten to forty hours each month | 10/31/15 (renewed) |
| Emergency Department Services Agreement | Green Valley Hospital | Shufeldt Consulting, LLC: 7332 BUTHERUS #1 85267 SCOTTSDALE AZ | Emergency Department Services Agreement including compensation structure for Medical Director, Administrative | 12/31/17 |

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 88 of 148

| Document Name | Entity | Description of Contract | Nature of Debtor's Interest | Date Contract Expires |
|---|---|---|---|---|
| | | | services and Professional Services | |
| BBVA Agreement | Green Valley Hospital Management | BBVA Agreement | BBVA Agreement for Credit Card Processing | Active until terminated |
| Care 360 Lab and Meds User Agreement | Green Valley Hospital | Care360 Labs | Labs and Meds User Agreement | Active until terminated |
| DNV GL Management System Certification Agreement | Green Valley Hospital Management | DNVGL: 1400 Ravello Drive Katy, TX 77449 | DNV GL Management System Certification Agreement | 4/31/30 |
| Facility Dude | Green Valley Hospital | Facility Dude: 11000 Regency Parkway #110 Cary, NC 27518 | Software to assist with efficiency at the facility | 1/1/16 (autorenewal) |
| Green Valley Water District | Green Valley Hospital | Green Valley Water District: 3290 S. Camino Del Sol #100 PO Box 623, Green Valley, Arizona, 85622 | Water Line for Fire System | Continues until disconnect |
| Aetna PPO Plans | Green Valley Hospital | Design and Benefits | Employee Benefit Plan | No Term |
| Guardian Dental & Vision | Green Valley Hospital | Dental and Vision | Employee Benefit Plan | No Term |
| Metlife Life Insurance | Green Valley Hospital | Supplemental and Basic Life Insurance Plan | Employee Benefit Plan | No Term |

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 89 of 148

**<u>Schedule 2.1(j)</u>**
**Assumed Leases**

| Description of Lease | Nature of Debtor's Interest | Date Lease Expires | Monthly Cost | Cure |
|---|---|---|---|---|
| CREEKRIDGE CAPITAL LLC | MEDTRONIC SURGERY EQUIP | 2/28/2019 | $2,206.53 | $15,861.64 (THRU 11-30-17) |
| CREEKRIDGE CAPITAL LLC | RESPIRATORY EQUIP | 11/30/2018 | $1,342.17 | $9,648.19 (THRU 11-30-17) |
| NFS LEASING | VOLCANO,MEDTRONIC,MAQUET MEDICAL SYSTEMS, GE HEALTHCARE | 2/21/2019 | $6,831.52 | $17,810.10 |
| NFS LEASING | GE EQUIP | 8/10/2019 | $7,388.92 | $    0 |
| NFS LEASING | LABSO EQUIPMENT | 8/29/2019 | $1,971.93 | $    0 |
| LEASE OF OFFICE SPACE IN MOBII (1,625 SQ. FT.) | GV HOSPITAL MANAGEMENT IS LESSEE (GREEN VALLEY HOSPITAL LLC WAS ORIGINAL LESSEE) | 8/31/20 | $2,789 + TRIPLE NET CHARGES | $67,100 |
| LEASE OF OFFICE SPACE IN MOBII (4,557 SQ. FT.) | GV HOSPITAL MANAGEMENT IS LESSEE (GREEN VALLEY HOSPITAL LLC WAS ORIGINAL LESSEE) | 8/31/22 | $7,822 + TRIPLE NET CHARGES | |
| OLYMPUS EQUIPMENT | UROLOGY EQUIPMENT | 5/27/2019 | $6,998.00 | $14,779.78 |
| US Bank Equipment Finance | Medical Equipment and Copiers | Various | $1,518.75 | $163.70 |

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document    Page 90 of 148

**Schedule 2.2(b)**
**Excluded Equipment**

1. All equipment subject to the security interest(s) held by SQN Asset Finance (Guernsey) Limited, including, but not limited to, the equipment described in the following UCC-1 Financing Statements:

   a.   UCC-1 Financing Statement filed with the Arizona Secretary of State on February 5, 2015, as File no. 2015-000-4769-0;

   b.   UCC-1 Financing Statement filed with the Arizona Secretary of State on February 5, 2015, as File no. 2015-000-4766-1; and

   c.   UCC-1 Financing Statement filed with the Arizona Secretary of State on February 5, 2015, as File no. 2015-000-4768-8.

8

**Schedule 2.2(g)**
**Insurance**

1. Wesco Insurance Company Policy No. EUW1418988 00 issued to Green Valley Hospital, LLC, with an inception date of 11-2-16 and an expiration date of 11-2-18 (as extended) covering Private Company Liability, Employment Practices Liability, and Fiduciary Liability (D&O Healthcare) with an aggregate liability limit of $6,000,000

**<u>Schedule 2.2(h)</u>**
**Additional Excluded Assets**

None.

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document       Page 93 of 148

## Schedule 2.5(a)

## Executory Contract Cure Costs

| Document Name | Entity | Description of Contract | Nature of Debtor's Interest | Date Contract Expires | Cure Costs |
|---|---|---|---|---|---|
| Foothills Pathology Services Agreement | Green Valley Hospital Management | Foothills Pathology PC 6200 N. La Cholla Blvd. Tucson, AZ 85741 | Pathology Services Agreement | 5/14/2018 | $79,223 |
| Tristan T. Berry, MD Urology On-Call Agreement | Green Valley Hospital Management | Tristan T. Berry: El Dorado Urology and Prostate Center 1100 N. El Dorado Place Tucson, AZ 85715 | Urology On- Call Agreement | 4/5/17 (auto renew until 4/5/19) | $4,800 |
| Mission Linen Supply | Green Valley Hospital | Mission Linen Supply: 301 South Park Avenue, Tucson, Arizona 85719 | Linen and Uniform | 4/2/2018 | $1,189 |
| Waste Management | Green Valley Hospital | Waste Management: 3152 N 34th Drive Phoenix, AZ 85018 | Waste removal | 5/1/2018 | $1,418 |
| Alex Verhoogen, MD Chief of Staff Services Agreement | Green Valley Hospital Management | Alex Verhoogen: 657 W GREENVIEW PLACE 85614 GREEN VALLEY AZ | Chief of Staff Service Agreement for $150 per hour for ten to forty hours each month | 10/31/15 (renewed) | $10,125 |
| Emergency Department Services Agreement | Green Valley Hospital | Shufeldt Consulting, LLC: 7332 BUTHERUS #1 85267 SCOTTSDALE AZ | Emergency Department Services Agreement including compensation structure for Medical Director, Administrative services and Professional Services | 12/31/17 | $18,063 |
| Green Valley Water District | Green Valley Hospital | Green Valley Water District: 3290 S. | Water Line for Fire System | Continues until disconnect | $1,683 |

| Document Name | Entity | Description of Contract | Nature of Debtor's Interest | Date Contract Expires | Cure Costs |
|---|---|---|---|---|---|
| | | Camino Del Sol #100 PO Box 623, Green Valley, Arizona, 85622 | | | |

**Assumed Equipment Cure Cost (Liens)**

| Senior Lienholder | Debtor Entity | Description of Deed of Trust/ Financing Statement | Nature of Lien | Equipment Senior Lien Amount |
|---|---|---|---|---|
| SQN Asset Finance (Guernsey) Limited | GV II Holdings, LLC | Deed of Trust and Fixture Filing (With Assignment of Rents and Security Agreement) dated February 3, 2015, recorded July 1, 2015, as Sequence No. 20151820597, Official Records of Pima County, Arizona | Deed of Trust on 2 parcels if vacant real estate | $13,878,289.88 |
| SQN Asset Finance (Guernsey) Limited | GV II Holdings, LLC | UCC-1 Financing Statement filed with the Arizona Secretary of State on February 5, 2015, as File no. 2015-000-4769-0 | Specified personal property associated with the real property | $13,878,289.88 |
| SQN Asset Finance (Guernsey) Limited | Green Valley Hospital, LLC | Security Agreement dated February 3, 2015 | Specified Equipment | $13,878,289.88 |
| SQN Asset Finance (Guernsey) Limited | Green Valley Hospital, LLC | UCC-1 Financing Statement filed with the Arizona Secretary of State on February 5, 2015, as File no. 2015-000-4766-1 UCC-1 Financing Statement filed with the Arizona Secretary of State on February 5, 2015, as File no. 2015-000-4768-8 | Specified Equipment | $13,878,289.88 |

| Senior Lienholder | Debtor Entity | Description of Deed of Trust/ Financing Statement | Nature of Lien | Equipment Senior Lien Amount |
|---|---|---|---|---|
| GE Healthcare | Green Valley Hospital, LLC | UCC-1 Financing Statement filed with the Arizona Secretary of State on March 3, 2015, as File no. 2015-000-7562-9<br><br>UCC-1 Financing Statement filed with the Arizona Secretary of State on March 20, 2015, as File no. 2015-000-9716-0<br><br>UCC-1 Financing Statement filed with the Arizona Secretary of State on April 1, 2015, as File no. 2015-001-1201-3 | Specified Equipment | $750,831.96 |
| Med One Capital Funding, LLC | Green Valley Hospital, LLC | UCC-1 Financing Statement filed with the Arizona Secretary of State on April 10, 2015, as File no. 2015-001-2684-7 | Specified Equipment | $156,688.48 |

**Assumed Equipment Cure Cost (Leases)**

| Description of Lease | Nature of Debtor's Interest | Date Lease Expires | Monthly Cost | Cure |
|---|---|---|---|---|
| CREEKRIDGE CAPITAL LLC | MEDTRONIC SURGERY EQUIP | 2/28/2019 | $2,206.53 | $15,861.64 (THRU 11-30-17) |
| CREEKRIDGE CAPITAL LLC | RESPIRATORY EQUIP | 11/30/2018 | $1,342.17 | $9,648.19 (THRU 11-30-17) |
| NFS LEASING | VOLCANO,MEDTRONIC,MAQUET MEDICAL SYSTEMS, GE HEALTHCARE | 2/21/2019 | $6,831.52 | $17,810.10 |

| | | | | |
|---|---|---|---|---|
| NFS LEASING | GE EQUIP | 8/10/2019 | $7,388.92 | $ 0 |
| NFS LEASING | LABSO EQUIPMENT | 8/29/2019 | $1,971.93 | $ 0 |
| OLYMPUS EQUIPMENT | UROLOGY EQUIPMENT | 5/27/2019 | $6,998.00 | $14,779.78 |
| US Bank Equipment Finance | Medical Equipment and Copiers | Various | $1,518.75 | $163.70 |

**Assumed Real Property Lease Cure Cost**

| Description of Lease | Nature of Debtor's Interest | Date Lease Expires | Monthly Cost | Cure |
|---|---|---|---|---|
| LEASE OF OFFICE SPACE IN MOBII (1,625 SQ. FT.) | GV HOSPITAL MANAGEMENT IS LESSEE (GREEN VALLEY HOSPITAL LLC WAS ORIGINAL LESSEE) | 8/31/20 | $2,789 + TRIPLE NET CHARGES | $67,100 |
| LEASE OF OFFICE SPACE IN MOBII (4,557 SQ. FT.) | GV HOSPITAL MANAGEMENT IS LESSEE (GREEN VALLEY HOSPITAL LLC WAS ORIGINAL LESSEE) | 8/31/22 | $7,822 + TRIPLE NET CHARGES | |

## Schedule 5.3(ii)(A)
### Violations and Breaches

None

**<u>Schedule 5.3(ii)(B)</u>**
**Resulting Encumbrances**

None

Case 4:17-bk-03351-SHG    Doc 616    Filed 01/08/18    Entered 01/08/18 16:55:54    Desc
Main Document      Page 99 of 148

**5.3(ii)(C)**
**Required Consents and Notices**

1. Transfer of the licenses and permits listed in Schedule 9.7 will require the consent of the governmental or other entities that issued them.

2. Notice of the transaction will be provided to the following regulatory bodies:

> AHCCCS
>
> Matthew J. Devlin
> Assistant Director/General
> Counsel
> Office of Administrative Legal
> Services
> Arizona Health Care Cost
> Containment System
> 701 E. Jefferson Street
> MD-6200
> Phoenix, AZ 85034
> Tel: (602) 417-4008
> Fax: (602) 253-9115
> Email: Matt.Devlin@azahcccs.gov

CMS

Office of the Regional
Administrator
Attn: Steven Chickering
Associate Regional Administrator
90 – 7th Street, Suite 5-300
San Francisco, CA 94103-6706
Tel: 415-744-3696
Email: ROSFOSO@cms.hhs.go

Noridian

Noridian JF Part A
Attn: Kiah Gainakos
PO Box 6730
Fargo, ND 58108-6730
Email:
Kiah.Gianakos@noridian.com

DNV

DNV GL - Healthcare
400 Techne Center Drive
Suite 100
Milford, OH 45150
Email: healthcare@dnvgl.com

AZDHS

Arizona Department of Health
Services
Bureau of Medical Facilities
Licensing

Attn: Connie Belden
150 N 18th Avenue Ste. 450
Phoenix, Arizona 85007
Tel: (602) 542-1025
Fax:(602) 542-0883
Email: Connie.Belden@azdhs.gov

Defense Health Agency

Defense Health Agency
7700 Arlington Boulevard
Suite 5101
Falls Church, VA 22042-5101

Arizona Pharmacy Board

Board of Pharmacy
1616 W. Adams St., Suite 120
Phoenix, AZ 85007
Tel: (602) 771-2727
Fax: (602) 771-2749

Arizona Radiation Regulatory
Agency

Arizona Radiation Regulatory
Agency
4814 S. 40th St.
Phoenix, AZ 85040
Tel: (602) 255-4845
Fax: (602) 437-0705

<u>DEA</u>

Drug Enforcement Administration
Phoenix Division
Westmount Place, Suite 301
3010 North 2nd Street
Phoenix, AZ 85012
Tel: (602) 664-5600

3.

**Schedule 5.5**
**Pending Legal Proceedings affecting the Agreement**

1.  Green Valley Medical Investments, LLLP ("GVMI") has filed an appeal of the Order Approving the Employment of Kaufman, Hall & Associates, LLC as Debtors' Sales Agent on a Fixed Fee Basis [Dkt. No. 491].

2.  GVMI has also filed an appeal of the Order Establishing Procedures for the Sale of Substantially All of Debtors' Assets [Dkt. No. 493].

21

<u>Schedule 5.6</u>

**COMPLIANCE WITH LAWS, PERMITS, HEALTHCARE MATTERS**

- Green Valley Hospital is delinquent on its payments of the state AHCCCS assessment under A.R.S. §§ 36-2901.08 and 36-2901.09, and A.A.C. §R9-22-730. The Hospital has been in negotiations with AHCCCS concerning the assessment and a potential settlement. Failure to pay the assessment could result in termination of the Hospital's AHCCCS provider status and loss of license under A.R.S. § 36-2901.08(H).

- Green Valley Hospital has agreed to submit and comply with a corrective action plan with the Arizona Department of Health Services Public Health Preparedness Bureau of Public Health Statistics (AZDHS). Green Valley Hospital is subject to this corrective action plan and civil money penalties in the amount of $34,000 as a result of purported failure of the Hospital to report inpatient and emergency data under A.R.S. § 36-125.05 through a prescribed uniform patient reporting system as outlined in Arizona Administrative Code § R9-11-402 and §R9-11-502.

- Green Valley Hospital received overpayments from the Centers from Medicare and Medicaid Services (CMS) and has entered into an extended repayment plan with CMS to fulfill its repayment obligation. The overpayment was a result of a Noridian miscalculation, whereby Noridian calculated the payments based on the Hospital's fixed asset ledger. Upon submission of the cost report, Noridian realized that they had over calculated payments. The Chief Financial Officer of the Hospital also realized the overpayments and set up a liability to address the overpayment issue while coordinating with Noridian.

- GV Hospital Management, LLC failed to pay to the Internal Revenue Service and the State of Arizona its employee payroll tax withholdings for certain prior periods; the total amount owing is approximately $2,000,000, exclusive of penalties and interest.

- Green Valley Hospital recently obtained swing bed status for 21 of its beds. This does not decrease the total number of beds but allows the hospital to provide long term skilled nursing care to patients in 21 designated beds.

- Green Valley Hospital licenses its electronic medical record system from Cerner. Cerner disclosed Green Valley Hospital patient protected health information to another hospital in violation of HIPAA. To remedy this breach, Cerner has entered into a corrective action plan with Green Valley Hospital.

- The Hospital is self-reporting a Stark violation regarding payments to two orthopedic surgeons but believes that the violation and the potential penalty are immaterial.

- The AZDOH received a complaint in November or December of 2017 and the Hospital is required to submit a plan of correction.

**Schedule 5.7**
**Intellectual Property**

1. Green Valley Hospital LLC has an agreement with Cerner whereby Cerner provides electronic medical record software to the Hospital in return for a license payment. Green Valley Hospital is delinquent on its payment under the license and, as such may be subject to a claim or litigation with regard to this matter. The amount of the arrearage owing to Cerner is approximately $2.2 million.

2. Green Valley Hospital LLC has an agreement with Microsoft, as reflected in the Business and Services Agreement, Enterprise Agreement, Enterprise Enrollment, and Transaction Tax Terms & Conditions, all dating from February of 2015. The agreement includes, among other things, one or more licenses to use Microsoft software. The agreement has a three year term. The amount presently owing under the agreement is $105,881.58. Microsoft may insist on payment as a condition to renewing the agreement or entering into a new one.

3. GreenValleyHospital.com  (domain name)

4. Green Valley Hospital, ASOS File No. 659063 (registered tradename in Arizona)

**<u>Schedule 5.8</u>**
**Data Privacy and Security**

- Green Valley Hospital licenses its electronic medical record system from Cerner. Cerner disclosed Green Valley Hospital patient protected health information to another hospital in violation of HIPAA. To remedy this breach, Cerner has entered into a corrective action plan with Green Valley Hospital.

## Schedule 5.11
### Financial Statements

**Attachments**

1.    Unaudited consolidated financial statement for 2016

2.    Unaudited consolidated financial statement for 2017 YTD through 11-30-17

**GVH Profit and Loss Statement**
**12/31/2016**
**For the Twelve Months Ending**

| | GVH Mgmt, LLC | GVH, LLC | MOB 1 | MOB 2 | MOB 3 | GVII Holdings, LLC | Total |
|---|---|---|---|---|---|---|---|
| **Patient Charges** | | | | | | | |
| Inpatient Charges | $40,755,858 | | | | | $0 | $40,755,858 |
| Outpatient Charges | 49,344,994 | | | | | 0 | 49,344,994 |
| Total Charges | 90,100,852 | 0 | 0 | 0 | 0 | 0 | 90,100,852 |
| | | | | | | | |
| Other Operating Revenue | 555,614 | | | | | 0 | 555,614 |
| Rental Income | | | | 248,037 | 214,858 | | 462,896 |
| Gain on Disposal | | | | | 248,215 | | 248,215 |
| | | | | | | | |
| Contractuals | (62,126,975) | | | | | 0 | (62,126,975) |
| | | | | | | | |
| Net Revenue | 28,529,491 | 0 | 0 | 248,037 | 463,073 | 0 | 29,240,602 |
| | | | | | | | |
| **Expenses** | | | | | | | |
| Labor | 16,151,177 | 57,814 | | | | | 16,208,991 |
| Benefits | 2,500,086 | 7,764 | | | | | 2,507,850 |
| Professional Fees | 5,386,028 | 97,421 | 1,035 | 5,288 | 24,548 | 12,596 | 5,526,916 |
| Supplies | 5,092,904 | 471 | | | | | 5,093,375 |
| Purchase Service | 3,004,750 | 1,351 | 1,568 | 19,212 | 10,165 | | 3,037,046 |
| Other | 1,925,796 | 8,899 | | 58,835 | 12,913 | 4,557 | 2,011,000 |
| Property Taxes | 297,363 | 0 | | | | | 297,363 |
| Bad Debt | 2,409,120 | 253,107 | | | 159,910 | | 2,822,137 |
| | | | | | | | |
| Total Operating Expense | 36,767,224 | 426,827 | 2,603 | 83,334 | 207,537 | 17,153 | 37,504,677 |
| | | | | | | | |
| EBITDA | (8,237,733) | (426,827) | (2,603) | 164,703 | 255,537 | (17,153) | (8,264,075) |
| | | | | | | | |
| Depreciation | | 6,552,878 | 45,071 | 180,647 | 87,978 | | 6,866,574 |
| Interest | 895,505 | 8,298,513 | | 386,454 | 38,142 | | 9,618,614 |
| | | | | | | | |
| Total Expense | 37,662,729 | 15,278,218 | 47,674 | 650,435 | 333,657 | 17,153 | 53,989,865 |
| | | | | | | | |
| **Operating Income (Loss)** | (9,133,238) | (15,278,218) | (47,674) | (402,398) | 129,417 | (17,153) | (24,749,263) |

**Green Valley Hospital**
*Balance Sheet*
*12/31/2016*

| ASSETS | GVH Mgmt, LLC | GVH, LLC | MOB 1 | MOB 2 | MOB 3 | GVII Holdings, LLC | Eliminations | Total |
|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | |
| Cash and Short Term Investments | $401,690 | $1,876,126 | $478 | $31,965 | $4,292 | $184 | | $2,314,735 |
| Accounts Receivable | $2,449,915 | $372 | | | $20,509 | | | $2,470,796 |
| Inventory | $938,265 | | | | | | | $938,265 |
| Prepaid Expenses | $133,061 | | | $9,075 | | | | $142,136 |
| Due from Insurance | $335,828 | | | | | | | $335,828 |
| Other Receivables | | | | | | 149,865 | | 149,865 |
| **Total Current Assets** | **4,258,759** | **1,876,498** | **478** | **41,040** | **24,801** | **150,049** | | **6,351,625** |
| | | | | | | | | |
| **Long Term Assets** | | | | | | | | |
| Property Plant & Equipment | | $72,636,098 | $737,525 | $3,748,463 | $1,807,719 | $2,297,084 | | $81,226,889 |
| Accumulated Depreciation | | ($11,145,187) | ($45,071) | ($229,073) | ($110,183) | | | ($11,529,514) |
| Due from Related Parties | | $13,257,629 | | $6,657 | $24,562 | | ($13,288,848) | $0 |
| Other Assets | 410,626 | | | 1,200 | | | | 411,826 |
| **TOTAL ASSETS** | **4,669,385** | **76,625,037** | **692,932** | **3,568,288** | **1,746,899** | **2,447,133** | | **76,460,825** |
| | | | | | | | | |
| **LIABILITIES AND OWNERS' EQUITY** | | | | | | | | |
| | | | | | | | | |
| **Current Liabilities** | | | | | | | | |
| Accounts Payable | $8,519,407 | $24,455 | | | $29,817 | $25,678 | | $8,599,358 |
| Accrued Payroll | $2,513,672 | | | | | | | $2,513,672 |
| Current Portion LT Debt | | $4,310,196 | | | | | | $4,310,196 |
| Due to Medicare | $1,967,197 | | | | | | | $1,967,197 |
| Other Current Liabilities | | | | $14,947 | | | | $14,947 |
| Due to Related Parties | $10,445,580 | $4,892 | $745,267 | $595,245 | $232,197 | $1,265,666 | ($13,288,848) | $0 |
| **Total Current Liabilities** | **23,445,857** | **4,339,543** | **745,267** | **610,192** | **262,015** | **1,291,344** | | **17,405,370** |
| **Long Term Liabilities** | | | | | | | | |
| Capital Lease LT Debt | | $79,520 | | | | | | $79,520 |
| Notes payable | | $7,860,091 | | | | | | $7,860,091 |
| A/R Revolver | $1,141,351 | | | | | | | $1,141,351 |
| Loan | | | | $3,300,000 | $1,502,674 | | | $4,802,674 |
| Artemis Loan | | $6,750,000 | | | | | | $6,750,000 |
| Construction Loan | | $61,820,777 | | | | | | $61,820,777 |
| SQN Equipment Loan | | $9,302,600 | | | | | | $9,302,600 |
| **Total Liabilities** | **24,587,208** | **90,152,532** | **745,267** | **3,910,192** | **1,764,689** | **1,291,344** | | **109,162,384** |
| | | | | | | | | |
| **Owners' Equity** | | | | | | | | |
| Prior Year Organization Costs | | ($7,910,267) | | | | | | ($7,910,267) |
| Retained Earnings | ($19,917,823) | ($5,617,228) | ($52,335) | ($341,905) | ($17,789) | $1,155,788 | | ($24,791,292) |
| **Total Owners' Equity** | **(19,917,823)** | **(13,527,495)** | **(52,335)** | **(341,905)** | **(17,789)** | **1,155,788** | | **(32,701,559)** |
| | | | | | | | | |
| **TOTAL LIABILITIES & OWNERS' EQUITY** | **4,669,385** | **76,625,037** | **692,932** | **3,568,288** | **1,746,899** | **2,447,133** | | **76,460,825** |

*GVH Profit and Loss Statement*
*November-17*

| | MONTH-TO-DATE | | | | | | |
|---|---|---|---|---|---|---|---|
| | GVH Mgmt, LLC | GVH, LLC | MOB 1 | MOB 2 | MOB 3 | GVII Holdings, LLC | Eliminations | Total |
| **Patient Charges** | | | | | | | | |
| Inpatient Charges | $3,533,895 | $0 | $0 | $0 | $0 | $0 | | $3,533,895 |
| Outpatient Charges | $6,408,691 | 0 | 0 | 0 | 0 | 0 | | 6,408,691 |
| Total Charges | 9,942,586 | 0 | 0 | 0 | 0 | 0 | | 9,942,586 |
| | | | | | | | | |
| Other Operating Revenue | 29,253 | 0 | 0 | 220 | 45 | 0 | | 29,517 |
| Rental Income | $0 | 0 | 0 | 34,443 | 529 | 0 | | 34,971 |
| Gain on Disposal | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| | | | | | | | | |
| Contractuals | (7,382,890) | 0 | 0 | 0 | 0 | 0 | | (7,382,890) |
| | | | | | | | | |
| Net Revenue | 2,588,949 | 0 | 0 | 34,663 | 573 | 0 | | 2,624,185 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Labor | 1,290,372 | 0 | 0 | 0 | 0 | 0 | | 1,290,372 |
| Contract Labor | 129,825 | | 0 | 0 | 0 | 0 | | 129,825 |
| Benefits | 193,102 | 0 | 0 | 0 | 0 | 0 | | 193,102 |
| Professional Fees | 370,634 | 0 | 12 | 105 | 0 | 0 | | 370,751 |
| Supplies | 571,544 | 0 | 0 | 0 | 0 | 0 | | 571,544 |
| Purchase Service | 299,033 | 0 | 0 | 0 | 75 | 0 | | 299,108 |
| Other | 249,601 | 0 | 355 | 703 | 208 | 0 | | 250,866 |
| Property Taxes | 116,602 | 0 | 0 | 0 | 950 | 0 | | 117,552 |
| | | | | | | | | |
| Total Operating Expense | 3,220,713 | 0 | 367 | 808 | 1,233 | 0 | | 3,223,120 |
| | | | | | | | | |
| EBITDA | (631,764) | 0 | (367) | 33,855 | (659) | 0 | | (598,936) |
| | | | | | | | | |
| Depreciation | 547,218 | 0 | 1,933 | 9,946 | 4,389 | 0 | | 563,486 |
| Interest | 1,136,989 | 61,574 | 0 | 0 | 6,288 | 0 | | 1,204,851 |
| Restructuring Expense | 61,200 | 0 | 0 | 0 | 0 | 0 | | 61,200 |
| | | | | | | | | |
| Total Expense | 4,966,120 | 61,574 | 2,299 | 10,754 | 11,910 | 0 | | 5,052,657 |
| | | | | | | | | |
| **Operating Income (Loss)** | **(2,377,171)** | **(61,574)** | **(2,299)** | **23,908** | **(11,336)** | **0** | | **(2,428,472)** |

*GVH Profit and Loss Statement*
*November-17*

| | | | YEAR-TO-DATE | | | | | |
|---|---|---|---|---|---|---|---|---|
| | GVH Mgmt, LLC | GVH, LLC | MOB 1 | MOB 2 | MOB 3 | GVII Holdings, LLC | Eliminations | Total |
| **Patient Charges** | | | | | | | | |
| Inpatient Charges | $34,988,366 | $0 | $0 | $0 | $0 | $0 | | $34,988,366 |
| Outpatient Charges | 51,347,987 | 0 | 0 | 0 | 0 | 0 | | 51,347,987 |
| Total Charges | 86,336,353 | 0 | 0 | 0 | 0 | 0 | | 86,336,353 |
| | | | | | | | | |
| Other Operating Revenue | 527,628 | 0 | 0 | 64,189 | 45 | 0 | | 591,862 |
| Rental Income | 0 | 0 | 0 | 336,001 | 5,681 | 0 | | 341,682 |
| Gain on Disposal | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| | | | | | | | | |
| Contractuals | (61,322,295) | | 0 | 0 | 0 | 0 | | (61,322,295) |
| | | | | | | | | |
| Net Revenue | 25,541,686 | 0 | 0 | 400,190 | 5,726 | 0 | | 25,947,601 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Labor | 14,244,892 | 0 | 0 | 0 | 0 | 0 | | 14,244,892 |
| Contract Labor | 1,051,467 | 0 | 0 | 0 | 0 | | | 1,051,467 |
| Benefits | 2,590,794 | 0 | 0 | 0 | 0 | 0 | | 2,590,794 |
| Professional Fees | 5,272,678 | 315,944 | 24 | 285 | (7,782) | 0 | | 5,581,150 |
| Supplies | 4,715,378 | 0 | 0 | 0 | 0 | 0 | | 4,715,378 |
| Purchase Service | 3,809,842 | 0 | 0 | 3,715 | 974 | 0 | | 3,814,531 |
| Other | 2,264,699 | 0 | 3,742 | 17,208 | 11,580 | 0 | | 2,297,229 |
| Property Taxes | 486,619 | 0 | 0 | 1,348 | 10,458 | 0 | | 498,425 |
| | | | | | | | | |
| Total Operating Expense | 34,436,369 | 315,944 | 3,766 | 22,557 | 15,230 | 0 | | 34,793,866 |
| | | | | | | | | |
| EBITDA | (8,894,683) | (315,944) | (3,766) | 377,633 | (9,504) | 0 | | (8,846,265) |
| | | | | | | | | |
| Depreciation | 6,016,594 | 0 | 67,638 | 314,274 | 127,321 | 0 | | 6,525,827 |
| Interest | 10,084,091 | 1,275,242 | 0 | 306,130 | 75,167 | 0 | | 11,740,630 |
| Restructuring Expense | 4,695,067 | 0 | 0 | 0 | 0 | 0 | | 4,695,067 |
| | | | | | | | | |
| Total Expense | 55,232,121 | 1,591,186 | 71,404 | 642,961 | 217,718 | 0 | | 57,755,390 |
| | | | | | | | | |
| **Operating Income (Loss)** | **(29,690,435)** | **(1,591,186)** | **(71,404)** | **(242,772)** | **(211,992)** | **0** | | **(31,807,789)** |

GVH Balance Sheet
Novmber 2017

| ASSETS | GVH Mgmt, LLC | GVH, LLC | MOB 1 | MOB 2 | MOB 3 | GVII Holdings, LLC | Elimination | Total |
|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | |
| Cash and Short Term Investments | $601,378 | $150 | $10 | $37,979 | $389 | $184 | | $640,090 |
| Accounts Receivable | $3,250,552 | $0 | $0 | $140,568 | $3,700 | $0 | | $3,394,820 |
| Inventory | $1,094,293 | $0 | $0 | $0 | $0 | $0 | | $1,094,293 |
| Prepaid Expenses | $174,859 | $0 | $0 | $9,075 | $0 | $0 | | $183,934 |
| Due from Insurance | $0 | $0 | $0 | $0 | $0 | $0 | | $0 |
| Other Receivables | $786,218 | $372 | $0 | $1,225 | $4,380 | $149,865 | | $942,059 |
| **Total Current Assets** | **5,907,300** | **522** | **10** | **188,847** | **8,468** | **150,049** | **0** | **6,255,195** |
| | | | | | | | | |
| **Long Term Assets** | | | | | | | | |
| Property Plant & Equipment | $72,805,757 | $0 | $737,525 | $3,649,225 | $1,802,999 | $2,297,084 | | $81,292,590 |
| Accumulated Depreciation | ($17,076,402) | $0 | ($67,638) | ($467,478) | ($149,526) | $0 | | ($17,761,044) |
| Due from Related Parties | 0 | $1,551,940 | $0 | $157,290 | $305,592 | $0 | ($2,014,822) | $0 |
| Other Assets | $300,665 | $0 | $0 | $0 | $0 | $0 | $347,903 | $648,568 |
| **TOTAL ASSETS** | **61,937,320** | **1,552,461** | **669,897** | **3,527,884** | **1,967,533** | **2,447,133** | **(1,666,919)** | **70,435,309** |
| | | | | | | | | |
| **LIABILITIES AND OWNERS' EQUITY** | | | | | | | | |
| | | | | | | | | |
| **Current Liabilities** | | | | | | | | |
| Accounts Payable | $17,937,660 | $0 | $0 | $655 | $236 | $25,678 | | $17,964,229 |
| Accrued Payroll | $3,531,258 | $0 | $0 | $0 | $0 | $0 | | $3,531,258 |
| Current Portion LT Debt | $0 | $0 | $0 | $0 | $0 | $0 | | $0 |
| Due to Medicare | $1,543,997 | $0 | $0 | $0 | $0 | $0 | | $1,543,997 |
| Other Current Liabilities | $8,649,719 | $0 | $0 | $15,456 | $4,247 | $0 | $1,288 | $8,670,710 |
| Due to Related Parties | ($10,057,147) | $8,745,315 | $4,793 | $10,700 | $146,940 | $1,265,666 | ($116,267) | $0 |
| Restructuring Clearing | $0 | $0 | $0 | $0 | $0 | $0 | | $0 |
| Lateral Global | $22,746,984 | $0 | $0 | $0 | $0 | $0 | | $22,746,984 |
| **Total Current Liabilities** | **44,352,471** | **8,745,315** | **4,793** | **26,812** | **151,422** | **1,291,344** | **(114,979)** | **54,457,179** |
| | | | | | | | | |
| **Long Term Liabilities** | | | | | | | | |
| Capital Lease LT Debt | $0 | $42,784 | $0 | $0 | $0 | $0 | | $42,784 |
| Notes payable | $0 | $7,905,995 | $0 | $0 | $0 | $0 | | $7,905,995 |
| A/R Revolver | $0 | $0 | $0 | $0 | $0 | $0 | | $0 |
| Loan | $0 | $0 | $0 | $3,300,000 | $1,456,641 | $0 | | $4,756,641 |
| Artemis Loan | $0 | $0 | $0 | $0 | $0 | $0 | | $0 |
| Construction Loan | $54,500,000 | $0 | $0 | $0 | $0 | $0 | | $54,500,000 |
| SQN Equipment Loan | $12,694,958 | $0 | $0 | $0 | $0 | $0 | | $12,694,958 |
| Lateral Global Loan | $0 | $0 | 0 | 0 | 0 | 0 | | $0 |
| **Total Liabilities** | **111,547,429** | **16,694,094** | **4,793** | **3,326,812** | **1,608,063** | **1,291,344** | **(114,979)** | **134,357,556** |
| | | | | | | | | |
| **Owners' Equity** | | | | | | | | |
| Capital Contributed | $0 | $10,130,077 | $739,805 | $722,180 | $326,947 | $0 | ($1,551,940) | $10,367,070 |
| Retained Earnings | ($49,610,109) | ($25,271,710) | ($74,701) | ($521,108) | $32,522 | $1,155,788 | | ($74,289,317) |
| **Total Owners' Equity** | **(49,610,109)** | **(15,141,632)** | **665,104** | **201,072** | **359,469** | **1,155,788** | **(1,551,940)** | **(63,922,247)** |
| | | | | | | | | |
| **TOTAL LIABILITIES & OWNERS' EQUITY** | **61,937,320** | **1,552,462** | **669,897** | **3,527,884** | **1,967,533** | **2,447,133** | **(1,666,919)** | **70,435,309** |

**Schedule 5.12**
**Employee Benefit Plans**

1. Paid Time Off Policy (Reference #HR010)

2. Paid Time Off Policy for Director Level and Above (Reference #HR011)

3. Aetna PPO 1000 Plan Design and Benefits 2017

4. Aetna PPO 2500 Plan Design and Benefits 2500

5. Aetna PPO HSA 2600 Plan Design and Benefits 2017

6. Green Valley 401k

7. Green Valley Hospital 2016_Aflac

8. Guardian Dental and Vision Enrollment Form

9. GV Hospital Management LLC - amend 1 1 2016 - Plan Document

10. Metlife Supplemental Term Life Rates

11. GVH Disability Pricing

12. HSA Document – 2017

13. Metlife Basic Life Policy

14. Power Point- Benefits 2017

15. Humana Health Plans

**Schedule 9.7**
**Permits/Licenses Held by Sellers**

| Entity Name on Permit/License | Regulatory Body | Description |
|---|---|---|
| GV Hospital Management | AZDHS Hospital License | H7155 |
| | Medicare NPI Number: | 1295125078 |
| | Notice of Registration Certificate for Ionizing Radiation Machine | Registration Number: 10-H-10493, Expiration Date March 31, 2025 |
| Green Valley Hospital | Notice of Registration Certificate for Ionizing Radiation Machine (Mammography) | Registration Number: 10-MM-10495, Expiration Date March 31, 2025 (Inactive) |
| | Medicaid Provider Number | 27347 |
| Green Valley Management, LLC | Hospital Pharmacy License | Permit Number Y006329 |

- Green Valley Hospital is accredited by DNV.

The above listing does not include certificates of occupancy and other immaterial governmental permits, licenses and approvals.

27

EXHIBIT "B"

17

**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, STE. 700
PHOENIX, ARIZONA 85012
TELEPHONE (602) 271-4250
FACSIMILE (602) 271-4300
S. CARY FORRESTER (006342)
BYRON H. FORRESTER (033877)
SCF@FORRESTERANDWORTH.COM
bhf@forresterandworth.com

COUNSEL FOR DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>**GV HOSPITAL MANAGEMENT, LLC**,<br><br>Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case Nos.: 4:17-bk-03351<br> 4:17-bk-03353; and<br> 4:17-bk-03354 |
| In re:<br><br>**GREEN VALLEY HOSPITAL, LLC**,<br><br>Debtor. | |
| In re:<br><br>**GV II HOLDINGS, LLC**,<br><br>Debtor. | **ORDER (A) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND BUYER; (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) AUTHORIZING THE ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; and (D) GRANTING CERTAIN RELATED RELIEF** |
| THIS FILING APPLIES TO:<br><br>☒ ALL DEBTORS<br><br>☐ GREEN VALLEY HOSPITAL, LLC<br><br>☐ GV HOSPITAL MANAGEMENT, LLC<br><br>☐ GVII HOLDINGS, LLC | Hearing Date: January 30, 2018<br>Hearing Time: 1:00 p.m.<br>Location: Courtroom No. 329<br><br>Video conference available in Phoenix Courtroom 301 |

Upon consideration of the motion [DE __] (the "**Sale Motion**")[1] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1, 6004-1, and 6006-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Arizona (the "**Local Rules**"), seeking the entry of an order (the "**Sale Order**") (a) approving that certain Asset Purchase Agreement (collectively with all exhibits and schedules thereto and all ancillary documents and agreements, and as any may be further amended, the "**Purchase Agreement**"), a copy of which is attached hereto as **Exhibit 1**, dated as of December 27, 2017, by and among Debtors, on the one hand, and Lateral GV, LLC (the "**Buyer**"), on the other hand, (b) authorizing the sale (collectively with all other transactions contemplated by the Purchase Agreement, the "**Sale**") of the Acquired Assets free and clear of any Interests (as defined herein) and Encumbrances other than the Permitted Encumbrances pursuant to the Purchase Agreement; (c) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases, including employee benefit plans, as may be amended in accordance with the Purchase Agreement (collectively, the "**Assigned Contracts**"); and (d) granting certain related relief; and the Court having entered the *Order Establishing Procedures for the Sale of Substantially All of Debtors' Assets* on October 16, 2017 [DE 493] and the *Amended Order Establishing Procedures for the Sale of Substantially All of Debtors' Assets* [DE 596] (as amended, the "**Sale Procedures Order**"); and Debtors having conducted the Auction on [January 25], 2018, and having determined, after an extensive marketing process by Kaufman Hall & Associates ("**KHA**") and after consultation with Lateral SMA Agent, LLC and Lateral GV, LLC (collectively "**Lateral**"), Green Valley Medical Investments

---

[1] Unless otherwise stated, all capitalized terms not defined herein shall have the same meanings ascribed to such terms in the Sale Motion or the Purchase Agreement, as applicable.

LLLP ("**GVMI**") and the Official Committee of Unsecured Creditors (the "**Committee**"), that the Buyer submitted the highest or otherwise best offer for the Acquired Assets; and the Court having reviewed and considered (w) the Sale Motion and all relief related thereto, (x) the objections thereto, if any, (y) the statements of counsel and evidence presented in support of the relief requested by Debtors at the hearing conducted before the Court on January 30, 2018 (the "**Sale Hearing**"), and (z) the entire record before the Court; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein,

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[2]

**Jurisdiction and Venue**

A.     This Court has jurisdiction over the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Statutory Bases**

B.     The statutory and other bases for the relief requested in the Sale Motion and entry of this Sale Order are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Local Rules 2002-1 and 6004-1.

**Compliance with Sale Procedures Order**

C.     As demonstrated by (i) the testimony and other evidence proffered or introduced at the Sale Hearing, and (ii) the representations of counsel on the record at the Sale Hearing, Debtors have thoroughly and fairly marketed the Acquired Assets

---

[2]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion and the Sale are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and conducted the related sale process in good faith and in compliance with the Sale Procedures Order in all material respects.

D.     The Sale Procedures set forth in the Sale Procedures Order were non-collusive and substantively and procedurally fair to all parties.  Moreover, the Sale Procedures enabled Debtors to obtain the highest or otherwise best offer for the Acquired Assets.  All interested persons and entities have been afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit bids and submit higher or otherwise better bids to purchase the Acquired Assets, and (iii) object and be heard in connection with the Sale Motion and the relief granted by this Sale Order.

E.     The Buyer is the Successful Bidder (as defined in the Sale Procedures) for the Acquired Assets in accordance with the Sale Procedures Order.  The consideration provided by the Buyer under the Purchase Agreement constitutes the highest or otherwise best offer and provides fair and reasonable consideration to Debtors for the sale of the Acquired Assets.  The Buyer has complied in all respects with the Sale Procedures Order and any other applicable order of this Court in negotiating and entering into the Purchase Agreement.  The Sale and the Purchase Agreement likewise comply with the Sale Procedures Order and all other applicable orders of this Court.

### Notice of the Sale, Auction and Cure Costs

F.     As evidenced by the affidavits of service filed with the Court [DE ___], proper, timely, adequate and sufficient notice of the Auction, the Sale Motion, the Sale Hearing, the Sale, and the assumption, assignment, and sale of the Assigned Contracts to the Buyer (including the proposed Cure Costs), was provided in accordance with the Sale Procedures Order, sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9007.  Such notice was good, sufficient and appropriate under the circumstances, and no other or further notice of the Auction, the Sale Motion,

4

the Sale Hearing, the Sale, and the assumption, assignment, and sale of the Assigned Contracts to the Buyer (including the proposed Cure Costs) is or shall be required.

G.    Actual written notice of the Auction, the Sale Motion, the Sale Hearing, the Sale, and assumption, assignment, and sale of the Assigned Contracts (including the proposed Cure Costs) and a fair and reasonable opportunity to object or otherwise be heard with the respect thereto, has been afforded to all known interested individuals and entities, including, but not limited to, the following parties:

(a)    the Office of the United States Trustee for the District of Arizona;

(b)    counsel to the Committee;

(c)    counsel to the Buyer;

(d)    all counterparties to the Assigned Contracts;

(e)    counsel to GVMI;

(f)    all known creditors of Debtors;

(g)    all entities known to have expressed a *bona fide* interest, within the last six months, in acquiring any of the Acquired Assets;

(h)    all entities (or counsel therefor) known to have asserted any lien, claim (as defined in section 101(5) of the Bankruptcy Code), Encumbrance, right of refusal, or other interest in or upon any of the Acquired Assets;

(i)    federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the Sale of the Acquired Assets, may have claims, contingent or otherwise, in connection with Debtors' ownership of the Acquired Assets or have any reasonably known interest in the relief requested by the Sale Motion;

(j)    all parties, if any, who are known to claim interests in any Assigned Contracts;

(k)    the Office of the United States Attorney for the District of Arizona;

(l)    the Internal Revenue Service;

5

(l)     the Arizona Department of Revenue;

(m)     all applicable health regulatory agencies, including, without limitation, the United States Department of Health and Human Services, the Centers for Medicare and Medicaid Services, the Arizona Health Care Cost Containment System, and the Arizona Department of Health Services and applicable accrediting organizations; and

(n)     all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date hereof.

H.     Debtors presented the results of the Auction to the Bankruptcy Court at the Sale Hearing in accordance with the Sale Procedures.

## Highest or Otherwise Best Offer

I.     Debtors conducted a sale process in accordance with, and have otherwise complied in all material respects with, the Sale Procedures Order.  The Auction was held in a non-collusive and fair manner and afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.

J.     Debtors have concluded, upon consultation with Lateral, GVMI and the Committee, that the offer of the Buyer, upon the terms and conditions set forth in the Purchase Agreement, including the form and total consideration to be realized by Debtors, constitutes the highest or otherwise best offer for the Acquired Assets, provides a greater certainty of recovery than would be provided by any other available alternative, and contains a cash component sufficient to pay the success fee owing to KHA at the closing of the Sale, if applicable.  Debtors' determination that the Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of Debtors' business judgment.

K.     The Purchase Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these Chapter 11 Cases.  No

6

other entity or group of entities has offered to purchase the Acquired Assets for greater overall value to Debtors' estates than the Buyer.

L. Approval of the Sale, Sale Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of Debtors' estates, creditors, equity holders and other parties in interest.

<u>**Arm's Length Sale**</u>

M. The Purchase Agreement was negotiated, proposed and entered into by Debtors and the Buyer without collusion, in good faith and from arm's length bargaining positions. Neither Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate purchase price paid by the Buyer for the Acquired Assets (the "**Purchase Price**") was not controlled by any agreement among the bidders. In addition, the Buyer is not an "insider" of any of Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

N. The disclosures made by Debtors concerning the Purchase Agreement, Auction, Sale, Sale Hearing, and the assumption, assignment, and sale of the Assigned Contracts (including the proposed Cure Costs) were good, complete, and adequate.

<u>**Good Faith of the Buyer**</u>

O. The Buyer is a good faith purchaser for value and, as such, is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law. The Buyer has at all times proceeded in good faith in all respects in connection with Debtors' Chapter 11 Cases in that, among other things: (a) the Buyer recognized that Debtors were free to deal with any other party interested in acquiring the Acquired Assets and assuming the Assumed Liabilities and Assigned Contracts, (b) the Buyer in no way induced or caused the chapter 11 filings by Debtors, and (c) all payments to be made by Buyer in connection

with the Sale have been disclosed.  The Buyer will continue to act in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Purchase Agreement.

<u>**No Fraudulent Transfer or Merger**</u>

P.     The consideration provided by the Buyer pursuant to the Purchase Agreement (a) is fair and reasonable, (b) is the highest and otherwise best offer for the Acquired Assets and Assigned Contracts, (c) will provide a greater recovery for Debtors' estates, creditors and equity holders than would be provided by any other practical available alternatives, and (d) constitutes reasonably equivalent value, fair consideration and fair value (as those terms are defined in each of the Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession or the District of Columbia.  No other person, entity or group of entities has offered to purchase the Acquired Assets for greater overall value to Debtors' estates than the Buyer.

Q.     The Purchase Agreement was not entered into for the purpose of hindering, delaying, preferring, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, and the District of Columbia.  None of Debtors nor the Buyer entered into the transactions contemplated by the Purchase Agreement fraudulently, thereby negating the possibility of any liability of the Buyer for any statutory or common law fraudulent conveyance or fraudulent transfer claims.

R.     The Buyer is not a mere continuation or an alter ego of Debtors or their estates.  There is no continuity or common identity between the Buyer, on the one hand, and any of Debtors, on the other hand.  The Buyer is not a successor to Debtors or their estates by reason of any theory of law or equity and the Sale does not amount to a

8

consolidation, merger or *de facto* merger of the Buyer and Debtors within the meaning of any applicable law, rule, ordinance or regulation.

### Free and Clear

S.      Except as otherwise expressly provided in the Purchase Agreement or this Sale Order, the Acquired Assets shall be sold free and clear of all interests, obligations, rights, Encumbrances, pledges, liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens), mortgages, deeds of trust, security interests, Claims, any "claim" as defined in section 101(5) of the Bankruptcy Code, liabilities, debt obligations, losses, penalties, leases, charges, offsets, contracts, options, rights of first refusal, rights of first offer, rights of first sale, rights of notice, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, conditional sale or other title retention agreements, judgments, hypothecations, demands, licenses, sublicenses, assignments, indentures, loan agreements, instruments, debts, rights of recovery, guaranties, contractual commitments, restrictions, recoupment, labor and employment rights and claims, employee benefit agreements and obligations, collective bargaining agreements and obligations, pension rights and claims, claims based on reimbursement, contribution, indemnity, exoneration, products liability, tortious conduct, property damage, personal injury, alter ego, taxes, claims based on pension plan contributions and related liabilities, environmental liabilities or obligations (including, without limitation, toxic tort claims), options to purchase, regulatory violations, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims and Excluded Liabilities, in each case, of whatever kind, nature, or description in, against or with respect to any of the Acquired Assets or Debtors having arisen, existed, or accrued prior to and through the Closing Date, whether direct or indirect, absolute, contingent, choate or inchoate, filed or unfiled,

scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

unperfected, material or non-material, disputed or undisputed, known or unknown,

matured or unmatured, liquidated or unliquidated, arising or imposed by agreement,

understanding, law, equity, statute, or otherwise, and whether arising prior to, on or

after the Petition Date, including claims or liabilities otherwise arising under state and

federal doctrines of Successor Liability (as defined below) or transferee liability, *de facto*

merger, substantial continuity or product line liability or liabilities or obligations arising

under any law or order, with the exception of the Permitted Encumbrances and

Assumed Liabilities expressly assumed by the Buyer under the Purchase Agreement

(collectively, the "**Interests**").

      T.     The transfer of the Acquired Assets to the Buyer free and clear of all

Interests will not result in any undue burden or prejudice to any holders of any Interest.

      U.     Debtors may sell the Acquired Assets free and clear of all Interests

because one or more standards set forth in section 363(f) of the Bankruptcy Code has

been satisfied. All holders of Interests who did not object or who withdrew their

objections to the Sale or the Sale Motion are deemed to have consented to the Sale and

the relief requested therein pursuant to section 363(f)(2) of the Bankruptcy Code. All

other holders of Interests, including those who maintained and did not withdraw

objections to the Sale or the Sale Motion, if any, fall within one or more of the

subsections of section 363(f) of the Bankruptcy Code.

      V.     The Buyer would not have entered into the Purchase Agreement and will

not consummate the transactions contemplated thereby, thus adversely affecting

Debtors, their estates, creditors, equity holders and other parties in interest, if the Sale

and the assumption, assignment, and sale of the Assigned Contracts were not free and

clear of all Interests, or if the Buyer, its affiliates, or their respective officers, directors,

managers, members or shareholders, or the Acquired Assets, would, or in the future

could, be liable for any such Interests, or would have any liability whatsoever with

Case 4:17-bk-03351-SHG   Doc 616   Filed 01/08/18   Entered 01/08/18 16:55:54   Desc
Main Document    Page 126 of 148

respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff or otherwise, directly or indirectly, any Interest, including rights or claims based on any state or federal doctrines of Successor Liability (as defined below) or transferee liability.

W. Not selling the Acquired Assets free and clear of all Interests would adversely impact Debtors' efforts to maximize the value of their estates, and the Sale of the Acquired Assets other than one free and clear of all Interests would be of substantially less benefit to Debtors' estates.

## Validity of Transfer

X. The Acquired Assets constitute property of Debtors' estates and title thereto is vested in Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

Y. The consummation of the Purchase Agreement and the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105, 363, and 365, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Purchase Agreement.

Z. Each Debtor has, to the extent necessary and applicable, (i) the requisite limited liability company power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (ii) all limited liability company authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (iii) taken all limited liability company action necessary to authorize and approve the Purchase Agreement and the consummation of the transactions contemplated thereby. No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for Debtors to consummate the Purchase Agreement and the transactions contemplated thereby.

AA.    Pursuant to the terms of the Purchase Agreement, the Buyer is not acquiring the Excluded Assets nor is it assuming the Excluded Liabilities (as such terms are defined in the Purchase Agreement).

BB.    The transfer of the Acquired Assets to the Buyer under the Purchase Agreement will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Acquired Assets free and clear of all Interests.  The transfer of the Acquired Assets will vest the Buyer with good and marketable title to the Acquired Assets.

<u>Assumption, Assignment, and Sale of the Assigned Contracts</u>

CC.    The assumption, assignment, and sale of the Assigned Contracts free and clear of Interests pursuant to the terms of the Purchase Agreement and this Sale Order is integral to the Purchase Agreement and is in the best interests of Debtors, their estates, creditors and equity holders, and all other parties in interest, and represents a reasonable exercise of Debtors' sound and prudent business judgment.

DD.    Pursuant to the terms of the Purchase Agreement, on or before the Closing Date, the Buyer shall have:  (i) cured, or provided adequate assurance of cure of, any monetary default existing as of and including the Closing Date under any of the Assigned Contracts to be assumed by the Buyer, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) paid the Buyer Cure Costs resulting from a monetary default existing as of and including the Closing Date under any of the Assigned Contracts to be assumed by the Buyer, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, in each case, in the respective amounts set forth in Schedule 2.5(a) of the Purchase Agreement.

EE.    The Buyer has demonstrated adequate assurance of its future performance under the Assigned Contracts to be assumed by the Buyer within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts to be assumed and assigned under the

Purchase Agreement shall be assigned, sold, and transferred to, and remain in full force and effect for the benefit of the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting or requiring consent or consultation in respect of their assignment or transfer.

## Medicare and Medicaid Matters

FF.     The Medicare and Medicaid provider agreements and associated provider numbers with the Center for Medicare and Medicaid Services and with the Arizona Healthcare Cost Containment Services are deemed to be Acquired Assets that transfer to the Buyer free and clear of all Interests under this Order; provided, however, that Buyer reserves the right to deem any provider agreement associated with the Medicare and Medicaid provider numbers to be an Assigned Contract to be assumed by the Buyer as provided above, or as otherwise negotiated with the applicable governmental agency.

## Compelling Circumstances for Sale

GG.     Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of a plan of reorganization, in that, among other things, the immediate implementation of this Sale Order and consummation of the Sale to the Buyer is necessary both to preserve and maximize the value of Debtors' assets for the benefit of Debtors, their estates, their creditors, their equity holders and all other parties in interest, and the Sale will provide the means for Debtors to maximize recoveries of creditors.

HH.     The sale of the Acquired Assets outside of a chapter 11 plan pursuant to the Purchase Agreement neither impermissibly restructures the rights of Debtors' creditors or equity holders nor impermissibly dictates the terms of a chapter 11 plan for Debtors, and therefore, does not constitute a *sub rosa* chapter 11 plan.

13

II.    To maximize the value of the Acquired Assets, preserve the viability of the businesses to which the Acquired Assets relate and avoid deterioration, erosion of value and uncertainty with respect to the future operations of the Acquired Assets, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement.  Time is of the essence in consummating the Sale and preserving the value of Debtors' assets.

JJ.    Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, the Sale of the Acquired Assets constitutes a reasonable and sound exercise of Debtors' business judgment and should be approved.

KK.    The consummation of the Sale and the assumption, assignment, and sale of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.    The relief requested in the Sale Motion is granted and approved, and the Sale contemplated thereby and by the Purchase Agreement is authorized as set forth herein and in the Purchase Agreement.

2.    All objections and responses, if any, to the Sale or Sale Motion that have not been withdrawn, waived or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are overruled on the merits and denied with prejudice.  All persons and entities given notice of the Sale Motion that failed to timely object thereto, including, without limitation, all non-debtor parties to the Assigned Contracts, are deemed to have consented to the relief sought therein, including without limitation the Buyer Cure Costs.

14

3.      The Court's findings of fact and conclusions of law set forth in the Sale Procedures Order are incorporated herein by reference.

## Approval of the Purchase Agreement

4.      The Sale and the Purchase Agreement and, in each case, all of the terms and conditions thereof are hereby authorized and approved in all respects.

5.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, Debtors are authorized and directed (a) to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement and effectuate the Purchase Agreement, together with any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Sale Order and the Sale, and to take all further actions as may be reasonably requested by the Buyer for the purposes of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, the Acquired Assets, free and clear of all Interests; (b) to assume, assign, and sell the Assigned Contracts to the Buyer on the Closing Date pursuant to the terms of the Purchase Agreement; and (c) to take any and all actions as may be necessary or appropriate to the performance of Debtors' obligations as contemplated by the Purchase Agreement, without any further corporate action or order of this Court.  John Matsuka, the Chief Executive Officer for Debtors (and such other officers of GV Hospital Management, LLC as designated by Green Valley Hospital LLC's board of directors), is hereby authorized to execute and deliver on behalf of Debtors, the Purchase Agreement and any and all documents necessary, required or contemplated by the Purchase Agreement.

## Transfer of the Acquired Assets

6.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, Debtors are authorized to transfer the Acquired Assets and the Assumed Liabilities to the Buyer on the Closing Date pursuant to the terms and conditions of the Purchase Agreement free and clear of all Interests.

15

7.      The transfer of the Acquired Assets to the Buyer shall constitute a legal, valid, binding, and effective transfer of all such Assets and shall vest the Buyer with all right, title, and interest of Debtors in the Acquired Assets.  Except as otherwise provided in the Purchase Agreement and the terms of this Sale Order, the Acquired Assets shall be sold free and clear of all Interests.

8.      Except as expressly permitted by the Purchase Agreement or this Sale Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code) (including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors) and their respective successors and assigns holding Interests in all or any portion of the Acquired Assets arising under or out of, in connection with, or in any way relating to Debtors, the Acquired Assets prior to and including the Closing Date or the transfer of the Acquired Assets to the Buyer, are hereby forever barred, estopped and permanently enjoined from (a) asserting such Interests against the Buyer, its successor and assigns, and its property, including without limitation, the Acquired Assets and (b) commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, Buyer's Affiliates or their respective assets (including the Acquired Assets), with respect to any Successor Liability or transferee liability, including the following actions: (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing

16

or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.  Following the Closing Date, no holder of any Interest shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Interest, or based on any action Debtors may take in their Chapter 11 Cases.

9.      All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of Debtors to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Sale Order.

10.     All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Buyer on the Closing Date.

11.     Upon consummation of the transactions contemplated in the Purchase Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 or related provisions of the Bankruptcy Code.

12.     A certified copy of this Sale Order may be filed with any appropriate clerk and/or recorded with any appropriate recorder to act to cancel any of the Interests of record in the Acquired Assets and to resolve any title issue with respect to the Acquired Assets.

13.     If any person or entity which has filed statements or other documents or agreements evidencing Interests with respect to all or any portion of the Acquired Assets shall not have delivered to Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary or

17

desirable to the Buyer for the purpose of documenting the release of all Interests that the person or entity has or may assert with respect to all or any portion of the Acquired Assets, Debtors and/or the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

14.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing is hereby directed to accept for filing any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

## Assumption, Assignment, and Sale of Assigned Contracts

15.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date and the terms of the Purchase Agreement, Debtors are authorized and directed to (a) assume each of the Assigned Contracts, specifically including those listed or described on Schedule 1.1(b), Schedule 2.1(i), and Schedule 2.1(j) of the Purchase Agreement, and assign and sell the Assigned Contracts to the Buyer free and clear of all Interests, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and sell the applicable Assigned Contracts to the Buyer.

16.     The Cure Costs set forth in Schedule 2.5(a) of the Purchase Agreement are the sole amounts necessary to be paid by the Buyer upon assumption of the Assigned

Contracts under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code, and the payment of the applicable Cure Costs shall, subject to the terms of the Purchase Agreement, (a) effect a cure of all defaults existing under the Assigned Contracts as of and including the Closing Date, and (b) compensate the counterparties to the Assigned Contracts for any actual pecuniary loss resulting from all defaults existing under the Contracts as of and including the Closing Date. Upon the payment of the Cure Costs by the Buyer, the Assigned Contracts will remain in full force and effect, and no default shall exist under the Assigned Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, would constitute such a default. After the payment of the Cure Costs, neither Debtors nor the Buyer shall have any further liabilities to the counterparties to the Assigned Contracts other than the Buyer's obligations under the Assigned Contracts assumed by it that accrue and become due and payable on or after the Closing Date.

17.     Any provisions in any Assigned Contract that prohibit, condition or require consultation in respect of the assignment of such Assigned Contract or allow the counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by Debtors and assignment and sale to the Buyer of the Assigned Contracts have been satisfied.

18.     Each Assigned Contract constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code. Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, (a) the Buyer shall be fully and irrevocably vested with all right, title, and interest of Debtors under the Assigned Contracts transferred to and assumed by it, (b) the Buyer shall be deemed to be

19

substituted for Debtors as a party to the applicable Assigned Contracts, and (c) Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

19.     The Buyer has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

20.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are hereby forever barred and permanently enjoined from (a) raising or asserting against Debtors or the Buyer any assignment fee, default, acceleration, breach, claim, pecuniary loss, or condition to assignment arising under or related to the Assigned Contracts existing as of and including the Closing Date or arising by reason of the closing of the Sale, including any breach related to or arising out of change-of-control provisions in such Assigned Contracts or any purported written or oral modification to the Assigned Contracts and (b) asserting against the Buyer (or its property, including the Acquired Assets) any Interest, claim (as defined in section 101(5) of the Bankruptcy Code), counterclaim, defense, breach, condition or setoff asserted or capable of being asserted against Debtors existing as of the Closing Date or arising by reason of the Closing, including under state or federal doctrines of Successor Liability or transferee liability.  Upon assignment to the Buyer, the Assigned Contracts shall be valid and binding, in full force and effect, and enforceable by the Buyer in accordance with their respective terms.

21.     Any provision in any Assigned Contract that purports to declare a breach or default as a result of a change of control in respect of Debtors or a failure to consult with the counterparty in respect of such change in control is unenforceable, and all Assigned Contracts shall remain in full force and effect, without existing default(s), subject only to payment by the Buyer of the appropriate Cure Cost, if any.  There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the

Buyer or Debtors as a result of the assumption, assignment, transfer, and/or sale of any Assigned Contract. The failure of Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Buyer's rights to enforce every term and condition of the Assigned Contract.

22. Any party that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption, assignment, and sale of such Assigned Contract.

23. Notwithstanding anything to the contrary in this Sale Order, no Assigned Contracts shall be assumed, assigned, or sold to the Buyer until the Closing. On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of Debtors' interests in the Acquired Assets to the Buyer and a full and complete general assignment, sale, and transfer of the Assigned Contracts to the Buyer.

24. Pursuant and subject to the terms of section 2.8 of the Purchase Agreement and at the request of the Buyer, Debtors shall have the right to assume and assign to the Buyer certain executory contracts and unexpired leases in addition to the Assigned Contracts prior to or after Closing.

### Purchase Price

25. The Purchase Price for the sale and transfer of the Acquired Assets under the Purchase Agreement is set forth in section 3.1 of the Purchase Agreement.

26. In connection with the closing of the Sale and as required by Section 3.3 of the Purchase Agreement, the Buyer is authorized and directed to pay, perform or satisfy the Assumed Liabilities in accordance with their respective terms.

## No Successor, Transferee, or Other Liability

27.     Except as otherwise expressly provided in the Purchase Agreement or this Sale Order, the Buyer shall not assume any liability or other obligation of Debtors arising under or related to any of the Acquired Assets, except with respect to the Assumed Liabilities and Permitted Encumbrances.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Purchase Agreement or this Sale Order, the Buyer shall not be liable for any interests, claims (as defined in section 101(5) of the Bankruptcy Code) or liabilities against Debtors or any of their predecessors or affiliates, and the Buyer shall not have any successor or vicarious liabilities of any kind or character ( "**Successor Liability**"), including, but not limited to, any theory of antitrust, environmental (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), products liability, Successor Liability or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of and including the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to Debtors or any obligations of Debtors arising prior to and including the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to Assets prior to and including the Closing Date, except with respect to the Transfer Taxes.

28.     The Buyer has given substantial consideration under the Purchase Agreement for the benefit of the holders of any Interest.  The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of Successor Liability or transferee liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Interests.

29.     Upon the Closing Date and except as otherwise expressly provided in the Purchase Agreement and this Sale Order, all persons and entities are hereby forever

prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Buyer, its successors and assigns, or the Acquired Assets, with respect to any (a) Interest arising under, out of, in connection with or in any way relating to Debtors, the Buyer, or the Acquired Assets prior to and including the Closing Date; or (b) Successor Liability or transferee liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets, or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Buyer, its successors or assigns, assets or properties; (iii) creating, perfecting, or enforcing any Interest against the Buyer, its successors or assigns, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment, in each case based on any liability or obligation of Debtors that is not expressly assumed by the Buyer in the Purchase Agreement or this Sale Order, against any obligation due by the Buyer or its successors or assigns, (v) commencing or continuing any action, in any manner or place, or (vi) prohibiting Buyer from enjoyment and full access to the Acquired Assets, including, without limitation, full enjoyment and access to the common areas, parking, entries, and exits associated with or related to the real property and buildings comprising the Acquired Assets, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect of this Sale Order and such other orders.

### Good Faith of the Buyer

30. The transactions contemplated by the Purchase Agreement are undertaken by Debtors and the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate

23

the Sale shall not affect the validity of the Sale (including the assumption, assignment, and sale of the Assigned Contracts), unless such authorization and consummation of such Sale are duly stayed pending such appeal.

31.     Neither Debtors nor the Buyer has engaged in any action or inaction that would cause or permit the Sale to be avoided or costs, damages, or other remedy to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Buyer for the Acquired Assets under the Purchase Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

## Other Provisions

32.     The consideration provided by the Buyer to Debtors pursuant to the Purchase Agreement for the Acquired Assets, including the assumption of the Assumed Liabilities, constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code, Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

33.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto strictly in accordance with, and subject to all limitations on amendments that are set forth in, the terms of the Purchase Agreement without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on Debtors' estates.

34.     This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being dismissed as moot.

35.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the

24

Purchase Agreement or any other Sale-related document or deliver any notice provided for in this Sale Order or the Purchase Agreement. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the preceding sentence or any other provisions of this Sale Order.

36. This Sale Order, the Purchase Agreement and all ancillary agreements shall be binding in all respects upon Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor, any holders of liens, claims (as defined in section 101(5) of the Bankruptcy Code), liabilities, Encumbrances, rights and interests in or against or on all or any portion of the Acquired Assets (whether known or unknown), the Buyer and all successors and assigns of the Buyer, all counterparties to the Assigned Contracts, other parties in interest and trustees, if any, subsequently appointed in any of Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of Debtors' Chapter 11 Cases or dismissal of any of Debtors' Chapter 11 Cases. This Sale Order and the Purchase Agreement shall inure to the benefit of Debtors, their estates, creditors and equity holders, the Buyer, and the respective successors and assigns of each of the foregoing.

37. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

38. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind in these Chapter 11 Cases, any subsequent chapter 7 cases in which these Chapter 11 Cases may be converted or any related proceedings subsequent to the entry of this Sale Order, shall alter or affect the terms and conditions of the Sale, the Purchase Agreement (or any ancillary documents executed in connection therewith) or the terms or implementation of this Sale Order.

39. To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or licenses relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account

25

of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale. To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and any other governmental authorization or approval of Debtors with respect to the Acquired Assets or the Assigned Contracts, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date. Each and every federal, state, and local governmental unit is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

40. Neither Buyer nor Seller shall have any obligation to proceed with Closing unless and until all conditions precedent to their respective obligations to do so, as set forth in the Purchase Agreement, have been met, satisfied or waived in accordance with the terms of the Purchase Agreement.

41. The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Sale Order. All of the provisions of this Sale Order are non-severable and mutually dependent.

42. The Court shall retain jurisdiction and power to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Buyer in accordance the Purchase Agreement, (b) interpret, implement and enforce the provisions of this Sale Order, (c) protect the Buyer against

26

any interests in or against Debtors or the Acquired Assets of any kind or nature whatsoever, and (d) enter any orders under sections 363 or 365 of the Bankruptcy Code with respect to the Acquired Assets and Assigned Contracts.

43.     Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

44.     To the extent this Sale Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.

**Exhibit 1**

**Purchase Agreement**

EXHIBIT "C"

**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012
602.258.2729 — MAIN
602.271.4300 — FAX
S. CARY FORRESTER (006342)
BYRON H. FORRESTER (033877)
SCF@FORRESTERANDWORTH.COM
BHF@FORRESTERANDWORTH.COM
COUNSEL FOR DEBTORS

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>**GV HOSPITAL MANAGEMENT, LLC,**<br><br>Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case Nos.: 4:17-bk-03351<br>4:17-bk-03353; and<br>4:17-bk-03354 |
| In re:<br><br>**GREEN VALLEY HOSPITAL, LLC,**<br><br>Debtor. | |
| In re:<br><br>**GV II HOLDINGS, LLC,**<br><br>Debtor. | **DECLARATION OF ANU R. SINGH IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDER (A) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND BUYER; (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) AUTHORIZING THE ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING CERTAIN RELATED RELIEF** |
| THIS FILING APPLIES TO:<br>☒ ALL DEBTORS<br>☐ GREEN VALLEY HOSPITAL, LLC<br>☐ GV HOSPITAL MANAGEMENT, LLC<br>☐ GVII HOLDINGS, LLC | |

Anu R. Singh hereby states as follows under penalty of perjury:

1. I am a managing director of Kaufman Hall & Associates, LLC ("**KHA**");

2. KHA has been a consultant to the healthcare industry for more than 30 years and has provided support in more than 150 completed transactions in the healthcare industry over the past five years alone;

3. KHA has been employed by Debtors to act as their sales agent for the purpose of pursuing a sale of substantially all of their assets under 11 U.S.C. § 363;

4. KHA has extensively marketed Debtors' assets, beginning in October of 2017;

5. In mid to late October, KHA collected information from Debtors for inclusion in its data room. It also used the information to prepare a confidential information presentation ("**CIP**");

6. KHA then reached out, by email and telephone, to ninety-eight potential purchasers, including non-profit and for-profit health systems, physician groups, REITs, private equity firms, and financial sponsors;

7. Those who expressed an interest were asked to sign a written confidentiality agreement. Eleven did so, including several of the major players in the Arizona healthcare market;

8. After signing the confidentiality agreements, these parties were provided with copies of the CIP. After reviewing it, three parties dropped out of the sale process;

9. In late October, KHA opened the data room using the services of RR Donnelley. Those who signed the confidentiality agreement and expressed an interest were granted access to the data room. Nine parties, including Buyer and Green Valley Medical Investments, LLLP, currently have access to the data room.

10. KHA then assembled a second presentation outlining what hospital management indicated are the potential areas of improvement to the hospital's

2

operations, focusing on initiatives to incrementally improve EBITDA. The supplemental presentation was circulated to all Potential Bidders who were still active in early December; and

11.    KHA remains in contact with those who are still involved in the sale process but cannot yet predict whether any will submit bids.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Anu R. Singh

3